UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

MICHAEL SCHILLER, FRANCESCA FIORENTINI,
ROBERT CURLEY, and NEAL CURLEY,

                                   Plaintiffs,

                -against-

The CITY OF NEW YORK, et al

                       Defendants.

---------------------------------------------------------------------- x

HACER DINLER, ANN MAURER, and ASHLEY
WATERS,

                                   Plaintiffs,

                -against-

The CITY OF NEW YORK, et al

                       Defendants.

---------------------------------------------------------------------- x

TARASIK ABDELL, et al.,

                                   Plaintiffs,

                -against-

THE CITY OF NEW YORK, et al.,

                       Defendants.

---------------------------------------------------------------------- x

**MOTION FOR RELIEF PURSUANT TO F.R.C.P. 72**

04 CV 7922 (KMK) (JCF)

04 CV 7921 (KMK) (JCF)

05 CV 8453 (KMK) (JCF)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR RELIEF
PURSUANT TO F.R.C.P. 72**

**Background**

The Schiller and Abdell cases arise from the arrests of more than 200 individuals near Church and Fulton Streets in downtown Manhattan on August 31, 2004 during the 2004 Republican National Convention ("RNC"). Those persons were arrested for committing several violations, including disorderly conduct and parading without a permit, while participating in a march (the "Church/Fulton march") organized by the War Resisters League ("WRL"). The WRL intended to march from the World Trade Center to the floor of Madison Square Garden and then participate in a "die-in" on the floor of Madison Square Garden. Prior to the march, WRL held a series of meetings at which WRL members discussed plans for engaging in civil disobedience as part of the Church/Fulton march. Notably, the few meeting minutes produced thus far in this litigation clearly state that "[w]e are agreed on going with the solemn march and die in as close to MSG as we get." (See Exhibit A annexed hereto). WRL also publicized its intentions to engage in unlawful conduct during the Church/Fulton march through flyers, press releases, notices, and similar materials. In addition, defendants are unaware of any efforts by WRL to obtain a permit for this event. Hundreds of those arrested at Church/Fulton have sued the City, claiming that their arrests were unlawful and thus placing the circumstances of their arrests, including their intent, at issue in these cases.

**Defendants' Motion to Compel**

Based upon WRL's role in organizing the march and its intention to engage in unlawful activity, defendants served subpoenas upon WRL and Frida Berrigan, a high-ranking member of WRL. The subpoenas (as narrowed after initial objections by counsel) sought all documents in the possession, custody or control of both WRL and Ms. Berrigan (1) relating to civil

disobedience, unlawful activity, or activity without a permit when such activity would otherwise require a permit, in connection with protests and like activities during the RNC, and (2) reflecting any attempts by WRL to obtain a permit from the City for such activities.

Defendants also requested that WRL member and Abdell plaintiff Ed Hedemann produce unredacted versions of the few WRL meeting minutes that Mr. Hedemann had produced in the litigation thus far. As previously noted, the unredacted portions of the meeting minutes clearly set forth finalized plans to engage in unlawful activity at the Church/Fulton march.

WRL and Ms. Berrigan refused to produce documents responsive to the subpoenas, and Mr. Hedemann refused to provide unredacted versions of the WRL meeting minutes that he had previously produced. Accordingly, defendants moved to compel responses to the subpoenas and to compel plaintiff Hedemann to produce unredacted meeting minutes.

**Judge Francis' Decision**

In an order dated December 7, 2006 (the "Order," a copy of which is annexed hereto as Exhibit B) Magistrate Judge James C. Francis IV granted defendants' motion in part and denied it in part.[1] Judge Francis granted the motion to the extent he held that defendants were entitled to all documents that reflect plans made by WRL or any other organization to engage in unlawful activity during the RNC on August 31, 2004 (including the Church/Fulton march), as well as any WRL meeting minutes reflecting discussions to engage in unlawful activity (1) by WRL on RNC dates other than August 31, 2004 or at locations other than Church/Fulton, and (2) by any other organization for any RNC date. (Id.) Defendants do not appeal that part of the order.

---

[1]    Judge Francis' order also granted a separate motion by defendants to compel Abdell plaintiff Ed Hedemann to execute releases to obtain certain arrest records (Order, pp. 19-20). Defendants do not object to that portion of the Order.

Judge Francis denied the motion to the extent that defendants sought the names of those arrested at Church/Fulton if that arrestee's name appeared in responsive documents (documents related to planned unlawful conduct), finding that defendants failed to demonstrate a "compelling need" for those names.[2] (Order, p. 15).

Judge Francis also denied the motion to the extent that defendants sought WRL documents relating to its efforts to secure a permit for the Church/Fulton march. Noting that "what is relevant here is not whether the WRL attempted to get a permit for the march, but whether the plaintiffs were aware that no permit was obtained," Judge Francis found that "[d]ocuments reflecting communications between the WRL and the City regarding a permit would reveal nothing about whether the plaintiffs knew that the march in which they participated was not authorized by the City." (Order, pp. 18-19). Defendants object to both of these denials as set forth in the Order.

