Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TARASIK ABDELL, JOSEPH AMATO, GARY
ASHBECK, ELLEN BARFIELD, DAVID
BARROWS, MICHAEL BECKER, DIANE BEENY,
JOHN BEHLING, RUTH BENN, BENJAMIN
BERNARD, ARUN BHALLA, KATHLEEN
BURICK, DANIEL BURNS, LINNEA CAPPS,
THOMAS CATCHPOLE, JOAN CAVANAGH,
MARC F. CHURCH, JEFFERY J. COHEN, MARK
COLVILLE, WILLIAM CONWELL, COLLEEN
COOK, SUSAN CRANE, RICHARD CSONTOS,
POLLY A. DAVIES, FELTON DAVIS, PATRICIA
DEBRUHL, PETER DEMOTT, DEWAYNE
DICKERSON, MATTHEW DIETZEN, WALTER
DITMAN, LOIS A. DOGGETT, JASON DORAIS,
SUSAN D'ORNELLAS, ALEXANDER HOLLEY
DRUMMOND, STEVEN EKBERG, CALLA EVANS,
ADAM FEINSTEIN, JAMES FLYNN, HOWARD
GALE, STEPHEN GAMBOA, GABRIEL GASTER,
TOBIAH GASTER, EDWARD GIBBONS, ZOE
GINSBURG, JOHN THEODORE GLICK, THOMAS
GOEKLER, CHARLES GOLDBERG, OREN
GOLDENBERG, DAVID GORDON, KATHRYN
GORDON, BARRETT Z. GROSS, RICHARD
HARDIE, ED HEDEMANN, KATHLEEN D.
HERNANDEZ, ROGER HILL, EDWARD
HOTCHKISS, RYAN D. HOTTLE, JANET S. HOWE,
BENJAMIN HUNT, ROCHELLE IANNUCCI,
THOMAS IVORS, MELISSA JAMESON, JENNIFER
JANNEY, DWIGHT JENKINS, MICHAEL JOSEPH,
PEPPER JUDD, SARAH KANOUSE, JAY KANTOR,
BRIAN KAVANAGH, KIMBERLY KERN, EDWARD
F. KINANE, JOSHUA KNAPP, MATTHEW KOCEK,
KATHARINE KRASSAN, LAURA KRESSLY,
ANDREW LAKEN, TESSA M. LALONDE, JARED
LANCTOT, JOHN LARSON, RICHARD LARSON,
MICHAEL R. LEVINSON, STEVEN LIPTAY,
JONOTHAN LOGAN, MARIELLE LOVECCHIO, JAY
MARX, RYAN MCGEE, BARBARA ANN MEISINGER,
TRISTAN MIGLIORE, JOHN M. MILLER, ZACHARY C.
MILLER, ROBERT V. MINERVINI, CHRIS G.
MURRAY, MARK NECHAY, BLOSSOM NICINSKI,
JAMES NOONAN, ANTHONY O'LEARY, DANIEL
O'REILLY-ROWE, MICHAEL OWEN, MICHAEL

**SECOND
AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

**05 Civ. 8453 (KMK) (JCF)**

1

PALMER, CHRISTINE PARDEW, LAWRENCE PARIS,
DANIEL M. PARROTT, NATHANIEL PARRY,
JEFFREY A. PATERSON, SHANNON PETRELLO,
STEPHEN PETRICK, KATHERINE POE, LAURA
RAYMOND, EDWIN REED-SANCHEZ, BRUCE
RENWICK, ADAM RICHINS, SHANA RIGBY,
DEBORAH RIVERBEND, RAYMOND ROBINSON,
LAMBERT ROCHFORT, RONALD E. ROSENBERG,
DEVON RUECKNER, RONALD W. SAN MARCHI,
FRANK SANCHEZ III,  MATTHEW SCHENNING,
STEVEN SCOFIELD, ANAIS SENSIBA, GORDON
WILLIAM SENSIBA, ROBERT J. SIEGEL,
SELMA SPRITZER, ANDREW ST. LAURENT,
MORA MI-OK STEPHENS, THERESA SWINK,
HANNAH TAYLOR, SARAH TEPSIC,
EMILY JO TESTA, JOHN TRINKL, ANN TRUDELL,
CHRISTY ANN TURNER, JOHANNA VALENTE,
PATRICK VOLPE, ZACHARY VREELAND, FRANTZ
WALKER, JAMES J. WHITE, PATRICIA WIELAND,
JAMES WILLIAMSON, JAMES WILSON, TERAN
WILSON, JENNIFER WONG, MATTHEW WRIGHT,
RAISSA WU, and THOMAS ZAMBECK,

                                        Plaintiffs,

                -versus-

THE CITY OF NEW YORK; MICHAEL
BLOOMBERG, Mayor of the City of New York,
RAYMOND KELLY, Commissioner of the New
York City Police Department, TERRENCE
MONAHAN, Assistant Chief of the New York City
Police Department, THOMAS GALATI,
and JOHN and JANE DOES,

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PRELIMINARY STATEMENT

1.      This is an action to vindicate the civil rights of individuals who engaged in peaceful and

lawful protest during the Republican National Convention and were arrested as a result of a New

York City Police Department ("NYPD") policy and practice of indiscriminately arresting groups

of people who were peacefully assembled on City sidewalks and who either were participating in or were in the vicinity of demonstrations.

2.      During the Republican National Convention ("the Convention"), which was held in New York City between August 30, 2004 and September 2, 2004, the NYPD arrested more than 1,800 people in connection with peaceful protests held throughout the City. The great majority of those charges have now been dismissed. Because the NYPD adopted mass-arrest tactics during the duration of the Convention—including through the use of mesh nets to enclose groups of people on sidewalks—rather than making arrests after a determination of individualized probable cause, the NYPD ended up arresting many people who were engaged in lawful protest activity or who were not even demonstrators.

3.      The plaintiffs, who were arrested on Tuesday, August 31, 2004, in the vicinity of the World Trade Center site, were victims of those tactics. The false arrests followed negotiations between protest organizers and NYPD officials, who authorized a peaceful march from the area near the PATH train station entrance, across Church Street, and on the sidewalk along Fulton Street, toward Broadway, heading toward the Convention site. Plaintiffs began to march under police supervision, but the front of the march only traveled about half a block down the Fulton Street sidewalk. The group was then stopped and, without any warning, were surrounded by police officers, who enclosed them in orange mesh nets. Throughout the brief march up the Fulton Street sidewalk, plaintiffs followed all directions and instructions given by police officers. At no time were plaintiffs advised to disperse, advised that their conduct might be considered illegal, or advised that their presence or conduct would subject them to arrest.

4.      Plaintiffs were among 227 persons who were then placed under arrest, handcuffed, and taken to a former bus depot known as Pier 57, which the NYPD had converted into an arrest holding facility for protestors arrested during the Republican National Convention.

5.      The floor of Pier 57 was still covered with the grease, grime, and toxic chemicals resulting from its use as a bus depot. Because there were few benches on which detainees could sit or lie,

plaintiffs were forced to stand during most of the many hours they were held at Pier 57 or to lie on the noxious floor.

6.      Plaintiffs were finally taken on Wednesday, September 1, 2004 to the New York City criminal courts for processing.   Eventually—and in many instances only as a result of court orders—people were released, with some having spent almost two days in police custody.

7.      On October 6, 2004, the Manhattan District Attorney's office announced that it would dismiss all of the 227 prosecutions arising out of the August 31 arrests on Fulton Street.

8.      THE CITY OF NEW YORK's policies and practices of (1) making mass arrests of persons lawfully participating in or observing demonstrations and (2) detaining those arrested on minor offenses for prolonged periods of time in unhealthy conditions violated the federal and state constitutions and New York statutory and common law.

## JURISDICTION AND VENUE

9.      This civil rights action is authorized by 42 U.S.C. § 1983.  An award of costs and attorneys fees is authorized pursuant to 42 U.S.C. § 1988.  The court has subject matter jurisdiction over the plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4).

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b) in that plaintiffs' claims arise in the Southern District of New York.

11.     This court has supplemental jurisdiction over all state constitutional and state law claims pursuant to 28 U.S.C. § 1367(a).

## NOTICES OF CLAIM

12.     Plaintiffs TARASIK ABDELL, JOSEPH AMATO, ELLEN BARFIELD, DAVID BARROWS, DIANE BEENY, BENJAMIN BERNARD, KATHLEEN BURICK, DANIEL BURNS, THOMAS CATCHPOLE, MARC F. CHURCH, COLLEEN COOK, POLLY A. DAVIES, FELTON DAVIS, PATRICIA DEBRUHL, PETER DEMOTT, MATTHEW DIETZEN, WALTER DITMAN, SUSAN D'ORNELLAS, ALEXANDER HOLLEY DRUMMOND, ADAM FEINSTEIN, JAMES FLYNN, HOWARD GALE, STEPHEN

GAMBOA, TOBIAH GASTER, JOHN THEODORE GLICK, DAVID GORDON, BARRETT Z. GROSS, KATHLEEN D. HERNANDEZ, JANET S. HOWE, BENJAMIN HUNT, THOMAS IVORS, JENNIFER JANNEY, DWIGHT JENKINS, JOSHUA KNAPP, JONOTHAN LOGAN, MARIELLE LOVECCHIO, RYAN MCGEE, ZACHARY C. MILLER, CHRIS G. MURRAY, JAMES NOONAN, CHRISTINE PARDEW, DANIEL M. PARROTT, KATHERINE POE, LAURA RAYMOND, EDWIN REED-SANCHEZ, BRUCE RENWICK, ANAIS SENSIBA, GORDON WILLIAM SENSIBA, ROBERT J. SIEGEL, MORA MI-OK STEPHENS, EMILY JO TESTA, JOHN TRINKL, ANN TRUDELL, CHRISTY ANN TURNER, PATRICK VOLPE, FRANTZ WALKER, PATRICIA WIELAND, JAMES WILLIAMSON, JAMES WILSON, TERAN WILSON, and RAISSA WU filed Notices of Claim with the Comptroller of the City of New York within 90 days of the events complained of herein.  More than 30 days have elapsed since the filing of the Notices of Claim, and adjustment or payment thereof has been neglected or refused.