In sum, defendants object to Judge Francis' rulings in the Order that (1) defendants are not entitled to the names of plaintiffs in RNC-related cases (or of non-parties who were arrested at Church/Fulton) if contained in documents in which plans for unlawful activity were stated, and (2) defendants are not entitled to documents reflecting WRL's efforts to secure a permit from the City for the Church/Fulton march. For the reasons set forth below, defendants respectfully submit these portions of the Order are clearly erroneous, and respectfully request they be reversed.

---

[2]    Defendants never sought, and made abundantly clear in their moving papers that they were not seeking, membership lists, and thus the motion was outside First Amendment "membership list" cases like NAACP v Alabama, 357 U.S. 449 (1958), relied upon by plaintiffs. WRL argued that the documents sought by defendants would contain WRL member names, the disclosure of which would violate the First Amendment associational rights of WRL members by exposing them to governmental harassment. In response, defendants made clear that they

## STANDARD OF REVIEW

In evaluating a Magistrate Judge's order with respect to a nondispositive pretrial matter, a district court shall, pursuant to Rule 72 of the Federal Rules of Civil Procedure and the Federal Magistrate's Act, 28 U.S.C.S. 636(b)(1)(A), modify or reverse any portion of the order found to be clearly erroneous or contrary to law. *See* Albin v. Cosmetics Plus, N.Y., 97 Civ. 2670 (WK),1999 U.S. Dist. LEXIS 2224, *7 (S.D.N.Y. Mar. 1,1999) (*citing* Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990) ("[m]atters involving pretrial discovery generally are considered nondispositive of the litigation and are subject to the more lenient 'clearly erroneous' standard"). A finding is deemed to be clearly erroneous when the reviewing court, although recognizing that there may be evidence to support the order, concludes that a mistake has been made. *Id.*

## POINT I

### THE NAMES OF PLAINTIFFS IN ANY RNC CASE AND THE NAMES OF PERSONS WHO WERE ARRESTED AT CHURCH/FULTON THAT APPEAR IN DOCUMENTS STATING OR DISCUSSING PLANNED UNLAWFUL ACTIVITY, SHOULD BE DISCLOSED TO DEFENDANTS

Judge Francis correctly identified the link between WRL's plans for the Church/Fulton march and the arrests that took place there by noting that "whether or not those who took part in the march intended to violate the law is relevant to the issue of whether the NYPD had probable cause" to arrest plaintiffs and others at Church/Fulton. (Order, p. 16). Indeed, New York's disorderly conduct statute states that a person is guilty of disorderly conduct when, "with intent

---

sought only the names of persons appearing in the documents who (1) are presently plaintiffs in the RNC cases consolidated before Your Honor, or (2) non-plaintiffs who were also arrestees from Church/Fulton.

to cause public inconvenience, annoyance or alarm, or reckless creating a risk thereof," he either obstructs vehicular or pedestrian traffic or, as part of a public gathering, refuses to comply with a lawful police order to disperse. (New York Penal Law 240.20). Because a particular plaintiff's intent to engage in unlawful conduct is relevant, evidence of that intent is equally relevant. For instance, if a plaintiff participated in the march either aware of WRL's plans for unlawful conduct by virtue of attending a meeting, or having advocated unlawful conduct himself at a WRL meeting, that is evidence that the trier of fact should be able to weigh in assessing that plaintiff's testimony about what he either intended or actually did.

More importantly, plaintiffs have placed their intent at issue when they commenced these lawsuits against the City. Plaintiffs may testify that they did not intend to commit civil disobedience or that they intended to follow the instructions of the NYPD at the unpermitted march. Evidence of intent to the contrary goes to the heart of plaintiffs' claims. Plaintiffs should not be able to use the First Amendment associational privilege as both a sword and a shield: by suing the City, they have put their intent at issue, and should not be permitted to then block defendants' inquiry into that intent. *See, e.g.,* Independent Productions Corp. v. Loew's, 22 F.R.D. 266, 276 (S.D.N.Y. 1958) ("[i]t would be uneven justice to permit plaintiffs to invoke the powers of this court for the purpose of seeking redress and, at the same time, to permit plaintiffs to fend off questions, the answers to which may constitute a valid defense or materially aid the defense"); Driscoll v. Morris, 111 F.R.D. 459, 464 (D.Conn. 1986) (assertion of First Amendment privilege by journalist who initiated suit "unfairly prejudice[d] the defendant's ability to prepare a defense"); Anderson v. Nixon, 444 F.Supp. 1195, 1198-1200 (D.D.C. 1978) (plaintiff asserting First Amendment privilege to shield confidential sources "cannot have it both ways" by frustrating defendants' ability to defend themselves).

Defendants also meet their burden of showing a compelling interest in the discovery sought. Indeed, Judge Francis recognized that evidence of plaintiffs' intent is at the center of plaintiffs' case: "The City is certainly entitled to ask the plaintiffs at deposition whether they were aware of the WRL's plans for civil disobedience, and whether they intended to violate the law on the day they were arrested." (Order, p. 14). While recognizing its direct relevance, Judge Francis nevertheless denied disclosure of the names. In doing so, Judge Francis erroneously relied upon cases where the First Amendment associational privilege was upheld only because the information sought did **not** go to the heart of the matter at issue. *See, e.g.*, NAACP v. Alabama ex rel., 357 U.S. 449, 78 S.Ct. 1163, 1172-73 (1958) (membership names were not necessary to establish that NAACP had improperly incorporated its state-based agency); Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 898 (1963) (government failed to show substantial relationship between its interest in investigating Communist infiltration and need for membership names); International Action Center v. United States, 207 F.R.D. 1, 4 (D.D.C. 2002) (government failed to show that the information they sought was relevant to its defense).