## PARTIES

13.    Plaintiffs were unlawfully arrested on August 31, 2004 and were thereafter unlawfully detained for approximately 14 to 50 hours.  Plaintiffs were citizens or residents of the United States or were otherwise lawfully in the United States at the time of the events complained of herein.

14.    Defendant THE CITY OF NEW YORK (the "City") is a municipal corporation within the State of New York.

15.    Defendants MICHAEL BLOOMBERG, RAYMOND KELLY, TERENCE MONAHAN, THOMAS GALATI, and JOHN and JANE DOES are and were at all times relevant herein duly appointed and acting officers, servants, employees and agents of THE CITY OF NEW YORK and/or the New York City Police Department, a municipal agency of defendant THE CITY OF NEW YORK. The defendants were at all relevant times acting under color of state law in the course and scope of their duties and functions as officers, agents, servants and employees of

defendant THE CITY OF NEW YORK, were acting for, and on behalf of, and with the power and authority vested in them by THE CITY OF NEW YORK and the New York City Police Department, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

## FACTS

16.    The Republican National Convention was held in New York City from August 30, 2004 to September 2, 2004. Hundreds of thousands of people participated in peaceful demonstrations in New York City during those days.

17.    THE CITY OF NEW YORK began planning for the Convention more than a year in advance. On information and belief, the City planned to make mass arrests during the Convention without determinations of individualized probable cause, and then to hold those arrested for prolonged periods of time to prevent them from participating in other protest activity.

18.    There were approximately 1,800 Convention-related arrests, many of them mass arrests of people lawfully on public sidewalks or streets. In many instances, the police effected those arrests by deploying long orange mesh nets to enclose large numbers of law-abiding demonstrators and innocent bystanders alike.

## The Arrests at the World Trade Center Site

19.    On Tuesday, August 31, 2004, the War Resisters League and the School of the Americas Watch organized a demonstration against the policies of the Bush administration. The demonstration was supposed to begin at the World Trade Center site and proceed to near Madison Square Garden.

20.    At about 3:00 p.m., people began gathering near the World Trade Center site on Church Street, near the intersection of Fulton Street. Plaintiff HEDEMANN, an organizer with the War Resisters League, negotiated with the police department, including defendant GALATI, to allow the march. Plaintiff HEDEMANN told *The New York Times* that "the commanders assured him the march could proceed—east on Fulton Street and up Broadway to the Garden—as long as

participants walked two abreast, in order to keep sidewalks clear, and did not block traffic at intersections."

21.    At approximately 4:00 p.m., the march began.  There were approximately 800 to 1,000 people assembled at this time.  Those at the front of the march, observing the traffic signal and in cooperation with the police, crossed Church Street and proceeded eastward up Fulton Street on the sidewalk.  The march was orderly and calm.  Almost immediately after the marchers crossed Church Street, and before they had gone even a full block, police halted the march.

22.    Without any warning, police officers surrounded over 200 people with orange mesh nets, and arrested them all, even though they had remained on the public sidewalk, were not blocking the sidewalk, and complied with police instructions.

23.    Those arrested were never told to disperse, were given no opportunity to disperse, and were never told that their conduct might be considered illegal, or advised that their presence or conduct would subject them to arrest..

24.    The persons arrested included people who were participating in the demonstration, others who were there merely by chance, some who were observers, and some who were taking photographs.

25.    Upon information and belief, defendants MONAHAN and GALATI ordered this mass arrest in accordance with the mass arrest tactics developed and adopted by policymaking officials of the New York City Police Department and THE CITY OF NEW YORK.

### The Detentions at Pier 57

26.    The over 200 people arrested on the Fulton Street sidewalk were transported to a facility known as Pier 57.  Pier 57, located on the Hudson River at 11th Avenue and 15th Street in Manhattan, was formerly a Metropolitan Transit Authority bus depot.

27.    According to published reports, three environmental inspections of Pier 57 in 2001 and early 2004 uncovered safety hazards including easily disturbed asbestos particles, lack of adequate fire protection systems, and floors covered with black oily soot.  Those conditions had

not been corrected by the time of plaintiffs' detention at Pier 57.

28.     Upon arrival at Pier 57, detainees, including the plaintiffs, were searched, had their property taken, and were placed in one of the holding cells.  Detainees could not sit on the floor without becoming covered in the filth.  There were generally not enough benches for the number of arrestees in each cell.  Many arrestees got rashes or blisters from the substance on the floor. The air quality was also poor, and many arrestees developed coughs or had difficulty breathing. At night, the facility became cold, and the detainees, who were dressed for a hot summer day in New York, were not provided with any blankets, nor was there any heat.  The arrestees were provided with food at sporadic times while at Pier 57, although some went many hours before receiving anything to eat.

29.     Upon information and belief, there was no fingerprinting equipment at Pier 57, and the only processing that took place there was an inventory of personal belongings.  Upon information and belief, the criminal courts were available to process those being held at Pier 57, and the State of New York was processing fingerprints in a timely manner.  Nonetheless, the NYPD, without justification, detained people at Pier 57 for lengthy periods of time without making any meaningful effort to process them so they could be released.  As a result of this, many people, including the plaintiffs, remained in police custody for unnecessarily lengthy periods of time.

30.     Upon information and belief, the conditions of plaintiffs' detention, and its duration, were the result of policies and practices developed by policymakers of the New York City Police Department and THE CITY OF NEW YORK.

31.     From Pier 57, the detainees were transferred to Central Booking at 100 Centre Street for processing.  There the detainees were photographed and fingerprinted.  The detainees were held for additional time at Central Booking before being either arraigned in front of a judge or given a Desk Appearance Ticket and released from Central Booking.  The duration of detention for the plaintiffs ranged from approximately 14 to 50 hours.  Upon information and belief, those arrested on Fulton Street were charged with only violations such as disorderly

conduct or parading without a permit.

32.    On October 6, 2004, the Manhattan District Attorney's office announced that it would

dismiss all of the 227 prosecutions arising out of the August 31, 2004 arrests on Fulton Street.

33.    The actions described above were taken under color of law and as a result of policies and

practices adopted and implemented by THE CITY OF NEW YORK.

## JURY DEMAND

34.    Plaintiffs demand a jury trial on each and every one of their claims.

## FIRST CAUSE OF ACTION:
### VIOLATION OF UNITED STATES AND NEW YORK CONSTITUTIONS ARISING FROM PLAINTIFFS' ARREST

35.    The arrest of plaintiffs violated their rights under the First, Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution and Article I, Section 8 and Article I, Section 12 of

the New York State Constitution.

36.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and

serious bodily injury, pain and suffering, emotional distress and psychological injury, great

humiliation, loss of income, costs and expenses, and were otherwise damaged and injured.

## SECOND CAUSE OF ACTION:
### VIOLATION OF UNITED STATES AND NEW YORK CONSTITUTIONS ARISING FROM PLAINTIFFS' DETENTION

37.    The detention of plaintiffs violated their rights under the First, Fourth, Fifth, and

Fourteenth Amendments to the United States Constitution and Article I, Section 8 and Article I,

Section 12 of the New York State Constitution.

38.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and

serious bodily injury, pain and suffering, emotional distress and psychological injury, great

humiliation, loss of income, costs and expenses, and were otherwise damaged and injured.

## THIRD CAUSE OF ACTION:
## FALSE ARREST AND FALSE IMPRISONMENT

39.    The false arrest and imprisonment of plaintiffs without reasonable or probable cause,

illegally and without a warrant, and without any right or authority to do so, were the direct and

proximate cause of injury and damage to the plaintiffs and violated their statutory and common

law rights as guaranteed by the laws and Constitution of the State of New York.

40.    As a result of the foregoing, plaintiffs were deprived of their liberty, suffered specific and

serious bodily injury, pain and suffering, emotional distress and psychological injury, great

humiliation, loss of income, costs and expenses, and were otherwise damaged and injured.


**WHEREFORE**, plaintiffs request the following relief jointly and severally against all of

the defendants:

　　　　　　　a.  Compensatory damages to all plaintiffs;

　　　　　　　b.  Punitive damages to all plaintiffs;

　　　　　　　c.  Pre- and post-judgment costs, interest and attorney's fees;

　　　　　　　d.  Such other and further relief as this court may deem just and proper.


　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　NORMAN FREDERICK BEST (NB 1968)
　　　　　　　　　　575 Madison Avenue, 10th Floor
　　　　　　　　　　New York, New York 10022
　　　　　　　　　　(212) 671-0122

　　　　　　　　　　ALAN LEVINE (AL 5297)
　　　　　　　　　　99 Hudson Street, 14th Floor
　　　　　　　　　　New York, New York 10013
　　　　　　　　　　(212) 739-7506

　　　　　　　　　　MICHAEL L. SPIEGEL (MS 0856)
　　　　　　　　　　111 Broadway, Suite 1305

New York, New York 10006
(212) 587-8558

MARTIN R. STOLAR (MS 1576)
351 Broadway
New York, New York 10013
(212) 219-1919

Counsel for Plaintiffs


By:    _____
          Michael L. Spiegel (MS 0856)

Dated: November 30, 2006
          New York, New York

Exhibit D

# MEMO ENDORSED





FEB 03 2006

THE CITY OF NEW YORK

## LAW DEPARTMENT

100 CHURCH STREET
NEW YORK, NY 10007

MICHAEL A. CARDOZO
*Corporation Counsel*

JEFFREY A. DOUGHERTY
*Special Assistant Corporation Counsel*
Room 3-135
Telephone: (212) 788-8342
Facsimile: (212) 788-9776
jdougher@law.nyc.gov

**BY HAND DELIVERY**

February 2, 2006

The Honorable James C. Francis IV
Unites States Magistrate Judge
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street – Room 1960
New York, New York 10007-1312

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/14/06

    Re:    Hershey-Wilson v. City of New York, et al., 05 CV 7026 (KMK) (JCF)

Dear Judge Francis:

        I write in reference to the above-referenced action, which arose from an arrest made during the 2004 Republican National Convention (the "RNC") and is consolidated with numerous other RNC cases before your Honor and Judge Karas for discovery.