As for non-plaintiff arrestees, defendants are entitled to witnesses to a plaintiff's statements and conduct in the event that plaintiff claims he was unaware of the planned unlawful activity. Defendants are entitled to depose those persons to defend plaintiffs' lawsuits. Moreover, numerous plaintiffs are alleging Monell claims against the NYPD for adopting a policy of indiscriminate mass arrests without probable cause. Defendants need the names of non-plaintiff arrestees who were also at the meetings where unlawful activity was planned, to rebut these Monell claims. Further, there is a proposed class action seeking to certify a class that would encompass these arrestees as plaintiffs.

For these reasons, defendants respectfully submit that Judge Francis' ruling that defendants are not entitled to the names of plaintiffs and other arrestees from Church/Fulton who appear in responsive documents, is clearly erroneous, and respectfully request that it be reversed.


## POINT II

**DOCUMENTS RELATING TO WRL'S EFFORTS TO SECURE A PERMIT FOR THE CHURCH/FULTON MARCH SHOULD BE PRODUCED TO DEFENDANTS**


Defendants also object to that portion of the Order holding that defendants are not entitled to documents relating to WRL's efforts to secure a permit for the Church/Fulton march. What is relevant, Judge Francis found, was not whether WRL attempted to secure a permit, but whether a particular plaintiff was aware that no permit was obtained (Order, pp. 18-19). Documents relating to WRL's efforts to obtain a permit may well answer that question.

For example, defendants will be deposing WRL's Ed Hedemann, a plaintiff in <u>Abdell</u>, and asking him whether he was aware that WRL did not obtain a permit for the Church/Fulton march. Should he answer that he was unaware of this fact, defendants would have no documents against which to challenge this assertion -- thus likewise preventing defendants from establishing Mr. Hedemann's intent to engage in unlawful conduct (i.e., parading without a permit) at Church/Fulton. The same applies to any other RNC plaintiff who was at a WRL meeting or had notice via WRL that no permit was being sought. Since plaintiffs have placed their intent at issue in these lawsuits, then defendants should be able to fully explore the nexus between what efforts WRL made to obtain or not obtain a permit and an RNC plaintiff's awareness of these

decisions before participating in the Church/Fulton march, of the fact that WRL did not have a permit.

For these reasons, defendants respectfully submit that Judge Francis' ruling that defendants are not entitled to documents reflecting WRL's efforts to secure a permit from the City for the Church/Fulton march is clearly erroneous, and respectfully request that it be reversed.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that Your Honor reverse Judge Francis' rulings in the Order, and hold that (1) defendants are entitled to the names of plaintiffs in RNC-related cases, or the names of non-plaintiff arrestees from Church/Fulton, that appear in responsive documents, and (2) defendants are entitled to documents reflecting WRL's efforts to obtain or not obtain a permit from the City for the Church/Fulton march.

Dated: New York, New York
      December 22, 2006

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 3-132
New York, New York 10007
(212) 788-1817

By: _____
Fred M. Weiler (FW 5864)
Assistant Corporation Counsel
Special Federal Litigation Division

Exhibit A

**NYC WRL**
**RNC Meeting Minutes**
**July 28, 2004**

Redacted

2. Our Scenario

      *We are agreed on going with the solemn march and die in as close to MSG as we get.*