        Specifically, Plaintiff Kyla Hannah Hershey-Wilson ("Plaintiff") has repeatedly refused to identify hospitals, doctors, psychiatrists, psychologists, social workers and other counselors who have rendered treatment to her, in response to Defendants' Interrogatories. (A copy of Plaintiff's response to Interrogatory No. 7 is attached as Exhibit A). Plaintiff has also refused to execute medical and/or pharmaceutical releases related to Plaintiff's psychological history. (Correspondence exchanged between counsel on these issues is attached as Exhibit B).

        As you know, on August 29, 2005, Judge Karas ruled that Defendants are entitled to broad discovery on psychological history when a plaintiff places this at issue in his/her action.

Plaintiff's First Amended Complaint clearly alleges that she suffered emotional injuries, mental anguish, emotional distress, psychological trauma, fear, humiliation, embarrassment and anxiety as a consequence of her arrest and detention. (Pertinent portions of the Amended Complaint are attached as Exhibit C). Further, Plaintiff testified in her 50-H hearing that she was diagnosed and treated for depression at some point within the 10 years preceding her arrest. Plaintiff also testified that she was medicated in connection with her depression. (Pertinent portions of Plaintiff's 50-H hearing transcript are attached as Exhibit D). Given the allegations in the Amended Complaint and her testimony, Defendants are entitled to explore Plaintiff's psychological history.

Accordingly, we respectfully request that Plaintiff be compelled to: (1) supplement her response to Interrogatory No. 7 by fully identifying all hospitals, doctors, psychiatrists, psychologists, social workers and other counselors who have treated her within the past 10 years for any mental, psychological or emotional issues; and (2) provide all medical and pharmaceutical releases for those providers.

Very truly yours,

Jeffrey A. Dougherty

cc:    James Meyerson, Esq. (by Hand Delivery)

2/13/06

Application granted. Judge Karas's prior ruling on this issue precludes the arguments now raised by plaintiff's counsel. In particular, Judge Karas rejected the distinction between claims of severe or permanent psychiatric injury and "garden variety" emotional or psychological stress. SO ORDERED.

James C. Francis IV

USMJ

2

Exhibit E

4.20.06 Oral Arg Trans.txt

1

64kPherM
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  KYLA HANNAH HERSHEY-WILSON,
3
4              Plaintiff,
4
5       v.                           05 Cv. 7026 (KMK)
5
6  NEW YORK CITY, et. al.,,
6
7              Defendants.
7
8  ------------------------------x
8                                    New York, N.Y.
9                                    April 20, 2006
9                                    11:30 a.m.
10
10  Before:
11
11                  HON. KENNETH M. KARAS,
12
12                                    District Judge
13
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

64kPherM
1           (In open court)
2           MR. MEYERSON:  Good morning, your Honor, James
3  Meyerson for Ms. Hershey-Wilson.
4           THE COURT:  Good morning, Mr. Meyerson.
5           MR. DOUGHERTY:  Good morning, Jeff Dougherty for
6  defendants.
7           THE COURT:  You got the call on this one, Mr.
8  Dougherty.
9           MR. MIRRO:  And James Mirro.
10          THE COURT:  Good morning, your Honor.  Again, for the
11  record.  This is becoming a habit.  There are worse habits in
12  life.
13          I have to say, Mr. Meyerson, I was struck your
14  reply --
15          MR. MEYERSON:  -- I don't know if that's good or bad.
16          THE COURT:  It's sort of interesting.  There is this
17  sort of righteous speech-like tone to you.  You sort of have to
18  live by the privilege and die by the privilege.
19          And you are very critical of the city's invocation of
Page 1

4.20.06 Oral Arg Trans.txt
```
20   certain privileges relating to their office -- psych testing
21   records are sought by the plaintiff.  And misconduct.
22   Invariably the city's attorneys object to what I was saying
23   before; that's true.
24        You were here six, seven weeks ago when they wanted to
25   invoke certain privileges having to do with unsubstantiated
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

64kPherM
```
1   claims of misconduct and other, arguably, privileged
2   information.  And I ended up agreeing with you that Judge
3   Francis's rulings were not clearly erroneous or contrary to
4   law.  I was just struck by that.
5        The city gets a five-point demerit for citing an
6   unpublished Second Circuit decision
7        MR. MIRRO:  The Supreme Court ruled --
8        THE COURT:  -- the Judicial Conference said that as of
9   2007, it is okay to cite unpublished opinions.  But just be
10  careful because there are some people in the building who might
11  get pretty hot under the collar.
12       MR. MIRRO:  We will, your Honor.
13       THE COURT:  Quick question for Mr. Dougherty.  I will
14  definitely hear from you, Mr. Meyerson.
15       What is the standard of review where, what Judge
16  Francis did was said that my ruling in MacNamara precluded him
17  from, in effect, agreeing with Mr. Meyerson?
18       So what we have is a situation, before the case gets
19  referred to a Magistrate Judge for discovery purposes, I issue
20  a discovery ruling in another case, albeit, one that's related,
21  which is why I got a hundred of these things.  And Judge
22  Francis feels bound by that ruling in this case.  And then Mr.
23  Meyerson appeals that ruling.
24       Is it Rule 72, abuse of discretion and contrary to
25  law?
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