Redacted

16

Exhibit B

```
UNITED STATES DISTRICT COURT                    (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
MICHAEL SCHILLER, et al.,              :  04 Civ. 7922 (KMK) (JCF)
                                       :
            Plaintiffs,                :
                                       :
     - against -                       :
                                       :
THE CITY OF NEW YORK, et al.,          :
                                       :
            Defendants.                :
- - - - - - - - - - - - - - - - - - -:
HACER DINLER, et al.,                  :  04 Civ. 7921 (KMK) (JCF)
                                       :
            Plaintiffs,                :
                                       :
     - against -                       :
                                       :
THE CITY OF NEW YORK, et al.,          :
                                       :
                                       :
            Defendants.                :
- - - - - - - - - - - - - - - - - - -:
TARASIK ABDELL, et al.,                :
            Plaintiffs,                :  05 Civ. 8453 (KMK) (JCF)
                                       :
     - against -                       :
                                       :      MEMORANDUM
                                       :      AND  ORDER
THE CITY OF NEW YORK, et al.,          :_____
                                       :
                                       :
            Defendants.                :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

These cases concern the arrests of persons protesting in connection with the Republican National Convention (the "RNC") in 2004. The Schiller and Abdell cases arise from arrests near the World Trade Center site on August 31, 2004 during a march organized by the War Resisters League (the "WRL"). The defendants

1

(hereinafter "the City") have moved pursuant to Rule 45(2)(c)(2)(B) of the Federal Rules of Civil Procedure to require the WRL and Frida Berrigan, both non-parties to the litigation, to produce documents responsive to a subpoena issued on September 28, 2005. The City has also moved pursuant to Rule 37(a)(2)(A) to compel the Abdell plaintiffs to produce related documents. Finally, the City has moved to compel Ed Hedemann, who is a plaintiff in Abdell, to provide the City with releases so that the City may obtain documents related to his arrests on occasions unrelated to the RNC. For the reasons described below, the City's motions to compel production are denied in part and granted in part, and the City's motion to compel Mr. Hedemann to execute the requested releases is granted.

Background

    A. August 31, 2004 Protest

The WRL is a pacifist anti-war organization. On August 31, 2004, the second day of the RNC, the WRL organized a vigil, march, and "die-in" to protest the wars in Iraq and Afghanistan and the "war on terror." The vigil was to take place at the World Trade Center site. From there, participants planned to march two abreast on the sidewalk to Union Square. From Union Square, participants were to proceed to Madison Square Garden, where some would knowingly risk arrest by participating in the die-in. ("Basic Scenario for Civil Disobedience at the RNC," attached as Exh. F to

Letter of Fred M. Weiler dated Oct. 6, 2006 ("Weiler 10/6/06 Letter")).  According to a press release issued by the WRL on August 30, 2004, the protest was part of a "full day of nonviolent direct actions in coordination with the A31 Action Coalition." The WRL noted that no permits had been sought or granted for any of these events. (Press Release, attached as Exh. F to Weiler 10/6/06 Letter).

The plaintiffs allege that on August 31, 2004, as protesters gathered near the World Trade Center site, the police informed the organizers that the group could march "as long as they remained on the sidewalk, obeyed traffic laws, and walked two-by-two." (Schiller First Amended Complaint ("Schiller Complaint"), ¶ 3). The police then stopped the march soon after it began and, "without giving people a meaningful opportunity to disperse," arrested more than two hundred people who were standing on the sidewalk. (Schiller Complaint, ¶ 3; see also Abdell Amended Complaint, ¶¶ 20-23).  The plaintiffs in Schiller and Abdell were among those arrested on this occasion.[1]  (Schiller Complaint, ¶¶ 6-9; Abdell Amended Complaint, ¶¶ 3-4).

---

[1] Although the disputed subpoenas were issued in Schiller and Dinler, the Dinler case arises from arrests that took place later on the evening of August 31, 2004, during the "A31 Street Party" at Union Square.  (Dinler First Amended Complaint, ¶ 3).  There is no indication that the WRL was involved in organizing the A31 Street Party.

B. Subpoenas

On September 28, 2005, the defendants served subpoenas on the WRL and Frida Berrigan, who had represented the WRL publicly in connection with RNC-related protests. (Subpoenas, attached as Exhs. A and B to Weiler 10/6/06 Letter; Letter of Vera M. Scanlon and Myron Beldock dated Nov. 2, 2006 ("Scanlon and Beldock 11/2/06 Letter"), at 2 n.2; Affidavit of Frida Berrigan dated Nov. 30, 2006 ("Berrigan Aff."), attached to Scanlon and Beldock 11/2/06 Letter, ¶¶ 6, 9). Neither the WRL nor Ms. Berrigan is a party to any RNC-related action. On the same date, the defendants served an identical subpoena on Ed Hedemann, a member of the WRL who is also a plaintiff in Abdell. (Subpoena, attached as Exh. C to Weiler 10/6/06 Letter). The subpoenas commanded Ms. Berrigan, Mr. Hedemann, and the "President or other Officer" of the WRL to appear for deposition, and to produce

> [a]ny and all documents . . . that relate or refer to any plans to organize or to engage in civil disobedience, protest(s), march(es), rallies or other events at any time during the Republican National Convention in New York City during the end of August and beginning of September 2004 (including but not limited to the World Trade Center vigil on 8/31/04).

(Subpoenas, attached as Exhs. A, B, and C to Weiler 10/6/06 Letter).

On October 5, 2005, Rachel Meeropol, acting on behalf of the WRL and Ms. Berrigan, objected to the subpoenas on the grounds that they were overbroad and vague. (Letter of Rachel Meeropol dated