64kPherM
```
1        MR. DOUGHERTY:  Your Honor, I would submit that in our
2   papers to Judge Francis, while I can't determine what it is
3   that, you know, ultimately determined his rationale, that we
4   did submit case law as well as transcripts from your ruling in
5   MacNamara.  And I believe this is a Rule 72 motion to be
6   governed by the earlier clearly erroneous standard or contrary
7   to law standard, whether or not at this level a discovery
8   motion can be overturned.
9        THE COURT:  His memo endorsement says that he felt --
10  and I had it out a second ago, let me pull it out -- Judge
11  Kara's prior ruling on this issue precludes the arguments now
12  raised by plaintiff's counsel.
13       So it is sort of a, what he said in another case,
14  which Judge Francis almost seems to be saying was law of the
15  case for all of these cases.
16       So why is that something that should be deferred to
17  when, in effect, he is citing my ruling in another case?
18       It is like saying I should refer to my own ruling in a
19  different case.
20       MR. DOUGHERTY:  I would say it is just as proper for
21  any Magistrate Judge to reply on a Southern District judge in a
22  related action or a nonconsolidated.
23       THE COURT:  But not necessarily to have preclusive
24  effect, right?
```
Page 2

```
                              4.20.06 Oral Arg Trans.txt
25                    MR. DOUGHERTY:  Yes.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                          5
```
     64kPherM
 1            THE COURT:  Do you think that the MacNamara ruling has
 2   a preclusive effect in this case?
 3            MR. DOUGHERTY:  I think that ruling was likely here
 4   considered by Magistrate Francis and was part of what is
 5   probably a conglomerate of facts that, of law, that he used to
 6   make the decision in the MacNamara case.
 7            THE COURT:  Thank you.
 8            Mr. Meyerson.
 9            MR. MEYERSON:  Your Honor, I do apologize for any
10   righteousness that --
11            THE COURT:  -- don't apologize for righteousness.
12            MR. MEYERSON:  Actually, I believe it came out, I
13   think there was a, I am saying righteous indignation on my
14   part.  My client, Ms. Hershey-Wilson is 21 years old, and I
15   kept thinking of my 21-year-old daughter who happens to be an
16   activist.
17            THE COURT:  I believe that was worth saying.  I was
18   only tweaking you.
19            You are right, what goes around comes around.
20            To the extent that the defendant takes what you think
21   is a cavalier attitude toward your client's privilege, my only
22   point is, at least Judge Francis and I agreed with you to their
23   privilege.
24            MR. MEYERSON:  I understand.
25            This is a very narrow issue, your Honor.  Although I
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                          6
```
     64kPherM
 1   think it has profound practical and profound legal
 2   implications.
 3            The narrow issue is what triggers the waiver of a
 4   client's mental health record privilege that pre -- the records
 5   coming from a prelitigation-incident therapy.
 6            You, in MacNamara, I think that's a question of law.
 7   And I think that Magistrate Judge Francis, on both a legal and
 8   practical and differential basis, said to himself, look,
 9   whatever I think of Meyerson's arguments, and however I might
10   have ruled, I am not going to write an opinion because whatever
11   I think, Judge Karas has sent all of these cases to me and I am
12   not going to buck Judge Karas because he made a ruling in a
13   previous case which has indicated his position of law on this
14   matter.  And, therefore, I am precluded from overruling Judge
15   Karas.  He can overrule me, I can't overrule him.  Fair enough.
16            I then file this appeal and say to you, your Honor,
17   that with due respect, I am critical, and I accept this with
18   whatever admonition you want to give me, I am critical of your
19   MacNamara decision.
20            And it is like I recently said to the Second Circuit
21   about Judge Koeltl, that I realize that the Second Circuit
22   recognized his wisdom as a jurist, as I do your wisdom as a
23   jurist.  You are just wrong, I think, on what you did in
24   MacNamara.
25            THE COURT:  No offense to Judge Koeltl.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

                                                                          7
```
     64kPherM
```
                              Page 3

4.20.06 Oral Arg Trans.txt
1          MR. MEYERSON:  No.  And I got him reversed.
2          THE COURT:  He is a great jurist.  Go ahead.
3          MR. MEYERSON:  And that's not due to me.  That was
4    because I was lucky that day in front of the circuit.
5          But the point I want to make here is, you have taken a
6    very broad view in MacNamara of what emotional damage claims
7    mean in reality and in law.
8          My client, let me give you these facts, and I just,
9    you have seen them, but my client is 24 years old.  At 24 she
10   is arrested at the RNC.
11         When she was in high school, she and her family went
12   to family counseling.  She may have gone to independent
13   counselling.  The therapist said, you are depressed, here is
14   some medication.
15         She graduates from high school, has no medication or
16   therapy for four years, gets arrested at the RNC and,
17   basically, says, I have a natural emotional reaction when I am
18   in jail for 24 hours.  That is my emotional reaction.  Has
19   nothing to do with my mental health condition.  I was scared, I
20   was sad, I was anxious.  And I got out 25 hours later.  I took
21   in the fresh air, I sighed.  And it largely evaporated, all
22   though not totally.  I went to Dr. Ores before I went back to
23   Maine.  You can have my records from Dr. Orres.  I am okay.  I
24   am not seeking to put into this record, in that litigation, my
25   mental health condition.  I am not going to call a
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                  8

64kPherM
1    psychiatrist, I am not going to say I have a permanent
2    condition, a clinical or nonclinical condition.
3          THE COURT:  Paragraph 71, quote, the plaintiff
4    denies -- of the incident herein described --
5          MR. MEYERSON:  -- I accept that as my failure in
6    developing the case.  We say that's not the case.  In point of
7    fact, the facts are the facts.  She never has sought treatment.
8          THE COURT:  The fact that she hasn't sought treatment,
9    that wouldn't be a cause to bounce that claim.
10         MR. MEYERSON:  I am standing up here and saying to you
11   that my client will get on the witness stand at the trial and
12   say, when I say, what emotional injury did you suffer -- well,
13   let me withdraw that.
14         Assuming my client just got on the witness stand and
15   said, I was in jail for 25 hours, and I didn't ask her another
16   question about any emotional reaction injury, and then I said
17   to a jury, she was in custody 25 hours, you should award her a
18   sum of money for the loss of her liberty, either for 25 hours
19   taken, anxiety and sadness she felt, objection, your Honor,
20   there is no evidence in the record.
21         Okay, so I want to ask her, what was your emotional
22   reaction injury?
23         And she will say, I was sad, I was unhappy, I was
24   scared.
25         And when did that end?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                  9

64kPherM
1          It ended largely when I got out of jail.  But I went
2    to somebody who said the records will show probably you will be
3    all right.  Just go home.
4          THE COURT:  Let me just stop you right there.
5          Even if she is claiming residual emotional injuries,
                              Page 4

4.20.06 Oral Arg Trans.txt

6  such that she went to, after the fact, see a therapist of some
7  kind, and even at the end of the day if, as a result of seeing
8  the therapist things get better in her life, again we are not
9  here at trial deciding what they get to put in.  The question
10 is whether or not anything about her psychological history, her
11 mental health history -- she was 65 and had high school visits
12 to a therapist, is that different?
13        That's why you have to be careful with my ruling in
14 MacNamara.  Once that door is even cracked open a little bit,
15 how can it be that the defendants don't get to have access to
16 her psychological history to rebut either the claim for the
17 injuries at all or the extent of the damages she should get as
18 a result of the alleged injury?
19        MR. MEYERSON:  If --
20        THE COURT:  By the way, that's the majority view of
21 the courts in this district.
22        MR. MEYERSON:  Actually not the majority view of
23 courts throughout the country, it is the view of courts
24 throughout this district, which comes out of Judge Buchwald's
25 decision when she was a magistrate.  Rather, it is a more

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

64kPherM
1  complex claim in which the views of psychiatrists figured
2  prominently in prelitigation events.
3        That is that there was a connection obviously made in
4  Sidor between the prelitigation therapy that that client had,
5  leading Magistrate Buchwald to conclude that there -- that
6  access to those records were relevant.  There has to be some
7  degree of time and material relevance.
8        And your prior ruling simply --
9        THE COURT::  -- forget the prior ruling.  Let's talk
10 about this case.
11        MR. MEYERSON:  But the problem is, Magistrate Judge
12 Francis seems to have implied that whatever the merits of your
13 arguments, Meyerson, that I might agree with, I can't touch it
14 because I am reading Judge Karas's ruling --
15        THE COURT:  -- argue it as if the standard review was
16 de novo.
17        MR. MEYERSON:  Okay.  Here is my response to you.
18        At the same time the law in this district, as you
19 interpret it, seems to suggest that access to those records are
20 permissible because she, by merely saying I had emotional
21 reaction for the time of the event, triggers the waiver.
22        The law in this district also seems to suggest, by
23 Judge Carter and Judge Sotomayor, when she was a District
24 Judge, is that when the city then says, and I will get to the
25 logic of it, we want to take her examination, we want a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

64kPherM
1  psychiatrist to look at her, the law in this district, if they
2  would argue that, is, you can't do that because this is really
3  a garden-variety thing.
4        And if that's the case, what is the value of the
5  records except to fish into the most highly sensitive material
6  that -- my client doesn't even know what's in there, that no
7  magistrate should look at.  That I don't want to look at.
8        And my position is, therefore, that if she couldn't be
9  subjected to an examination by a psychiatrist to disprove
10 something that we are not even attempting to prove, then there
Page 5

4.20.06 Oral Arg Trans.txt

11  is no basis for the records.
12          And if you want to make a thing out of, did she have
13  psychiatric treatment five years ago in high school?
14          She has admitted that.
15          She has also admitted that she had medication for
16  depression and family counseling.
17          I don't know what the litigation value would be of
18  bringing that out in front of a jury, because a jury would be
19  offended by that.
20          But if the city wanted to do that, and you let --
21          THE COURT:   -- that's a different question.  We are at
22  discovery.
23          MR. MEYERSON:   That's correct.  So what is the value
24  of the records?  We must again get to the point, Judge, of
25  these records are ordinarily privileged.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                        12

    64kPherM
1           what triggers the waiver of the privilege, that is the
2   narrowest -- that's the very narrow issue of law.  And if you
3   say that what triggers it is simply the fact that a client that
4   is put into jail for 25 hours and would testify, forget what I
5   put in my complaint, if you can, for the moment, would simply
6   testify, look, when I was in jail I was upset.
7           THE COURT:  And give me money for that, right?
8           MR. MEYERSON:  well --
9           THE COURT:  -- and give me money.
10          MR. MEYERSON:  That is correct.
11          THE COURT:  And how is it that the defendants are to
12  prepare their defense, to rebut any claim you might make as to
13  why she should get any money or why she should get a certain
14  amount --
15          MR. MEYERSON:  -- Judge, it seems to me that you are
16  seemingly bootstrapping yourself into almost -- almost into a
17  nonsensical position.
18          THE COURT:  I am surprised to hear you say that.
19  Because every case I have read, and I have read a bunch, in
20  addition to the ones you cited me to, to the extent that courts
21  have said that the privilege is waived when into the so-called
22  garden variety claims, not a term of art as far as I can tell,
23  but that's the one that everyone seems to be using, but the
24  reason it is relevant, so that the defendants can attack the
25  causation between the offending event and the so-called mental
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                        13

    64kPherM
1   distress.  And also the claim for damages.
2           I am not making this up.
3           MR. MEYERSON:  I understand that.  And then I say to
4   you, what do you expect to find in mental health records of a
5   high school kid?
6           Perhaps the high school kid might have said, gee, you
7   know, I am depressed.  And in five years if I get arrested,
8   what will happen to me, doc?  Will I be -- what conceivable
9   relevance beyond the fact, if it is relevant at all, that she
10  has had therapy, had medication, and that ceased to exist four
11  years ago?  If that's relevant, fine.
12          THE COURT:  Because when somebody claims to have
13  suffered some sort of emotional damage, distress, anxiety,
14  depression, their prior history, that might relate to this --
15  we are going in circles.
                        Page 6

4.20.06 Oral Arg Trans.txt

16    MR. MEYERSON:  Can I give you another example?
17    THE COURT:  Let me give you another example.
18    Let's take it out of mental health, put it in physical
19  health.
20    Somebody goes to a hospital and they decide to
21  involuntarily commit the person.  And in the middle of him
22  struggling he yells out, ouch, my knee.  And he doesn't put in
23  any expert testimony that he actually ripped his meniscus,
24  medial meniscus, or anything like that.  He says, I want money
25  for pain and suffering because my leg got hurt that day.  And
          SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

                                                              14

64kPherM
1  it turns out that 20 years prior to that he saw an orthopedic
2  surgeon.
3    MR. MEYERSON:  For a knee injury?
4    THE COURT:  Yes.
5    MR. MEYERSON:  He is entitled probably -- they are
6  probably entitled to get those records.
7    Here is where we are having our debate.  And it is a
8  fascinating debate, I tried to make it in my submission.
9    You are equating an emotional reaction to being in
10  jail for 24 hours, which is attended to the loss of the liberty
11  itself.  It's almost intrinsic in it.
12    I mean, I did have a client, a Quaker, an older man
13  who, when he was asked at a deposition by the City of New York
14  what his reaction was to being in jail for 24 hours, as the
15  good Quaker he was, he said, actually, it was an enlightening
16  experience.  And he actually wrote to the Quaker paper.
17    Again, it brings up a lot with my daughter, she went
18  to a Quaker school.
19    But he wrote to the Quaker paper.  And I said to
20  myself, you just indicated you didn't have any damages for
21  being in there.
22    The point being, most people, in being confined for 24
23  hours involuntarily in a  not-pleasant situation, might say, I
24  was sad, I was upset, I was scared.  And then I say --
25    THE COURT:  -- that's not how the complaint is worded.
          SOUTHERN DISTRICT REPORTERS, P.C.
                 (212) 805-0300

                                                              15

64kPherM
1  It is not limited to that.
2    MR. MEYERSON:  But --
3    THE COURT:  -- what you are trying to do --
4    MR. MEYERSON:  -- I am now limiting it.
5    THE COURT:  Mr. Meyerson, there is a complaint that
6  you filed.  You have brought actions against defendants.  And
7  you are seeking damages for emotional distress and anxiety.
8  And you are trying to, at the same time, asking potentially for
9  damages on those emotional harms.  You are trying to put a wall
10  on someone's emotional slash mental history and what they
11  suffered on that day.
12    MR. MEYERSON:  I am not --
13    THE COURT:  -- Mr. Meyerson, interrupting is not
14  helpful to anybody.  I never put time limits on you.  Don't do
15  that.
16    MR. MEYERSON:  I'm sorry.
17    THE COURT:  But that strikes me as antithetical to
18  common sense.  And many courts around the country have said,
19  you cannot pretend that a person's mental past has nothing to
20  do, is completely irrelevant, and all the standards that we
                        Page 7

4.20.06 Oral Arg Trans.txt
21    use -- and there is no conceivable relevance to the emotional
22    slash mental harm that somebody suffered on that day.
23            And you cannot ask the defendants to defend themselves
24    on causation and on the extent of the damages without getting
25    access to that information.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                                    16
      64kPherM
 1            Now, that is not to say that there cannot be limits.
 2    That is not to say that every record gets turned over.  That is
 3    not to say that there are temporal decisions here.
 4            You have a 24-year-old client, not a 74-year-old
 5    client.  So her high school records -- I wouldn't say, if I was
 6    Judge Pitman, to a five-year limitation.  But the reason for
 7    the limitation is that it recognizes that within that time
 8    period it is not -- say there is no reasonable relevance of the
 9    records -- go ahead.
10            MR. MEYERSON:  There are two things you mentioned in
11    there.  One is the complaint and one is the moreover arching
12    philosophical debate we are having --
13            THE COURT:  -- I don't do philosophy, Mr. Meyerson.  I
14    am doing law.
15            MR. MEYERSON:  Philosophical legal debate that we are
16    having, which is not inconsequential.
17            The first thing about the complaint is to the extent
18    that I drafted a complaint that defined, that says what it
19    says.
20            Of course, an attorney and a party can come in and
21    say, I withdraw the lawsuit, I withdraw this claim.  I narrow
22    this to the extent of a claim.
23            And to the extent that I have failed my client in the
24    manner of the drafting of the complaint, in the amended
25    complaint, to make it an -- that there is this all encompassing
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                                    17
      64kPherM
 1    emotional trauma that flows from this event, I stand indicted.
 2    But I withdraw that.  And my client has narrowed the claim.
 3    And the claim is simply that while I was incarcerated, and for
 4    a day or two thereafter, I had the ordinary natural reaction.
 5    Which I assume --
 6            THE COURT:  -- she says is ordinary and natural.  But
 7    how is it that a jury is to evaluate what she says is ordinary
 8    unless they know something potentially about her emotional
 9    past?
10            You know, New York law recognizes the thin skull
11    doctrine for psychological harms not recognized by the Second
12    Circuit.  But there are plenty of cases within New York State
13    that recognize it.
14            It is interesting because that could easily inure to
15    the plaintiff in these kinds of cases.
16            I don't want to get into philosophy.
17            MR. MEYERSON:  This is a legal argument, your Honor.
18            What I import from your comment, that I listened to
19    very carefully, and I apologize for interrupting, although I
20    did hear what you are saying, is, how do you know what is, and
21    I understand what you are saying, inquiring, how do I know that
22    that's natural?
23            The natural flow of that inquiry leads to them getting
24    records, because, you will say, get these records; and them
25    saying, oh, but irrespective of the records, she shouldn't have
                              Page 8

4.20.06 Oral Arg Trans.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

64kPherM

1   had this reaction.  Or maybe because of the fact that she
2   concedes she had depression, that's why she had the reaction.
3   Your Honor, we need to have her go to our psychiatrist for
4   several hours.
5           And Mr. Meyerson now needs to put on a psychiatrist so
6   that the jury can be -- so it can be explained to a jury that
7   intrinsic in being restrained of your liberty for 24 hours in a
8   jail, is a natural reaction of, whatever it might be, might
9   even be giddiness, but in this case it was sadness.
10          I just think, your Honor -- by the way, I believe the
11  law in this district is that they wouldn't be able to get that
12  mental health --
13          THE COURT::  -- why are we having a discussion about
14  something that is not on the table right now?  Because the
15  cases do recognize the distinction between a defendant's
16  interest in getting past mental health history of a plaintiff,
17  either an employment discrimination case, a civil rights case,
18  and a rule --
19          MR. MEYERSON:  -- at least --
20          THE COURT:  -- according to the cases that I read,
21  let's --
22          MR. MEYERSON:  -- but I think they are inner related,
23  because if, in fact, you can't get the examination, what does
24  the value of a record that says she was depressed in high
25  school have to do with her saying, I was afraid --
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

19

64kPherM

1           THE COURT:  Because she is only six years removed from
2   high school.  If she were 74 years old and it was high school
3   records, you might have a point.  Which is why many courts have
4   accepted, in part, your argument.
5           But they tailor it to the facts before them.  And
6   that's what I am trying to do, and say, that whether or not
7   MacNamara was the right decision or not, I am focused on this
8   case.
9           MR. MEYERSON:  Okay.  Well, I would ask you, then, to
10  defer back to Magistrate Judge Francis, and let me make the
11  arguments to Magistrate Judge Francis on the assumption, as I
12  read his decision, that he did not even waive the arguments,
13  simply said, I am precluded.
14          And it is understandable why he did that.
15          My last point and I will sit down, and it is, by
16  comparison, not a knee injury, but more directly in point.
17          In an antiwar demonstration case that I have with the
18  city, a client was in custody seven or eight hours.  She was an
19  NYU student.  A freshman then.
20          She'd had counseling when she went to NYU.  She said
21  that during the seven or eight hours she was on and off crying,
22  the next day she was upset.  And that's the extent of her
23  emotional injury associated with what she believed was a false
24  arrest and loss of her liberty.
25          The city didn't ask for the mental health records in
            SOUTHERN DISTRICT REPORTERS, P.C.
                   (212) 805-0300

20

64kPherM

1   that case.  That's neither here nor there, that's that
                        Page 9

4.20.06 Oral Arg Trans.txt

2  litigation.  But the import of your decision is, that if my
3  client had come in and said, look, I had no emotional damages
4  other than the fact that when I was in custody I cried on and
5  off, the next day I related to my family what happened, and I
6  was upset.  And that was it.  That they then -- that triggers a
7  waiver to open everything and anything.
8        And if you are fortunate to be a young kid, an
9  18-year-old freshman at NYU, or a 24-year old -- if you are
10 unfortunate enough, maybe, to be 24 and had gone to a shrink
11 when your family sent you to a shrink, when you were in high
12 school, the unfortunate situation, under Judge Karas's ruling,
13 is that if you were 74 you wouldn't have to give up those
14 records, but at 24 you do.  It doesn't make any sense.  And
15 maybe the law --
16       THE COURT:  What you are saying is it is never
17 relevant.  What I am saying, it depends on the case.
18       Do you think the blanket rule is never relevant and
19 they take the --
20       MR. MEYERSON:  -- there are Courts that have taken
21 that position.  Your Honor, please, with due respect, I respect
22 your broad ruling, it is a very broad ruling, but --
23       THE COURT:  I haven't ruled yet.
24       MR. MEYERSON:  Well, in MacNamara, there it's a broad
25 ruling.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

64kPherM
1        THE COURT:  It is not a broad ruling.  It's actually
2  not a broad ruling.  But doesn't matter, we are not here to
3  reopen MacNamara.
4        MR. MEYERSON:  There are cases that reject your
5  position, that say --
6        THE COURT::  -- it wouldn't be the first time.  Or the
7  last.
8        MR. MEYERSON:  That say that the emotional reaction
9  condition that I am describing here doesn't put in to play her
10 mental health condition, which is a different thing, as a
11 matter of law, that is what I am arguing.
12       THE COURT:  Okay.  Thank you, Mr. Meyerson.
13       MR. DOUGHERTY:  Well, your Honor, what, at first what
14 I think we need to do is pull back and realize that we are in a
15 court of law.  And subsequently we are governed by rules of
16 procedure.
17       And here the rule that we are governed by is the
18 standard under Rule 72.
19       And under that standard, and under the case law
20 governing that standard, Mr. Meyerson has failed to show that
21 Judge Francis's ruling was either clearly erroneous or contrary
22 to law.
23       And just briefly on the clearly erroneous point.
24 Under Lindenal versus Citco Refining, the reviewing Court has
25 to be left with the definite and confirm conviction that a
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

64kPherM
1  mistake has been committed.
2        Additionally, Mr. Meyerson has failed to establish
3  that Judge Francis failed to apply relevant case law or
4  statutes, that that is the standard of review that this Court
5  should be governed by making its determination on this motion.
6        And just to get into the merits, the reason that
Page 10

4.20.06 Oral Arg Trans.txt
7   Ms. Hershey-Wilson's psychological history is relevant and
8   discoverable, is because she put it at issue by claiming and
9   seeking emotional distress damages.
10          We are governed by the complaint which suggests that
11  there are residual effects that she suffered as a result of her
12  arrest, which was a sworn statement as well as interrogatory
13  responses, indicate that in interrogatory 5 she suffered
14  emotional distress, mental anguish, fear, psychological trauma.
15          Because of that, it is clear -- and she is seeking
16  damages, money damages, which would ultimately come from the
17  taxpayers of New York for those damages which the city must be
18  allowed an opportunity to examine intervening causation of her
19  emotional distress, and obtain a picture of her psychological
20  history.
21          And one of the things that is also relevant, I would
22  like to point out, is that the records we are seeking are
23  contemporaneously relevant to her arrest.  She was 24 at the
24  time.  The records reach back maybe four or five years.  And
25  under Judge Pitman's ruling in McKenna, he allowed in
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              23

64kPherM
1   psychological history that reached back five years, which is
2   the same time frame that we are working with here.
3           MR. MIRRO:  Judge, if I may, just to add one or two
4   brief points.
5           THE COURT:  Yes.
6           MR. MIRRO:  First, I want to thank you, Judge, for
7   your patience today.
8           A couple of points I wanted to mention, Judge.  First,
9   you asked earlier about the standard of review and Judge
10  Francis's order.
11          I would like to emphasize, Judge, Judge Francis had
12  before him all of the factual materials and all of the factual
13  arguments that we are making today.
14          In addition, Judge Francis had before him the legal
15  authorities that we submitted to your Honor.  So Judge
16  Francis's decision and Judge Francis's order, were based on
17  both the facts and on the law.
18          And in that situation, I would submit to you, Judge,
19  that the standard here is, as Mr. Dougherty has said, is the
20  clearly reasonable standard.
21          This is not a case where the Judge Francis has made up
22  purely a determination based on purely legal principles that
23  might be a de novo, might be subject to de novo review by this
24  Court.  This decision was based on both facts and the law.  And
25  citation.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              24

64kPherM
1           Maybe there is language in that order that suggests,
2   loose language in the order, that suggests otherwise.  But
3   that's what was in front of him.  And we would submit that
4   Judge Francis couldn't have made a determination that your
5   Honor's decision in MacNamara was pervasive unless he
6   considered the factual underpinnings.
7           The only other point, Judge, that I wanted to make at
8   this point, the question of relevance has come up.
9           Your Honor clearly understands what the issue is here.
10  And the issue is, and as Mr. Dougherty said, the issue is one
11  of causation.
                          Page 11

4.20.06 Oral Arg Trans.txt

12     Mr. Meyerson's client is suing us for money due to
13  emotional, claimed emotional distress, that results in waiver.
14  And the reason that the emotional history, the psychological
15  history are relevant, because we are entitled, as the Court has
16  alluded to several times today, to examine this plaintiff on
17  what alternative causes of emotional distress she may have been
18  suffering at the time of her arrest and after her arrest.
19     Your Honor, the principle here is that defendants are
20  not obligated to take plaintiff's word for it, that her
21  emotional distress was caused solely by the arrest and
22  confinement.
23     We understand that counsel -- plaintiff's counsel made
24  a very fine argument, and we understand that he is advocating
25  on behalf of his client. But we are not obligated, and it is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

64kPherM

1  contrary to the discovery rules to suggest that we are
2  obligated, to take plaintiff's word for it on the causation
3  question with respect to her emotional distress. And it goes
4  to damages as well.
5     I think that is the sum and substance of it, Judge.
6  And, obviously, there is just a wealth of authority supporting
7  both the MacNamara decision and the ruling that we are seeking
8  here.
9     I mean, and let's look at it, just one other point,
10  one other point. Mr. Meyerson has not put in, really, any
11  legal authority of substance. He got a wealth of authority
12  from outside the district that obviously doesn't bind the
13  Court. But he hasn't explained why this case is any different
14  from all the decisions that do bind this Court, including
15  Second Circuit opinions.
16     And I think I will leave it at that.
17     THE COURT:  Sure.  Mr. Meyerson, you get the last
18  word.
19     MR. MEYERSON:  One, Mr. Dougherty talked about
20  intervening causation.  This is a preexisting causation, and I
21  would agree with him, that if we were dealing with an
22  intervening causation, that is that there had been the arrest,
23  she said this, and then afterwards some other incident
24  occurred, then it becomes -- and she sought treatment for that,
25  we then have that intervening causation.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

26

64kPherM

1     Number 2, with all due respect to the city, in
2  substance, they are ruled -- that Judge Francis was ruled by
3  MacNamara, whether or not you were limiting it to -- he was
4  precluding it to where he could go or not go on this matter.
5     Finally, to the extent that the city wants to put into
6  play the fact that she had a preexisting condition for which
7  she sought treatment, they have the facts.  I did not direct
8  her not to answer, or -- she hasn't been deposed yet, but they
9  know that she has, and she would answer, she had -- I guess it
10  came out of her 58-H hearing.  She did say, I had treatment, it
11  was for depression, in family counseling.
12     To the extent that they want to bring to the jury that
13  there were other matters that implicated her actions, and the
14  information in the records isn't going to elucidate anything.
15     Thank you, your Honor.  I apologize and I appreciate
16  your indulgence.

Page 12