4

Oct. 5, 2005 ("Meeropol 10/5/05 Letter"), attached as Exh. D to Weilar 10/6/06 letter, at 2). Ms. Meeropol also stated that the subpoenas violated "the core First Amendment protection against government infringement on freedom of speech, assembly and association." (Meeropol 10/5/05 Letter at 2).

In August 2006, the City wrote to Myron Beldock, who had replaced Ms. Meeropol as counsel for the WRL and Ms. Berrigan. The City stated that in response to their concerns, it would modify its request to seek the following documents:

> Any and all documents relating to civil disobedience, unlawful activity, or activity without a permit when such activity would otherwise require a permit, in connection with any protests, demonstrations, marches, rallies, processions, parades, vigils, or like events during August 21-September 4, 2004 . . . [as well as a]ny and all documents reflecting communications by the WRL with the City of New York relating to obtaining a permit for any protests, demonstrations, marches, rallies, processions, parades, vigils or like events scheduled to take place between August 21-September 4, 2004.

(Letter of Fred M. Weiler dated Aug. 16, 2006 ("Weiler 8/16/06 Letter"), attached as Exh. E to Weiler 10/6/06 Letter, at 1).

After being notified that Mr. Hedemann is a plaintiff in Abdell, the City withdrew the subpoena issued to him and sought the same documents by way of a discovery request. (Letter of Alan Levine dated Nov. 1, 2006 ("Levine 11/1/06 Letter"), at 1 n.1). In response to this request, Mr. Hedemann produced a number of documents from his own files, including WRL flyers, press releases, and other materials related to the August 31, 2004 demonstration.

5

(Weiler 10/6/06 Letter at 2; Levine 11/1/06 Letter at 3).  He also produced redacted minutes from WRL meetings on July 28, August 12, and August 19, 2004, at which WRL members discussed their plans for the upcoming demonstration.  (Minutes, attached as Exh. G to Weiler 10/6/06 Letter).  The redacted portions of these minutes contain the names of WRL members, "discussions of ideas and political perspectives, possible activities that were not adopted by the WRL, and notes about matters unrelated to the August 31, 2004 political activity."  (Berrigan Aff., ¶¶ 6-7).  The WRL and Ms. Berrigan have informed the City, in response to its revised subpoena, that they will not produce any documents other than the ones already produced by Mr. Hedemann.  (Scanlon and Beldock 11/2/06 Letter at 3).

The City now requests an order compelling the WRL and Ms. Berrigan to produce documents responsive to the subpoenas.  The City also seeks an order compelling the Abdell plaintiffs, including Mr. Hedemann, to produce unredacted versions of the minutes of any WRL meetings at which the August 31, 2004 protest was discussed.[2]  Citing the First Amendment guarantees of freedom of speech and freedom of association, the WRL and Ms. Berrigan have

---

[2] Specifically, the City seeks an order compelling the Abdell plaintiffs to produce "unredacted copies of the minutes of all meetings of the WRL during which there was: (1) any discussion of or planning for the WRL's August 31, 2004 march at Church and Fulton Streets . . . or (2) any discussion of the WRL's communication with (or coordination with) the A-31 Action Coalition."  (Letter of Jeffrey A. Dougherty dated Sept. 13, 2006 ("Dougherty 9/13/06 Letter") at 1-2).

moved to quash the subpoenas and the Abdell plaintiffs have opposed the motion to compel production.

### C. Mr. Hedemann's Arrest Records

In response to an interrogatory from the City, plaintiff Ed Hedemann stated that, aside from his arrest at the RNC, he had been arrested five times in the past ten years. Four of those arrests took place prior to August 31, 2004. Two of these were in Manhattan, one was in Washington, D.C., and one was in Arlington, Virginia. Mr. Hedemann also identified one arrest in Brooklyn subsequent to the RNC.[3] With the exception of the arrest in Virginia, for which he was convicted and incarcerated for two days, Mr. Hedemann stated that he was not convicted or incarcerated after any of these arrests. (Spiegel 2/7/06 Letter at 1). The City has requested that Mr. Hedemann provide releases so that the City can obtain sealed documents related to these arrests, and Mr. Hedemann has refused to do so. Accordingly, the City now seeks an order compelling Mr. Hedemann to execute the releases.[4]

---

[3] The City mistakenly states that Mr. Hedemann has identified "five occasions that he was arrested prior to his arrest at Church/Fulton Streets on August 31, 2004." (Letter of Jeffrey A. Dougherty dated Oct. 6, 2006 ("Dougherty 10/6/06 Letter"), at 1). In fact, as noted, one of the arrests identified by Mr. Hedemann occurred on March 19, 2005. (Letter of Michael L. Spiegel dated Feb. 7, 2006 ("Spiegel 2/7/06 Letter"), attached as Exh. A to Dougherty 10/6/06 Letter, at 1).

[4] Since Mr. Hedemann's 1998 arrest in Virginia resulted in a conviction, the City should not need a release in order to obtain records relating to that arrest. Records relating to Mr. Hedemann's other arrests are presumably sealed pursuant to New York

Discussion

A. WRL Minutes

As noted above, Mr. Hedemann has turned over to the City redacted minutes from three WRL meetings. The City now seeks unredacted copies of those minutes.

1. Names of WRL Members

The WRL, Ms. Berrigan, and Mr. Hedemann object to disclosure of the names of WRL members on the grounds that such disclosure would infringe upon the privacy of association and belief guaranteed by the First Amendment. It is the policy of the WRL to keep the names of its members confidential except for those who choose to identify themselves publicly as members of the organization. (Berrigan Aff., ¶ 6). Accordingly, the names of WRL members have been redacted from the minutes produced by Mr. Hedemann.