```
                        4.20.06 Oral Arg Trans.txt
17          MR. DOUGHERTY:  On the issue of causation, actually,
18   one of the cases cited by Mr. Meyerson, Bridge v. Eastman
19   Kodak, there was language in that case, on page 223, saying
20   that, moreover, since plaintiff seeks to prove they suffered
21   emotional distress, defense counsel has the right to inquire
22   into plaintiff's past for showing, at least in part, that they
23   were not job related.
24          That case dealt with Title VII sexual harassment.
25   But it should be considered in this case as well.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
     64kPherM
1           THE COURT::  I don't know that Rule 72 applies here,
2    but I know, for it doesn't make sense to send it back to Judge
3    Francis because then the losers are going to come back to me
4    anyway.  So whether or not it is de novo review or discretion,
5    I would assume it is de novo review.  Not that I think Judge
6    Francis did anything wrong.
7           Rule 26 provision for liberal discovery, anything that
8    is relevant to, conservativebly relevant to the case that can
9    lead to admissible evidence, the parties are entitled to Rule
10   26.  And the law recognizes privileges.
11          But the law also disfavors privilege because they
12   destruct the ascertainment of the truth.  And, therefore, the
13   law recognizes that in certain situations, when a plaintiff
14   makes certain claims related to medical damages or mental
15   health damages, then the plaintiff can be deemed to have waived
16   the applicable privileges.
17          Now, let me say, just so it is crystal clear for the
18   record, I don't feel bound by what I ruled in MacNamara,
19   because these are evidentiary rulings.  These are discovery
20   rulings.  These are not matters of first impression where the
21   principle is unaffected by the facts of the particular case.
22          So it is true that the city put forth legal arguments
23   in addition to my ruling in MacNamara.  And whether Judge
24   Francis felt he was bound by that ruling or he was persuaded by
25   it, is of no import to this case.  MacNamara is MacNamara, this
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

```
     64kPherM
1    case is this case.
2           Now, in terms of this case, we have a 24-year-old
3    plaintiff who has claimed, both in her complaint and in her
4    interrogatory responses, which presumably she can't blame Mr.
5    Meyerson for, that she suffered emotional distress,
6    psychological trauma, fear, humiliation, embarrassment and
7    anxiety.
8           She went to see a doctor.  And in the complaint she
9    alleges that she continues to suffer residual emotional
10   damages.
11          Now, Mr. Meyerson may want to selectively withdraw
12   that one sentence from the complaint.  But her interrogatory
13   answers are it.  That is it.  That is what she is claiming.
14          And she would then ask a jury to award her damages,
15   presumably not an insignificant amount of damages, based on
16   those injuries.
17          Now, some might call those garden variety.  Some have
18   described precisely those kind of damages being more than
19   garden variety.
20          I haven't read a case that gives the precise
21   definition of what garden variety is.
                              Page 13
```