The United States Supreme Court recognized in National Association for the Advancement of Colored People v. Alabama ex rel Patterson, 357 U.S. 449 (1958), that the First Amendment and the Due Process Clause of the Fourteenth Amendment protect against compelled disclosure of membership lists where such disclosure would "abridge the rights of [an organization's] rank-and-file members to engage in lawful association in support of their common

_____

Criminal Procedure Law § 160.50 and any equivalent District of Columbia statute.

8

beliefs." Id. at 460. The Court noted that the National
Association for the Advancement of Colored People (the "NAACP") had
made "an uncontroverted showing that on past occasions revelation
of the identity of its rank-and-file members has exposed members to
economic reprisal, loss of employment, threat of physical coercion,
and other manifestations of public hostility." Id. at at 462.
Given those circumstances, the Court found that compelled
disclosure of the identities of the NAACP's Alabama members would
hinder the ability of the organization and its members to pursue
their common goals because it might induce members to withdraw or
deter others from joining the organization for fear of exposure.
Id. at 462-63.

"The First and Fourteenth Amendment right[] of . . . free
association [is] fundamental and highly prized, and 'need[s]
breathing space to survive.'" Gibson v. Florida Legislative
Investigation Committee, 372 U.S. 539, 544 (1963) (quoting NAACP v.
Button, 371 U.S. 415, 433 (1963)). For this reason, "state action
which may have the effect of curtailing the freedom to associate is
subject to the closest scrutiny." NAACP v. Alabama, 357 U.S. at
460-61; see also Buckley v. Valeo, 424 U.S. 1, 64 (1976) ("Since
NAACP v. Alabama we have required that the subordinating interests
of the State must survive exacting scrutiny."). Accordingly, when
an organization resisting disclosure of the identities of its
members makes a prima facie showing that disclosure would infringe

9

upon its First Amendment rights, the burden shifts to the party
seeking disclosure to show a compelling need for the information.
New York State National Organization for Women v. Terry, 886 F.2d
1339, 1355 (2d Cir. 1989).  This "[qualified] privilege . . . [is]
designed to protect members of groups from harassment and
intimidation and to prevent the 'chilling effect' that disclosure
may have on the willingness of individuals to associate with the
group."  International Society for Krishna Consciousness, Inc. v.
Lee, No. 75 Civ. 5388, 1985 WL 315, at *8 (S.D.N.Y. Feb. 28, 1985)
(internal citations omitted).

The Second Circuit has noted that in order to make out a prima
facie showing of infringement,

> [a] party resisting discovery need not make a showing of
> harm or other coercion; but before the burden shifts to
> [the party seeking disclosure] to demonstrate the
> necessary compelling interest in having discovery, [the
> party resisting discovery] must at least articulate some
> resulting encroachment on their liberties.

Terry, 886 F.2d at 1355.  This encroachment cannot be merely
speculative, see Buckley, 424 U.S. at 70, and courts have required
parties resisting disclosure to produce "specific evidence of past
or present harassment of members due to their associational ties,
. . . harassment directed against the organization itself, [or a]
pattern of threats or specific manifestations of public hostility."
Buckley, 424 U.S. at 74; see also Brown v. Socialist Workers '74
Campaign Committee (Ohio), 459 U.S. 87, 99-101 (1982) (citing
numerous instances of recent harassment and surveillance of the

10

Socialist Workers Party ("SWP") and its members by government and private parties); Doe v. Martin, 404 F. Supp. 753, 756 (D.D.C. 1975) (finding that SWP had made the required showing by producing affidavits that party's members had been harassed by government agencies and private employers); cf. Doyle v. New York State Division of Housing, No. 98 Civ. 2161, 1999 WL 177441, at *8 (S.D.N.Y. March 30, 1999)(party resisting discovery had shown "neither a history of retaliation nor even a commonsense practical likelihood of retaliation").

However, "[m]indful of the crucial place speech and associational rights occupy under our constitution," the Second Circuit has emphasized that "in making out a prima facie case of harm the burden is light." Terry, 886 F.2d at 1355; accord United States v. Citizens State Bank, 612 F.2d 1091, 1094 (8th Cir. 1980) (party resisting subpoena has initial burden of showing "arguable First Amendment infringement"); Anderson v. Hale, No. 00 C 2021, 2001 WL 503045, at *3 (N.D. Ill. May 10, 2001)("concrete showing of infringement" unnecessary to assert privilege).

Mr. Hedemann, Ms. Berrigan, and David McReynolds (a longtime member and former employee of the WRL) have submitted uncontroverted affidavits describing a long history of government surveillance of the WRL and its members. (Berrigan Aff., ¶ 18; Affidavit of Ed Hedemann dated Nov. 1, 2006 ("Hedemann Aff."), attached as Exh. A to Levine 11/1/06 Letter, ¶¶ 4-6; Affidavit of

11

David McReynolds dated Oct. 30, 2006 ("McReynolds Aff."), attached to Scanlon and Beldock 11/2/06 Letter, ¶¶ 3, 6-7, 9-12). The affiants gained much of their knowledge of this surveillance from reviewing files maintained by the Federal Bureau of Investigation (the "FBI"). For example, Mr. Hedemann states that in reviewing his FBI file, he discovered that various government agencies reported to the FBI about him, sent covert government agents to meetings that he attended and demonstrations that he organized, and questioned his neighbors about him. (Hedemann Aff., ¶ 6). According to the affidavits, the WRL was targeted by the federal government's infamous COINTELPRO program during the early 1970s, and in 1969 the organization's offices were vandalized and its files stolen. (Hedemann Aff., ¶¶ 4-5; McReynolds Aff., ¶ 11).

Admittedly, much of the government surveillance and harassment described in these affidavits took place several decades ago. However, the affidavits describe the belief of many WRL members, based on news reports and documents released pursuant to Freedom of Information Act requests, that federal and local government agencies continue to monitor the activities of anti-war organizations and their members. (Berrigan Aff., ¶ 18; McReynolds Aff., ¶ 12). "Some members of WRL maintain a relatively low profile and do not participate in [the organization's] more public activities" for fear of subjecting themselves to government scrutiny. (Berrigan Aff., ¶ 19). Other members choose to keep