4.20.06 Oral Arg Trans.txt

```
22        It has been my experience that garden variety is part
23   in the eye of the beholder, but even assuming it is a garden
24   variety claim, I am persuaded by the cases, not just in this
25   district, but around the country, that have found that
```

29

64kPherM
```
 1   precisely such claims waive the privilege to some extent.
 2   Because I do think, to the extent that somebody is claiming,
 3   for example, psychological trauma, even if she doesn't intend
 4   to substantiate the claim, or to quantify her damages through
 5   the use of an expert, just based on her own testimony of what
 6   she felt, what she felt she was harmed by, what emotional pain
 7   and suffering she claims to have been inflicted upon her, opens
 8   the door to the possibility that the defendant should be
 9   allowed to explore either alternate causes for such
10   psychological trauma and other mental health damages, and also
11   to rebut the claim for the amount of damages that the plaintiff
12   might seek from a jury.
13        And the cases that discuss this, discuss it in a wide
14   variety of contexts, employment discrimination, and civil
15   rights, and specifically describe them as garden variety cases,
16   and specifically note that the plaintiff is not claiming to
17   rely on an expert to substantiate the claim for mental health
18   damages.
19        But the fact that plaintiff isn't saying,
20   notwithstanding what is in her complaint, that she continues to
21   suffer from these things, that may just go to the amount of
22   damages she gets, it doesn't change the fact that she is
23   alleging that the wrong done to her allegedly by the
24   defendants, caused her mental health harms.
25        And it cannot be redressed as emotional distress, and
```

30

64kPherM
```
 1   somehow pretend it is in in another category where there is no
 2   relevance between somebody's mental health history and the
 3   emotional distress that somebody claims to have suffered.
 4        And that is what the cases talk about.  I am not going
 5   to list them all.  Some of the ones are the ones listed in the
 6   city's papers.  But I have read cases, there is a recent case
 7   from the Eastern District of Michigan that goes through the law
 8   on this.
 9        For the record, of course, I reviewed the McKenna
10   case.  I reviewed the Sidor case, which Judge Buchwald does
11   say, even if it is garden variety, that it does open the door.
12        There is a case called Williams versus NPC
13   International from the Northern District of Mississippi.  There
14   is a case called Victoria versus Larkinder from the Eastern
15   District of Louisiana, Synbios.  S-Y-N-B-I-O-S.  Another
16   Colorado case called Fox versus The Gates Corporation.
17   District of Connecticut case called Gattegno, G-A-T-T-E-G-N-O,
18   versus Price Waterhouse Coopers LLP.
19        And, by the way, so everybody's clear, none of this
20   means that if the defendant wants to do a Rule 35 examination,
21   that this ruling is a per se basis for them to get that.  We
22   will have that fight if and when the defendant makes that
23   application.
24        Now, I do think that, as Judge Pitman recognized, and
25   I think he is right, that this doesn't mean that the privilege
```