their membership in the organization private because, given the organization's dissident stance, they fear adverse employment consequences if their beliefs are made public. (Berrigan Aff., ¶¶ 16, 19; McReynolds Aff., ¶¶ 7-8). It is therefore reasonable to believe that potential WRL members would be deterred from joining, and current members dissuaded from active participation, if they thought that their membership in the organization would be made public.[5]

Although the City alleges that these fears are "exaggerated and baseless" (Weiler 11/20/06 Letter at 2), it has provided no evidence to contradict the affidavits submitted by Ms. Berrigan, Mr. Hedemann, and Mr. McReynolds. As noted above, organizations resisting discovery on freedom of association grounds bear a minimal burden of proof. The WRL, Ms. Berrigan, and the Abdell plaintiffs have provided sufficient evidence to shift the burden onto the City to show a compelling need to obtain the names of WRL members.

The City first asserts that it is entitled to the names of WRL members who are plaintiffs in RNC-related cases because the City is

---

[5] The City suggests that fear of public disclosure of WRL members' identities could be allayed by designating the unredacted minutes "attorneys'-eyes-only." However, "[i]t is the government itself that Plaintiffs fear, and therefore confining the information to government . . . counsel will hardly assuage those fears or avoid the intimidation that Plaintiffs fear might follow." International Action Center v. United States, 207 F.R.D. 1, 3 (D. D.C. 2002).

"entitled, in examining any WRL member/plaintiff at deposition, to learn what such plaintiff intended and knew beforehand of WRL's plans for the march." (Weiler 11/20/06 Letter at 3). The City is certainly entitled to ask the plaintiffs at deposition whether they were aware of the WRL's plans for civil disobedience, and whether they intended to violate the law on the day they were arrested. However, since the WRL's plans for the protest were publicly available, there is no need to determine whether a particular plaintiff is a WRL member, or was present at WRL planning meetings, in order to determine whether he or she knew of the organization's plans. The minimal relevance of a plaintiff's membership in the WRL or presence at a WRL planning meeting is insufficient to meet the City's burden of showing a "compelling interest in having discovery." Terry, 886 F.2d at 1355; see also Anderson, 2001 WL 503045, at *4 ("[T]he inquiring party must show that the information sought is so relevant that it goes to the 'heart of the matter'; that is, the information is crucial to the party's case.").

The City also maintains that it is entitled to the names of any WRL members present at the meetings who are non-party arrestees. The City argues that "if persons who were arrested [during the RNC] had also been advocating unlawful conduct at a WRL planning meeting, that intention would go a long way toward rebutting" the plaintiffs' claims that the defendants implemented

14

a policy of indiscriminate "sweep" arrests.[6] (Weiler 11/20/06 Letter at 2). The logic of the City's argument is not immediately apparent, but in any case, statements made by individual non-party arrestees at WRL meetings would add little to the City's defense. The City has already obtained numerous statements regarding the WRL's plans to engage in civil disobedience and can depose the plaintiffs regarding their intentions. The marginal value of statements by non-party arrestees regarding their intent to violate the law cannot overcome the associational rights of the WRL and its members.

The City has failed to demonstrate a compelling need for the names of WRL members, and the motions to compel production are therefore denied to the extent that they seek that information.

    2. <u>Other Redacted Information</u>

In addition to redacting the names of WRL members, Mr. Hedemann has redacted "discussions of ideas and political perspectives, possible activities that were not adopted by the WRL, and notes about matters unrelated to the August 31, 2004 political activity." (Berrigan Aff., ¶ 7).

The unredacted portions of the minutes produced by Mr. Hedemann reflect decisions made by the WRL regarding the vigil,

---

[6] The plaintiffs make this argument under <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978), which held that local government can be held liable under 42 U.S.C. § 1983 if state actor acts unconstitutionally pursuant to government policy or custom.

15

march, and die-in that was to take place on August 31, 2004.  For
example, the minutes from August 19, 2004 state that once the group
reached Madison Square Garden, the WRL "concluded not to go through
the barricades and that we should cluster together.  We all did
agree to die in the streets and not on the sidewalk . . . .  We
concluded to keep it completely silent."  (Minutes of WRL Meeting
on August 19, 2004, attached as Exh. G to Weiler 10/6/06 Letter).
As the City points out, whether or not those who took part in the
march intended to violate the law is relevant to the issue of
whether the NYPD had probable cause to arrest the plaintiffs.  The
WRL's plans for the march are therefore clearly relevant and
discoverable.  Accordingly, Mr. Hedemann has produced WRL documents
made public before the protest, as well as those portions of the
minutes that reflect the WRL's plans for the August 31, 2004
protest.

The redacted information, by contrast, is not relevant to any
claim or defense in this litigation. The WRL's internal political
discussions are clearly irrelevant to the issue of the plaintiffs'
intent.  Furthermore, whether WRL members discussed other courses
of action is irrelevant to what the organization ultimately agreed
to do during the protest.  Suggestions that were considered and