4.20.06 Oral Arg Trans.txt
(212) 805-0300

31

64kPherM

1  is waived in its entirety.  It depends on the case.  It depends
2  on the claim, it depends on the extent of the mental health
3  history that, in part, may depend on, for example, the length
4  of time between when somebody may have sought psychiatric
5  health or suffered from some sought of emotional disease.  Even
6  and when the alleged injury took place.
7           Here, even a five-year limitation, so the defendant
8  would not be allowed to go back further than five years into
9  plaintiff's mental health history, wouldn't change anything
10  because, as I understand it, a lot of the data is within the
11  five years.  But I am not saying that five-year rule makes
12  sense here.  I am saying that a 24-year old isn't getting any
13  comfort.
14           I think what happened to her in high school and
15  college is relevant to what she is claiming in this case.
16           And, Mr. Meyerson, I don't take lightly at all your
17  philosophical point.  I understand this may put people like
18  your client in a potential dilemma, but that is what the law
19  does to your client's position.  It is not just your client, it
20  is people alleging all kinds of mental health allegations.  It
21  involves things in people's medical history that they don't
22  want revealed.  But the law says they have to make a choice.
23  If they want to recover money for these types of injuries, then
24  they have to be prepared under these circumstances to
25  recognize, to properly allow the defendants to rebut the claim,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

32

64kPherM

1  either in terms of causation or in damages, that they are going
2  to get peeked into that person's mental history, as in this
3  case.
4           So I am affirming Judge Francis's ruling, even on the
5  de novo standard.
6           MR. MEYERSON:  Could I have the records before they
7  are sent to the city reviewed by Magistrate Judge Francis?
8           THE COURT:  Yes, thank you for reminding me of that.
9  It is something I did in MacNamara.
10           If it is something, even in the context of
11  psychological records that would appear to be super sensitive,
12  for example, if there is something that comes up in an
13  evaluation by a doctor, that came up in a conversation with a
14  doctor, but really isn't relevant to the damages claimed here,
15  I don't want to give an example because I wouldn't want to
16  impugn your client, I wouldn't see a problem if you want to
17  have Judge Francis review them in camera first.
18           I do think you should be judicious in using that tool.
19           MR. MEYERSON:  Do I understand -- my understanding is
20  that my client went to high school and lived in Portland.  So I
21  don't even -- I get to her name of her family counselor,
22  psychiatrist, co-therapist, whoever it was.  I will get an
23  authorization from my client and I will send for the records
24  and ask them to be delivered to Magistrate Judge Francis, I
25  guess.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

33

64kPherM

1           THE COURT:  But that is precisely what I was
2  suggesting I don't think you should do.  Because what you are

Page 15

4.20.06_Oral Arg Trans.txt

```
 3   saying is that -- all of these records are so sensitive they
 4   should be reviewed in camera.
 5             MR. MEYERSON:  I don't know.  I don't even think --
 6             THE COURT:  -- I know that you can take an appeal if
 7   you want.
 8             MR. MEYERSON:  Well, then, I will get the records
 9   under your order, I will review them understanding your order
10   is that I shouldn't just be knee jerk about it and make a
11   judgment as to whether I think there is something in there that
12   is of super sensitivity.  For example, the topic of an
13   incestuous thing, I am not suggesting that that is in there.
14             THE COURT:  what if, in the course of talking to a
15   psychiatrist, somebody admits to committing a crime, a
16   misdemeanor, that may have no relevance to this case
17   whatsoever, could be highly prejudicial.  It is a case that has
18   been through a deferred prosecution or some sort of alternative
19   resolution and wiped from the records.  That might not go to
20   her credibility.  But I can see an argument being made.  And
21   what my ruling allows for is for you to exercise your judgment
22   and seek refuse from Judge Francis.
23             MR. MEYERSON:  Secondly, and this is again an inquiry,
24   assuming that my client decides that she doesn't want to persue
25   whatsoever emotional damage claims, and that the only claim she
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    34
64kPherM
```
 1   will make is for the loss of her liberty and the violation of
 2   her rights, the damage claim, and I withdraw that claim
 3   formally and in every which way.  I take it then the records
 4   become irrelevant?
 5             THE COURT:  You are asking for an advisory opinion?
 6             MR. MEYERSON:  No, I am asking, because there are
 7   three options, and the third option is to withdraw the lawsuit.
 8             I don't know what my client's answer is going to be.
 9   I never asked my client.  But I wanted to make the arguments
10   without me being affected that my client may elect to withdraw
11   the case, because I think that it is punitive.  I understand
12   your ruling and you are not punitive.
13             THE COURT:  I -- you can do the research.  If all she
14   is going to claim is mere loss of liberty, you know, I haven't
15   seen any cases that say one thing or another on it.  But you
16   can decide what you want to do.  I hope she doesn't withdraw
17   the whole case.
18             MR. MEYERSON:  I understand that.  You are not going
19   to rule on that.  But on the issue --
20             THE COURT:  I couldn't possibly.  I haven't thought
21   about it, it's an advisory opinion, I understand why you asked
22   for it.  But I can't answer the question, Mr. Meyerson.
23             MR. MEYERSON:  Okay.
24             MR. MIRRO:  You raised an issue about in-camera review
25   by Judge Francis of certain super sensitive records.  And that
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    35
64kPherM
```
 1   is an issue that, of course, came up in the MacNamara case.
 2   And we have that transcript.  And there you described the type
 3   of records of being extraordinarily sensitive.  I think the
 4   parties would benefit, Judge, from some clarification on what
 5   you mean.
 6             Here is my concern, Judge.  We have a motion pending
 7   right now before Judge Francis, where one of the plaintiff's
```
                              Page 16

4.20.06 Oral Arg Trans.txt

8  counsel is asking for Judge Francis to do a line-by-line review
9  of psychological records, and to adopt certain redactions and
10  so on.  So the issue is going to be, the issue is very ripe
11  before Judge Francis, I think it would be helpful if you could
12  give some guidelines as to what you think --
13       THE COURT:  I think I just did by way of example.  I
14  can't do any better than what I have done.
15       Again, you have to, from my standpoint, these have to
16  be culled down the middle.  The ruling that Mr. Meyerson got in
17  his favor as to your client's work history, and the privileges
18  and whatnot, if you had wanted to go to Judge Francis with
19  something super or extremely sensitive, then you can make that
20  application.
21       But it is more a, you-will-know-it-when-you-see-it
22  kind of thing.  I can't give more direction.  And, frankly, I
23  would be more reluctant to because my involvement in discovery
24  in this case is very different than Judge Francis's.  He is in
25  the weeds.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

36

64kPherM
1       So for me to tell him, an excellent jurist, to use Mr.
2  Meyerson's laudatory phrasing, somebody who is steeped in the
3  facts of these cases, to tell him how to evaluate these things,
4  would be folly.
5       Look, I am going to assume, with good reason, the good
6  faith of Mr. Meyerson.  And, of course, going to assume that
7  Judge Francis will give this an expedited and serious and
8  thorough review.  And to the extent people have a disagreement
9  with how he's handled it, I am here six days a week
10       MR. MIRRO:  One other question.  We have had
11  opportunity to review the MacNamara transcript where you talk
12  about the in-camera procedure.  One of the things you said, I
13  just want to know if you are still on board with this, that the
14  in-camera procedure should only be employed where something is
15  super or extraordinarily sensitive, and where, you said,
16  irrelevant to the case.
17       THE COURT:  But that is the balancing.  From Mr.
18  Meyerson's standpoint, the example I gave about, in the course
19  of meeting with a therapist, something got said that has
20  nothing to do with the therapy, just comes up with the
21  conversation.  I am taking an extreme example.  It arguably
22  will not be -- it is not discoverable, or even if it is
23  remotely relevant, and maybe there is some other reason to
24  preclude it being turned over, what if, in the context of
25  talking about her psychological past, she brings up a medical

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

64kPherM
1  issue that has got nothing to do with this case, deeply
2  personal medical issue, that has got nothing to do with this
3  case, then Judge Francis could decide that the records will get
4  turned over in redacted form.  I can't give any more direction
5  than that.
6       MR. MIRRO:  My only concern is that if a patient is
7  going to a psychotherapist or counselor or psychologist to deal
8  with her emotional distress, presumably serious emotional
9  distress, arising from something, whatever that something is,
10  then my question becomes, gee, is that still an issue in this
11  plaintiff's life, was it an issue at the time of her arrest.
12       THE COURT:  When you get something that is redacted

Page 17

4.20.06 Oral Arg Trans.txt

13  and you want to challenge it, you call me up and I will see
14  you.
15          MR. MEYERSON:  I take it that any records that are
16  eventually turned over to the city will be turned over under
17  protection?
18          THE COURT:  Yes.  Thank you, Mr. Meyerson.
19          MR. MEYERSON:  And finally, I am not sure what I am
20  going to do, and with all due respect to you, because I raised
21  it in my submission, I am asking you to certify the issue, it
22  is a very -- I am professionally and personally concerned about
23  this issue.  After 36 years, there are not too many issues that
24  pound me, because you have seen it all.  But this is kind of an
25  issue that I think is a very, very important issue.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                38

    64kPherM
1           THE COURT:  You don't even have the records handy
2   right now, so you are going -- it is going to take you some
3   time to get the records, go over them with your client, and you
4   can decide what you want to do.  And you can let me know.
5           MR. MEYERSON:  Thank you, your Honor.
6           THE COURT:  I don't think there is any prejudice to
7   defendants if, since Mr. Meyerson isn't sitting on the records
8   anyway, I would, even if he were, I would give him some time to
9   think it over.
10          I have been told many times by the city that you are
11  overworked anyway, so you can work on other motions that are
12  coming your way.
13          MR. DOUGHERTY:  Your Honor, just one, finally.  I just
14  want to be clear that Mr. Meyerson turns over the records to
15  Judge Francis, and he is not involved in any self-review or
16  redaction prior to these being closed to the case.  Plaintiff
17  should not be involved in selective determination of relevance
18  of their psychological records.
19          THE COURT:  I think what Mr. Meyerson and I talked
20  about is that he will turn them over, except to the extent
21  there is something he would like Judge Francis to review and
22  perhaps redact.  So what you are talking about is Mr. Meyerson
23  shows the documents to nobody, you or Judge Francis, that is
24  not at all what we talked about.
25          MR. DOUGHERTY:  I guess I just wanted some
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                39

    64kPherM
1   clarification.
2           THE COURT:  He is going to turn over his client's
3   mental history records.  But he is going to look at them in
4   their entirety and decide whether or not there are some things,
5   some documents, some records within that bundle that he would
6   like Judge Francis to say he doesn't have to turn over.  And
7   the rest of it he will turn over.  He will turn it over if
8   Judge Francis disagrees with him.  So everything gets turned
9   over unless Judge Francis says it doesn't.
10          MR. DOUGHERTY:  Thank you, your Honor.
11
12
13                          oOo
14
15
16
17

                        Page 18

4.20.06 Oral Arg Trans.txt
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/20/06

KYLA HANNAH HERSHEY-WILSON,

                Plaintiff,

    -v-

THE CITY OF NEW YORK, ET AL,

                Defendants.