rejected by the organization have no bearing on whether the
plaintiffs intended to engage in civil disobedience at the World
Trade Center site.  Finally, discussions of matters unrelated to

16

the August 31, 2004 protest are irrelevant unless, as explained below, they relate to plans made by the WRL or another organization to engage in civil disobedience on other dates during the RNC. Accordingly, the City's motion to compel production of unredacted versions of the minutes is denied.[7]

B. Other Documents

In addition to the unredacted minutes, the City seeks to compel the production of a number of additional documents. First, the City seeks from the WRL and Ms. Berrigan any documents that reflect plans made by the WRL or any other organization to engage in unlawful activity during the RNC other than the August 31, 2004 vigil, march, and die-in. (Weiler 8/16/06 Letter at 1). The City does not contend that the WRL was involved in planning any RNC-related protests other than these. However, it may be that the WRL did plan another protest, or that the WRL or Ms. Berrigan have documents, such as notices or flyers, related to protests planned by other organizations. If that is the case, those documents shall

_____

[7] The City has also moved to compel production by Mr. Hedemann of any WRL meeting minutes containing discussion of the WRL's "communication with (or coordination with) the A-31 Action Coalition." (Dougherty 9/13/06 Letter at 2). As noted above, the WRL is not obligated to produce documents that reflect discussions of ideas, political perspectives, or tactics ultimately rejected by either the WRL or the A-31 Action Coalition. On the other hand, the WRL's meeting minutes may contain statements regarding the A-31 Action Coalition's plans for the "full day of nonviolent direct actions" that was to take place on August 31, 2004. Such statements are relevant and must be produced if they exist.

17

be produced to the extent that they contain information regarding plans for civil disobedience that may be relevant to the intent of plaintiffs in an RNC-related civil action.

The City also seeks from the WRL and Ms. Berrigan any documents reflecting communications with the City related to obtaining a permit for the August 31, 2004 march from the World Trade Center site to Madison Square Garden.[8]   (Weiler 8/16/06 Letter at 1).  The City contends that "[w]hether WRL contemplated or made efforts to obtain a permit for the Church/Fulton march [] bears on WRL's intent and the intent of participants," since those arrested at the World Trade Center site were charged with parading without a permit.  (Weiler 10/6/06 Letter at 5).

As noted above, a press release issued by the WRL on August 30, 2004 indicates that no permits were sought for any of the August 31, 2004 protests coordinated by the A-31 Action Coalition. (Press Release, attached as Exh. F to Weiler 10/6/06 Letter).  For this reason, it seems unlikely that any documents responsive to this request actually exist.  In any case, however, what is relevant here is not whether the WRL attempted to get a permit for the march, but whether the plaintiffs were aware that no permit was

---

[8] The City's subpoena seeks any documents related to obtaining a permit for any RNC-related protest.  However, as noted above, it does not appear that the WRL planned any RNC-related protests other than the one that took place on August 31, 2004.  In its motion to compel production, the City argues only that documents reflecting efforts to secure a permit for the August 31 march are relevant. (Weiler 10/6/06 Letter at 5).

obtained. Documents reflecting communications between the WRL and the City regarding a permit would reveal nothing about whether the plaintiffs knew that the march in which they participated was not authorized by the City. The WRL and Ms. Berrigan are therefore not required to produce documents reflecting communications with the City regarding a permit for the march.

    C. Hedemann Arrest Records

    Finally, the City has moved to compel Mr. Hedemann to produce releases to permit the City to obtain his arrest records. The City correctly points out that "documents detailing [Mr. Hedemann's] prior arrest experiences, previous arrest processing, and criminal court proceedings are relevant to refute [his] claims regarding the cause and extent of emotional distress damages attributable to his August 31, 2004 arrest and confinement." (Dougherty 10/6/06 Letter at 2). Whether or not they will ultimately be admissible at trial, Mr. Hedemann's arrest records are relevant to the issue of damages for emotional distress.[9] See Green v. Baca, 226 F.R.D. 624, 656-57 (C.D. Cal. 2005). Furthermore, if Mr. Hedemann's prior arrests involve disorderly conduct, parading without a permit, or similar charges, the records may lead to information that would cast doubt upon Mr. Hedemann's credibility with respect to his contention that

---

    [9] Assuming that the City is also seeking a release for records related to the 2005 arrest, Mr. Hedemann must provide a release for that arrest as well because subsequent arrests are relevant to damages for ongoing mental and emotional distress.

the NYPD lacked probable cause to arrest him on August 31, 2004. Accordingly, the City's motion to compel Mr. Hedemann to execute releases so that the City may obtain his arrest records is granted.

Conclusion

For the reasons set forth above, the defendants' motions to compel production of WRL documents are granted in part and denied in part. The defendants' motion to compel Mr. Hedemann to execute releases for the unsealing of his arrest records is granted.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       December 7, 2006

Copies mailed this date:

Vera M. Scanlon, Esq.
Myron Beldock, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue
New York, New York 10016

Alan Levine, Esq.
99 Hudson Street, 14th Floor
New York, New York 10013

Michael L. Spiegel
111 Broadway, Suite 1305
New York, New York 10006

20

Fred M. Weiler, Esq.
Jeffrey A. Dougherty, Esq.
Assistant Corporation Counsel
100 Church Street
New York, New York 10007