Case No. 05-CV-7026 (KMK) (JCF)

ORDER

KENNETH M. KARAS, District Judge:

    For the reasons stated on the record at the April 20, 2006 conference, Plaintiff's Motion for Relief Pursuant to Fed. R. Civ. P. 72 from Magistrate Judge Francis's February 13, 2006 Order is DENIED.

    Pursuant to Magistrate Judge Francis's February 13, 2006 Order, Plaintiff is ORDERED to turn over all records to Defendants from hospitals, doctors, psychiatrists, psychologists, social workers, and other counselors who have treated Plaintiff within the past ten years for any mental, psychological, or emotional issues. These records are to be turned over pursuant to a protective order entered by this Court. Plaintiff may submit records to Magistrate Judge Francis for *in camera* review if she believes they contain extraordinarily sensitive or irrelevant information.

The Clerk of Court is directed to terminate this Motion (Doc. No. 20).

SO ORDERED.

Dated:        April 20, 2006
              New York, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KYLA HANNAH HERSHEY-WILSON,

Plaintiff,

-v-

THE CITY OF NEW YORK, ET AL,

Defendants.

Case No. 05-CV-7026 (KMK) (JCF)

ORDER

KENNETH M. KARAS, District Judge:

Having considered the submissions of the Parties, IT IS HEREBY ORDERED THAT:

Plaintiff's Motion for Reconsideration is DENIED. IT IS FURTHER ORDERED THAT:

Plaintiff's request for certification of the question to the Court of Appeals is DENIED.

On April 20, 2006, the Court heard oral argument on Plaintiff's Motion for Relief

pursuant to Federal Rule of Civil Procedure 72 of Magistrate Judge Francis' discovery ruling

requiring Plaintiff to produce certain mental health records. On the record and in an Order dated

that same day, the Court denied Plaintiff's Motion. On May 2, 2006, Plaintiff filed a Motion for

Reconsideration, or in the Alternative, for Certification of the Question to the Court of Appeals

("Motion for Reconsideration"). Familiarity with the facts of this case is presumed. For the

reasons stated below, Plaintiff's Motion is denied.

Motions for reconsideration are governed by Local Civil Rule 6.3 and Federal Rule of

Civl Procedure 59(e), which applies to interlocutory judgments and orders. *See Lichtenberg v.*

*Besicorp Group Inc.*, 204 F.3d 397, 400 (2d Cir. 2000). Pursuant to Rule 59(e), "[a] court is

justified in reconsidering its previous ruling if: (1) there is an intervening change in the

controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent obvious injustice." *Marino v. United States*, No. 97 Civ. 1884, 1998 WL 512958, at *1 (S.D.N.Y. Aug. 18, 1998). The standard for granting a motion for reconsideration is "strict, and reconsideration will generally be denied" unless the moving party can show that the Court "overlooked controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court." *Zinnamon v. Bank of New York*, No. 06 Civ. 1805, 2006 WL 1652662, at *1 (E.D.N.Y. June 8, 2006). The moving party cannot introduce arguments "not made in the challenged proceeding" in his motion for reconsideration. *Marino*, 1998 WL 512958, at *2. However, the moving party can introduce "additional relevant case law" to prove that the Court has made a clear error of law. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). It is within this Court's discretion to grant the Motion for Reconsideration. *See Dweck Law Firm, LLP v. Mann*, No. 03 Civ. 8967, 2004 WL 2202587, at *1 (S.D.N.Y. Sept. 30, 2004).

Plaintiff argues that the Court should reconsider its April 20, 2006 Order based on case law decided subsequent to this Court's Order. In *Greenberg v. Smolka*, No. 03 Civ. 8572, 2006 WL 1116521 (S.D.N.Y. Apr. 27, 2006), the court held that the plaintiff had not waived the psychotherapist-patient privilege by alleging emotional distress. *Id.* at *7. *Greenberg* constitutes neither controlling case law nor a change in the law.[1] First, *Greenberg* is a district court case,

---

[1] On September 18, 2006, Plaintiff submitted a letter requesting that the Court consider two additional cases not cited in Plaintiff's initial Motion for Reconsideration. Plaintiff argues that these cases – *Kunstler, et. al. v. City of New York*, No. 04 Civ. 1145, 2006 WL 2516625 (S.D.N.Y. Aug. 29, 2006) and *Brown v. Mineta*, No. 03 Civ. 2594 (E.D.N.Y. Oct. 14, 2005) – "further support[] the request for Reconsideration." (Letter from James I. Meyerson to the Court,

and therefore, is not controlling on this Court. Second, even the *Greenberg* court acknowledges that "the courts have not developed a consistent approach to whether and when waiver is properly inferred" where a plaintiff has asserted so-called "garden variety" emotional distress. *Id.* at *5. In its April 20, 2006 Order, this Court considered the relevant case law (including case law cited by Plaintiff) and determined that Plaintiff had waived the privilege.[2] Plaintiff has not demonstrated that there has been an intervening change in controlling law, that new evidence has come to light, or that this decision was a clear error of law. Accordingly, Plaintiff's Motion for Reconsideration is denied.

What remains is the question of Plaintiff's request for a certificate of appeal. Discovery orders generally are not appealable. *See, e.g., In re W.R. Grace & Co.*, 984 F.2d 587, 589 (2d Cir. 1993) (refusing to issue writ of mandamus on a pre-trial discovery order); *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 166 (2d Cir. 1992) (reaffirming "long-standing view" that interlocutory discovery orders are not appealable, even when a claim of privilege is involved); *Xerox Corp. v. SCM Corp.*, 534 F.2d 1031, 1031-32 (2d Cir. 1976) ("[W]e have repeatedly sought to make clear that in the absence of a certification pursuant to 28 U.S.C. § 1292(b) or of a showing of persistent disregard of the Rules of Civil Procedure, . . . or of a manifest abuse of discretion, . . . on the part of the district court, no

---

Sept. 16, 2006) However, like *Greenberg*, these cases constitute neither controlling case law nor a change in the law, and therefore do not support reconsideration under Rule 59(e).

[2]Plaintiff argues that the Second Circuit in *Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004) demonstrated an inclination to adopt her position. (Pl.'s Mem. 11) However, there is nothing in *Kerman* which would suggest such an interpretation. The passage to which Plaintiff refers is a discussion about damage awards for a loss of liberty claim, not the scope of discovery, and is not applicable to the issue in this case. *See id.* at 125.

3

jurisdictional basis exists for interlocutory review of pretrial discovery orders . . . ." (quotations and citations omitted)). If the Court believes that the "order involves a controlling question of law as to which there is substantial ground for difference of opinion *and* that an immediate appeal from the order may materially advance the ultimate termination of the litigation," the Court may certify the question for appeal. 28 U.S.C. § 1292(b) (emphasis added). Nevertheless, the Second Circuit has held that "although [section 1292(b)] was designed as a means to make an interlocutory appeal available, it is a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996).

Permitting appeal of the question at this juncture will not "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "An immediate appeal is considered to advance the ultimate termination of the litigation if that 'appeal promises to advance the time for trial or to shorten the time required for trial.'" *In re Oxford Health Plans, Inc.*, 182 F.R.D. 51, 53 (S.D.N.Y. 1998) (quoting 16 Charles A. Wright & Arthur Miller, Federal Practice and Procedure § 3930 (2d ed. 1996)). Reversal of this Court's discovery Order on appeal would have no effect on the commencement or the length of the trial. Plaintiff's emotional distress claim is one of several she makes. Therefore, even if a protective order were issued, there will still be extensive discovery related to her other claims. *See Lorentz v. Westinghouse Elec. Corp.*, 472 F. Supp. 954, 956 (D. Pa. 1979) ("[C]ourts have refused certification for interlocutory orders because the question involved in the interlocutory appeal was only one of many triable issues."). Moreover, Plaintiff concedes that the magnitude of her mental health records is not great. Whether those records are discoverable will have little effect

on the discovery schedule or the time for trial.

Because the Court finds that appeal of the instant discovery Order will not advance the ultimate termination of the litigation, it need not address whether there is a controlling question of law or whether there is substantial ground for difference of opinion. Accordingly, Plaintiff's request to have this issue certified for appeal is denied.

The Clerk of the Court is directed to terminate the Motion (Doc. No. 32).


SO ORDERED.

Dated:        September 20, 2006
              New York, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

5

Service List:

James I. Meyerson
396 Broadway
#601
New York, NY 10013
Fax: (212) 219-9412
*Counsel for Plaintiff*

Jay Alan Kranis
Jeffrey Anthony Dougherty
City of New York Law Department
100 Church Street
New York, NY 10007
Fax: (212) 788-9776
*Counsel for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NEW YORK 10007-1312

Chambers of
Kenneth M. Karas

# FAX COVER SHEET

Date:       9/21/2006

To:         James Meyerson (Fax: 212.219.9412)
            Jay Kranis (Fax: 212.788.9776)

From:       Law Clerk

In Re:      *Hershey-Wilson v. City of New York*, 05-CV-7026

Pages:      7 (including cover)

Notes:      **<u>Please notify all parties.</u>**