UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

| | |
|---|---|
| RNC CONSOLIDATED CASES, | **DECLARATION OF RAJU SUNDARAN**<br><br>(RJS)(JCF) |

------------------------------------------------------------------------ x

RAJU SUNDARAN, an attorney duly admitted to practice in the United States District Court for the Southern District of New York, declares under penalty of perjury and pursuant to 28 U.S.C. §1746 that the following is true and correct:

1.      I am an Assistant Corporation Counsel in the office of MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, attorney for defendants.

2.      I am familiar with the facts and circumstances stated herein based upon personal knowledge, the books and records of the City of New York, and conversations with its agents and employees. I submit this declaration in support of defendants' reply memorandum of law in further support of their objections to the order of Magistrate Judge James C. Francis IV's, dated January 23, 2008, granting plaintiffs' motions to amend in part.

3.      Annexed hereto as Exhibit G is the Order of Magistrate Judge James C. Francis IV, entered March 19, 2008, in all RNC actions concerning the RNC case management orders.

4.      Annexed hereto as Exhibit H is the Order of Magistrate Judge James C. Francis IV, entered July 5, 2007, in all RNC actions concerning deposition scheduling.

5.      Annexed hereto as Exhibit I is the Order of Magistrate Judge James C. Francis IV, entered October 26, 2007 in all RNC actions suspending deadlines for submission of dispositive motions in each case management order.

6.    Annexed hereto as <u>Exhibit J</u> is Order of the Honorable Kenneth M. Karas, entered on July 21, 2005 in <u>MacNamara, *et al.* v. City of New York, *et al.*</u>, 04 CV 9216 (RJS)(JCF).

7.    Annexed hereto as <u>Exhibit K</u> is the Case Management Order, entered May 5, 2006, in <u>Tikkun v. City of New York, *et al.*</u>, 05 CV 9901 (RJS)(JCF) specifically setting forth the deadline to amend the complaint.

8.    Annexed hereto as <u>Exhibit L</u> is the Case Management Order, entered May 15, 2006, in <u>Portera, *et al.* v. City of New York, *et al.*</u>, 05 CV 9985 (RJS)(JCF) specifically setting forth the deadline to amend the complaint.

9.    Annexed hereto as <u>Exhibit M</u> is the Case Management Order, entered November 9, 2005, in <u>Lee v. City of New York, *et al.*</u>, 05 CV 5528 (RJS)(JCF) and <u>Cohen v. City of New York, *et* al.</u>, 05 CV 6780 (RJS)(JCF) specifically setting forth the deadline to amend the complaint.

10.    Annexed hereto as <u>Exhibit N</u> is the Case Management Order, entered November 10, 2005, in <u>Bell v. City of New York, *et al.*</u>, 05 CV 3705 (RJS)(JCF) and <u>Starin v. City of New York, *et* al.</u>, 05 CV 5152 (RJS)(JCF) specifically setting forth the deadline to amend the complaint.

11.    Annexed hereto as <u>Exhibit O</u> is the Order of Magistrate Judge James C. Francis IV, entered November 20, 2006, in <u>Phillips, *et al.* v. City of New York, *et al.*</u>, 05 CV 7624 (RJS)(JCF); <u>Coburn, *et al.* v. City of New York, *et al.*</u>, 05 CV 7623 (RJS)(JCF); <u>Sloan, *et al.* v. City of New York, *et al.*</u>, 05 CV 7668 (RJS)(JCF); <u>Galitzer v. City of New York, *et al.*</u>, 05 CV 7669 (RJS)(JCF); <u>Bastidas, *et al.* v. City of New York, *et al.*</u>, 05 CV 7670 (RJS)(JCF); <u>Carney, *et al.* v. City of New York, *et al.*</u>, 05 CV 7672 (RJS)(JCF); and <u>Sikelianos v. City of New York, *et al.*</u>, 05 CV 7673 (RJS)(JCF) and the Order of Magistrate Judge James C. Francis IV, entered

March 2, 2007, in <u>Drescher v. City of New York, *et al.*</u>, 05 CV 7541 (RJS)(JCF), concerning discovery deadlines in the case management orders.

12.     Annexed hereto as <u>Exhibit P</u> are excerpts from the Deposition Testimony of Chief Terence Monahan in the RNC cases specifically identifying Commissioner David Cohen in connection with the RNC.

13.     Annexed hereto as <u>Exhibit Q</u> are excerpts from the Deposition Testimony of Chief Joseph Esposito in the RNC cases specifically identifying Commissioner David Cohen in connection with the RNC.

14.     Annexed hereto as <u>Exhibit R</u> is the Letter from James Mirro, Esq., dated February 1, 2008, to the Honorable Richard J. Sullivan, U.S.D.J., concerning the proposed briefing schedule for defendants' Rule 72 Appeal of Magistrate James C. Francis IV's January 23, 2008 Order granting plaintiffs' motion to amend in part.

15.     Annexed hereto as <u>Exhibit S</u> is an Email from Clare Norins, Esq., dated February 3, 2008, to defendants' request for consent to the proposed Rule 72 briefing schedule.

16.     I certify that the documents attached as Exhibits G through S to this declaration are true and correct copies of the original documents.

Dated: New York, New York
      April 7, 2008

                                  RAJU SUNDARAN (RS 8011)
                                  Assistant Corporation Counsel

## Appendix of Cases On Appeal Of January 23, 2008 Order

1. MacNamara, *et al.* v. City of New York, *et al.*, 04 CV 9216 (RJS)(JCF).

2. Rechtschaffer v. City of New York, *et al.*, 05 CV 9930 (RJS)(JCF).

3. Portera v. City of New York, *et al.*, 05 CV 9985 (RJS)(JCF).

4. Bunim, *et al.* v. City of New York, *et al.*, 05 CV 1562 (RJS)(JCF).

5. Kalra, *et al.* v. City of New York, *et al.*, 05 CV 1563 (RJS)(JCF).

6. Ryan, *et al.* v. City of New York, *et al.*, 05 CV 1564 (RJS)(JCF).

7. Garbini, *et al.* v. City of New York, *et al.*, 05 CV 1565 (RJS)(JCF).

8. Greenwald, *et al.* v. City of New York, *et al.*, 05 CV 1566 (RJS)(JCF).

9. Pickett, *et al.* v. City of New York, *et al.*, 05 CV 1567 (RJS)(JCF).

10. Tremayne, *et al.* v. City of New York, *et al.*, 05 CV 1568 (RJS)(JCF).

11. Biddle, *et al.* v. City of New York, *et al.*, 05 CV 1570 (RJS)(JCF).

12. Moran, *et al.* v. City of New York, *et al.*, 05 CV 1571 (RJS)(JCF).

13. Botbol, *et al.* v. City of New York, *et al.*, 05 CV 1572 (RJS)(JCF).

14. Crotty, *et al.* v. City of New York, *et al.*, 05 CV 7577 (RJS)(JCF).

15. Stark, *et al.* v. City of New York, *et al.*, 05 CV 7579 (RJS)(JCF).

16. Lalier, *et al.* v. City of New York, *et al.*, 05 CV 7580 (RJS)(JCF).

17. Grosso v. City of New York, *et al.*, 05 CV 5080 (RJS)(JCF).

18. Dudek v. City of New York, *et al.*, 04 CV 10178 (RJS)(JCF).

19. Bell v. City of New York, *et al.*, 05 CV 3705 (RJS)(JCF).

20. Starin v. City of New York, *et al.*, 05 CV 5152 (RJS)(JCF).

21. Lee v. City of New York, *et al.*, 05 CV 5528 (RJS)(JCF).

22. Cohen v. City of New York, *et al.*, 05 CV 6780 (RJS)(JCF).

23.    Phillips, *et al.* v. City of New York, *et al.*, 05 CV 7624 (RJS)(JCF).

24.    Coburn, *et al.* v. City of New York, *et al.*, 05 CV 7623 (RJS)(JCF).

25.    Drescher v. City of New York, *et al.*, 05 CV 7541 (RJS)(JCF).

26.    Bastidas, *et al.* v. City of New York, *et al.*, 05 CV 7670 (RJS)(JCF).

27.    Xu, *et al.* v. City of New York, *et al.*, 05 CV 7672 (RJS)(JCF).

28.    Sloan, *et al.* v. City of New York, *et al.*, 05 CV 7668 (RJS)(JCF).

29.    Galitzer v. City of New York, *et al.*, 05 CV 7669 (RJS)(JCF).

30.    Sikelianos v. City of New York, *et al.*, 05 CV 7673 (RJS)(JCF).

31.    Abdell, *et al.* v. City of New York, *et al.*, 05 CV 8453 (RJS)(JCF).

32.    Adams, *et al.* v. City of New York, *et al.*, 05 CV 9484 (RJS)(JCF).

33.    Araneda, *et al.* v. City of New York, *et al.*, 05 CV 9738 (RJS)(JCF).

34.    Eastwood, *et al.* v. City of New York, *et al.*, 05 CV 9483 (RJS)(JCF).

35.    Tikkun v. City of New York, *et al.*, 05 CV 9901 (RJS)(JCF).

# EXHIBIT G

THIS ORDER IS TO BE DOCKETED & FILED IN ALL RNC CASES

UNITED STATES DISTRICT COURT                  (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - :
MICHAEL SCHILLER, et al.,                     : 04 Civ. 7922 (RJS) (JCF)
                                              :    *LEAD CASE*
                Plaintiffs,                    :
                                              :
     - against -                              :
                                              :
THE CITY OF NEW YORK, et al.,                 :
                                              :
                Defendants.                    :
- - - - - - - - - - - - - - - - - - - - - :
HACER DINLER, et al.,                         : 04 Civ. 7921 (RJS) (JCF)
                                              :
                Plaintiffs,                    :       O R D E R
                                              :
     - against -                              :
                                              :
THE CITY OF NEW YORK, et al.,                 :
                                              :
                Defendants.                    :
- - - - - - - - - - - - - - - - - - - - - :

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

┌────────────────────────────────┐
│ USDS SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____                  │
│ DATE FILED: 3/19/08             │
└────────────────────────────────┘

        Defendants having requested by letter dated February 13, 2008

an order requiring plaintiffs in all RNC cases to identify those

non-party witnesses they expect to call at trial, it is hereby

ORDERED as follows:

        1.  By March 31, 2008, counsel for all parties shall identify

all non-party fact witnesses that they reasonably expect to testify

at trial on behalf of their respective clients.

        2.  Absent exceptional circumstances, depositions of fact

witnesses are concluded in all RNC cases, consistent with the case

management orders.  While some of the case management orders were

extended de facto by the master deposition scheduling order, there

was no basis for assuming that they had been abandoned altogether.

This Order does not preclude depositions necessitated by Judge

Sullivan's determination of issues now pending before him.


SO ORDERED.


JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           March 19, 2008


Copies mailed this date:

All Plaintiff's Counsel

Gerald S. Smith, Esq.
Senior Corporation Counsel
City of New York Law Department
100 Church Street
New York, NY 10007

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

(ECF)

- - - - - - - - - - - - - - - - - :

MICHAEL SCHILLER, FRANCESCA
FIORENTINI, ROBERT CURLEY, and
NEAL CURLEY,

        . Plaintiffs,

    - against -

The CITY OF NEW YORK; RAYMOND
KELLY, Commissioner of the New
York City Police Department;
TERENCE MONAHAN, Assistant Chief
of the Bronx Bureau of the New
York City Police Department,

        Defendants.

- - - - - - - - - - - - - - - - - :

HACER DINLER, ANN MAURER, ASHLEY
WATERS,

        Plaintiffs,

    - against -

CITY OF NEW YORK, COMMISSIONER
RAYMOND KELLY,

        Defendants.

- - - - - - - - - - - - - - - - - :

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

04 Civ. 7922 (KMK) (JCF)

*LEAD CASE*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/5/07

*DOCKET IN ALL
RNC CASES*

04 Civ. 7921 (KMK) (JCF)

O R D E R

    Counsel having submitted lists of agreed dates for depositions as well as lists of deponents for whom no date has been agreed upon, it is hereby ORDERED as follows:

    1.  Depositions shall be conducted in accordance with the schedule set forth in the Appendix to this order.  Counsel may deviate from that schedule only upon written stipulation or further order of the Court.

    2.  Where counsel appear to have agreed on more than one date for any witness, that witness has been listed for multiple dates.

3. Witnesses previously deposed have not been included in the schedule. If and when a dispute arises concerning either the propriety of recalling such a witness or the date of such a deposition, I will adjudicate those issues.

4. All counsel shall receive electronic notice of this order via ECF.


SO ORDERED.


JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          July 5, 2007

Copies mailed this date:

Christopher T. Dunn, Esq.
New York Civil Liberties Union
125 Broad Street, 17th Floor
New York, New York  10004

Peter G. Farrell, Esq.
Special Assistant Corporation Counsel
City of New York Law Department
100 Church Street
New York, New York 10007

Joseph Carranza
P.O. Box 575060
Whitestone, New York 11357

## APPENDIX

July 2-6, 2007

| Date | Plaintiffs Witnesses | Defendants Witnesses |
|------|---------------------|---------------------|
| 7/2 | Crotty | |
| 7/3 | Geocos<br>Hardesty | PO Denise Rose Hinksman<br>Sgt. Sean O'Connor |
| 7/5 | | DC Vincent Giordano |
| 7/6 | Flynn | |

July 9-13, 2007

| Date | Plaintiffs Witnesses | Defendants Witnesses |
|------|---------------------|---------------------|
| 7/9 | Ryan | Captain William Crossan<br>PO Linder |
| 7/10 | Lucrezia<br>Neary<br>Roebling<br>Tepsic | PO Keri Mitchell<br>Sgt. Evan Minoque<br>Lt. David Sleve<br>Insp. James McCarthy |
| 7/11 | Henriksen<br>Heinegg<br>Migliore<br>Burns | |
| 7/12 | Rochfort<br>Charity James | PO Donald Nelzi<br>Sgt. Michael Sold<br>PO Jeremiah Malone |
| 7/13 | Rosemoore<br>Vaughan<br>Poe<br>Hannah Janeway | Captain Ronald Mercandetti |

July 16-20, 2007

| Date | Plaintiffs Witnesses | Defendants Witnesses |
|------|---------------------|---------------------|
| 7/16 | Ponce<br>Lorusso<br>Stone | Sgt. Allison Mullen<br>Lt. Byrne<br>PO Michael Eils<br>PO Michael Caligere<br>Lt. Brian Jackson<br>Lt. Chris Delsante |
| 7/17 | Vaull<br>Milne<br>Marx | Sgt. Eddie Murpy<br>Det. Michael Cummings<br>PO Phillip Facenda<br>PO Magdalen Kobiolka<br>PO Yahaira LaChapell |

| 7/18 | Lalier<br>Marty<br>Rosenberg<br>Paris | Lt. James O'Sullivan<br>Sgt. Jorge Encarnacion<br>PO Cuong Nguyen |
|---|---|---|
| 7/19 | Paine<br>C. Lee<br>Ortiz<br>Palmer | UC 6216<br>PO Johanna Greenberg<br>PO Timothy Cai<br>PO Ed Harrigan |
| 7/20 | Parrot<br>Melchor<br>Church<br>Howe | Lt. John Berquist<br>PO Valerio Rodriguez<br>PO Joseph Cappleman |

### July 23-27, 2007

| 7/23 | Biddle<br>Benjamin<br>Goldenberg<br>Jashnani | Cpt. Chico<br>Cpt. Alexander Laera<br>EMT Emery Taylor |
|---|---|---|
| 7/24 | Biddle<br>Ingber<br>Wipfli<br>Henry | PO Vincent Fortunato<br>PO Victor Perez<br>Sgt. Allison Keating<br>PO Tyree Fischer<br>PO Sal Sedita |
| 7/25 | Wood<br>Hasa<br>Feinstein<br>Miller | Chief William Morris<br>Sgt. Donnelly<br>Sgt. Darligan |
| 7/26 | Bekavac<br>Hardesty<br>Dickerson<br>St. Laurent | Connie Fisher<br>Lt. John Dolan<br>Sgt. Evelyn Rivera<br>Sgt. Conor McCourt<br>PO Brett Bara<br>PO Heriberto Mercado |
| 7/27 | Adams<br>Stark<br>Cheung<br>Petrick | John Doe White Shirt Supervisor |

### July 30-Aug.3, 2007

| 7/30 | Stipe<br>Muellan<br>Pogge<br>Goldberg | Lt. Daniel Albano<br>PO Courtney Hamlin<br>Sergio Coppola |
|---|---|---|
| 7/31 | Zalk<br>Crook<br>Mukerjee<br>Robinson | DI Michael Yanosik<br>Sgt. William Murphy<br>PO Remy Randall<br>PO Daniel Ryan<br>PO Christopher Chan<br>PO Patrick Speechley |

| 8/1 | Giuliani<br>Roberts<br>Swink<br>Howard | Steven Hammerman<br>PO Jose Chaparro |
|---|---|---|
| 8/2 | Mitrano<br>Albert<br>Raymond | Insp. Thomas Pelligrino<br>Captain Eugene Montchal<br>PO Daniel Jasinski<br>Lt. John Pribetich |
| 8/3 | Fowler<br>Bornstein<br>Nechay<br>Shiller | PO Adam Piergostino<br>PO Thomas Carney<br>PO Patrice Barolette |

Aug. 6-10, 2007

| 8/6 | Sladek<br>Averbakh<br>Jones<br>O'Reilly | PO Michael Balicki<br>Sgt. Bolte<br>PO Jagdeep Singh |
|---|---|---|
| 8/7 | Griffith<br>Wood<br>Hall<br>Turse | PO John Cousins |
| 8/8 | Taft<br>Alexander<br>Tejada<br>Ellisen | PO Melissa Roman<br>Insp. Ward |
| 8/9 | Lewis<br>Sidle<br>Ogden-Nuss<br>Remmes | PO Gregory Karnbach<br>Ranking DCPI employees at 16th St.<br>Ranking NYPD Legal Bureau at 16th St. |
| 8/10 | Bensen<br>Sidle<br>Lefemine | Sgt. Michael Ingram<br>PO Javier Cordero<br>Chief Michael Scagnelli<br>Sgt. Arthur Smarsch<br>PO Kathleen Curnyn |

Aug. 13-17, 2007

| 8/13 | Nelia<br>Calabrese<br>Cook<br>Bhalla | PO Raymond Ng<br>Ranking DCPI employee Fulton St.<br>PO Matt Wohl<br>PO Walter Padilla<br>PO Martin Vasquez |
|---|---|---|
| 8/14 | Flaton<br>Luci<br>Bunn<br>Rigby | Lt. James Griffin<br>Lt. Joseph Sitro<br>PO Michael Carrieri<br>PO Joseph Andrade |

| 8/15 | Gingold<br>Lang<br>Richins | PO Kegham Jarjokian<br>Cmmr. Garry McCarthy<br>Cmmr. Robert Messner<br>"Blue"<br>PO Christopher Triquet |
|---|---|---|
| 8/16 | Chandra<br>Rivera<br>Spector<br>Rettstadt | Capt. Robert Bonifati<br>Sgt. Crichigno<br>Sgt. Daniel Sarrubbo |
| 8/17 | Botbol<br>Blackburn<br>Kyne | Captain Dowling<br>PO Steven Papola |

Aug. 20-24, 2007

| 8/20 | Roth<br>Lassel<br>Behling<br>Duncan | Captain Dermot Shea<br>PO Brian McSweeney<br>PO James Wolff<br>PO John Rooney |
|---|---|---|
| 8/21 | Rechtschaffer<br>Bhagat<br>Rubin<br>Dietzen<br>Cohen | PO Neil Rodriguez<br>Sean Gumbs<br>Patrick Quigley |
| 8/22 | Rorvig<br>Langley<br>Emmer<br>Knapp | PO Victoria Schneider |
| 8/23 | O'Dierno<br>Todd<br>Glick<br>Grisham | PO Noel Rodriguez<br>Insp. John Hughes |
| 8/24 | Pielri<br>Winkler<br>T. Gaster | Sgt. Gregory Pekera<br>PO Jason Wolf<br>PO Tanisha Diaz<br>Martin Paolino<br>Sgt. Leslie Chan |

Aug. 27-31, 2007

| 8/27 | Aikman<br>Davidson<br>Trinkl<br>Eastwood | PO Michael Filoseta<br>Lt. Chris Pasquarelli |
|---|---|---|
| 8/28 | Pelcynski<br>Muench<br>Rosenthal<br>Trudell<br>C. Dwyer | Sgt. Jim Giambrone<br>Sgt. Hugh Byrne |

| 8/29 | Fremont<br>Borok<br>Renwick<br>Hunt<br>Martin | Sgt. Anthony Rivers<br>Sgt. Janus Fitzpatrick<br>PO David Lawrence<br>PO Gregory Markowski |
|------|------|------|
| 8/30 | Portera<br>Buhle<br>Walker<br>Wu | Lt. Antonio Venice |
| 8/31 | Greenwald<br>Vreeland<br>Conley | PO Anthony Mason |

Sept. 3-7, 2007

| 9/4 | Galitzer<br>Brar<br>DeBruhl<br>Gaster | Sgt. Holmes |
|------|------|------|
| 9/5 | Viertel<br>Janeway<br>Tremayne<br>Stephens<br>Kalra | Lt. Christopher Czark<br>Sgt. John White<br>Sgt. Anthony Dellavalle |
| 9/6 | Katz<br>Kappel<br>Gamboa<br>Sanchez<br>Albertson | PO Francesco Belluscio<br>PO Robert Hamer |
| 9/7 | Biddle<br>Rubinfeld<br>Ferrand-Sapsis<br>Wilson<br>Walden<br>Carranza | Comm. Thomas Doepfner |

Sept. 10-14, 2007

| 9/10 | Argyros<br>Quick<br>Reyna<br>Janney<br>Wright | Sgt. Geraldine Falcon<br>Sgt. Frederick Grover<br>PO John Martinez<br>PO Jacqueline DeCarlo |
|------|------|------|
| 9/11 | Juarez<br>Mathews<br>Williamson<br>Esquiviel | Ruby Marin-Jordan<br>Det. Ahearn<br>Sgt. DeConne |

| 9/12 | Kojis<br>Holt<br>Gross<br>Ekberg<br>Albertson | Lt. John Connolly |
|------|------|------|
| 9/13 | Freas<br>Davies<br>A. Sensiba<br>G. Sensiba | Insp. Kerry Sweet |
| 9/14 | Bastidas<br>Shekarchi<br>Mulligan<br>Segal<br>Jordan | PO Kevin Scott<br>Sgt. Anthony Kempinski<br>Sgt. Marc Manara |

Sept. 17-21, 2007

| 9/17 | Soloff<br>Becker<br>Capps<br>Lovecchio | Insp. John O'Connell<br>PO Joseph Fong<br>PO Brian Martin<br>PO John Murtagh |
|------|------|------|
| 9/18 | Sakayama<br>Edwards<br>Epstein<br>Drummond<br>Walsh | SA Stephen Hughes |
| 9/19 | Reed<br>Rahn<br>Vik<br>Hotchkiss<br>O'Reilly-Rowe | Captain Thomas Arnet<br>PO Bart Pipcinski<br>Lt. Daniel Hayes<br>Sgt. Steven Dean<br>Mark Vazques |
| 9/20 | Majmudar<br>Schulmeister<br>Consigny<br>Catchpole<br>Drescher | PO Raul Santos<br>PO Michael Christian |
| 9/21 | Weaver<br>Belbin<br>Parry<br>Spritzer | Captain Andrew Savino<br>PO Santo Ippolito<br>PO William Haut |

Sept. 24-28, 2007

| 9/24 | Barron<br>Cox<br>Pardew<br>D. Dwyer<br>Petrello | Lt. Daniel MacFarland<br>PO Neil Stumpf<br>PO Christopher Krutys |
|------|------|------|

| 9/25 | Laura<br>K. Roberts<br>Bunim<br>Zambeck<br>Arenda | PO Michael Safoshnick<br>PO Josh Lewis<br>PO Linda Araque<br>PO Mark Steiner |
|---|---|---|
| 9/26 | Caspar<br>Dyer<br>Schoemann<br>Wilson<br>Miller | Crim. Justice Coordinator Reps.<br>Sgt. O'Toole<br>Sgt. Marerro |
| 9/27 | Adamson<br>Haglund<br>Podber<br>Ditman<br>Cohnen | Sgt. Gantt<br>White shirted supervisor |
| 9/28 | Jabour<br>Shaw<br>Weikart<br>Noonan<br>Lang | Yahoshua Blisko |

Oct. 1-5, 2007

| 10/1 | Xu<br>Zariela<br>Handleman<br>Assam<br>Kressly | PO Debra Mitchell<br>PO James Grimes<br>PO Alberto Angilletta<br>PO Rene Sola |
|---|---|---|
| 10/2 | Kaplan<br>Vendetti<br>Pan<br>Rueckner | Det. Joseph Sobolewski<br>PO Jason Stewart<br>PO Sontz<br>PO Timothy Spies<br>PO Ebony Huntley |
| 10/3 | Heinhold<br>Kunz<br>Ellmannn<br>Martini<br>Miller | PO Mona Phillips<br>Capt. Kavanaugh<br>Carmine Fiore |
| 10/4 | Flanigan<br>Eifert<br>Toerper<br>James<br>Cavanagh | Lt. Connolly<br>Sgt. Chang<br>Det. Nicholas Stanich<br>PO Brendan Meehan |
| 10/5 | Miller<br>Hurley<br>Whitney<br>Norwid<br>Turner | PO Jason Martinoff<br>Sgt. Thomas Durkin<br>PO Gary Florencio |

Oct. 8-12, 2007

| | | |
|---|---|---|
| 10/8 | Potok | Sgt. Ronald Meyers |
| | Gibbons | Sgt. Gerald Fitzpatrick |
| | | PO Poletto |
| | | PO Glenn Hudecek |
| | | |
| 10/9 | Lesser | PO Elvis Shero |
| | Dress | Carlos Pucheco |
| | Taylor | Isaura Peralta |
| | Hottle | |
| | Lahn | |
| | | |
| 10/10 | Reilly | Amir Rasheed |
| | Levin | PO Donna Farrell |
| | Lynn | PO Shawn Allen |
| | Hernandez | |
| | Tikkun | |
| | | |
| 10/11 | Porto | Commander Charles DiRienzo |
| | Rosen | Lt. Charles Harnan |
| | Weltha | PO Gregory Michels |
| | Rose | PO Louron Hall |
| | Kanouse | |
| | | |
| 10/12 | Phillips | Shakeel Ansari |
| | Maddox | PO James Chung |
| | Grimshaw | PO Michael Bonacci |
| | M. Lee | PO Pavel Gomez |
| | Ashbeck | |

Oct. 15-19, 2007

| | | |
|---|---|---|
| 10/15 | Harak | PO Shield 4483 |
| | Coburn | Sgt. Young |
| | Heifetz | PO Steven Caraballo |
| | Bacon | PO Hui Chi |
| | Davis | |
| | | |
| 10/16 | Ross | PO Manzi |
| | Cody | PO Adam Panasuk |
| | Strasser | PO Michael Ali |
| | Barber | |
| | Larson | |
| | | |
| 10/17 | Conklin | PO Matthew Sherman |
| | Palmer | PO Maria Veliz |
| | McGee | PO Victor Lebron |
| | Gross | PO James Connolly |
| | Kantor | |
| | | |
| 10/18 | Goldstein | Sgt. Gutierrez |
| | Peterson | Sgt. Reynolds |
| | Carney | Sgt. Rivers |
| | Kavanagh | Sgt. Rivera |

| | | |
|---|---|---|
| 10/19 | Espisito<br>Tuzzolo<br>McEldowney<br>Langergaard<br>Kocek | PO Gabriel Healy<br>Gregory Fontaine |

Oct. 22-26, 2007

| | | |
|---|---|---|
| 10/22 | Thomas-Melly<br>Aronowsky<br>Breznau<br>Nawalkowsky<br>Laken | PO Tyrone Riggan<br>PO Franklin Diaz<br>PO Colleen Killen |
| 10/23 | Wilcox<br>Mahoney<br>Murdock<br>Crane<br>Hill | Policy Witness (Tikkun) |
| 10/24 | Weiss<br>Partnow<br>Seshimo<br>Lanctot<br>Hedemann | PO Felicia Alfred<br>PO Sgt. Calderone |
| 10/25 | Swanson<br>Sassone<br>Pickett<br>Duvall<br>Lahond | PO Kimberly Daly<br>PO Michael Gonzalez<br>PO Terence McMenamy |
| 10/26 | Stefanelli<br>Gindi<br>Anastasio<br>Barrows<br>Boisvert | PO Giuseppe Ganci<br>Sgt. Shield 2713<br>PO Lucille Fredericks |

Oct. 29-Nov. 2, 2007

| | | |
|---|---|---|
| 10/29 | Sikelianos<br>Kaye<br>Sperry<br>Wetherby<br>Siegel | PO John Woods<br>PO Michael Deckert |
| 10/30 | Meyer<br>Pelzek<br>Gordon<br>Barfield | PO Moises Martinez<br>PO Thomas McDonnell |
| 10/31 | Sloan<br>Fix<br>Adams<br>Logan<br>Parrott | PO Joseph Bucchignano<br>PO Virgilio Benscosme |

| 11/1 | Lovejoy<br>Philips<br>Lebet<br>Nicinski<br>McGee | Lt. James Johnson<br>Captain McCormack |
|---|---|---|
| 11/2 | Hobbs<br><br>Vilanova-Marques<br>Duhaime<br>San Marchi<br>Dorals | Official re DOCS Planning &<br>Arrest Processing<br>David Szaboles<br>Stephen Valentine |

Nov. 5-9, 2007

| 11/5 | Flynn<br>Martin<br>White<br>Shotwell<br>Colville | PO Robert Martin<br>PO Gerard Neumann |
|---|---|---|
| 11/6 | Hankin | Sgt. Acosta<br>Shield 14447<br>Lt. Thomas Lowe |
| 11/7 | Schutzenhofer<br>Moran<br>Freitag<br>Krassan<br>Benn | Roland Betts<br>PO Gregory Bell |
| 11/8 | Adame<br>Elfrank-Dana<br>Reyes<br>Scofield<br>Kern | Insp. James Capaldo<br>Lt. Raymond Spinella<br>PO Michael Ho<br>PO Drew Repetti |
| 11/9 | Landwehr<br>Jenkins<br>Pincus<br>D'Ornellas<br>Murray | PO Khamwate Brijbukhan<br>PO Dominick Bizarro |

Nov. 12-16, 2007

| 11/12 | Walsh<br>Perry<br>Hardie<br>Joseph | PO John Epstein<br>N. Hoy |
|---|---|---|
| 11/13 | Corley<br>Ross<br>Bernard<br>Beeny | Scooter Supervisor |

| 11/14 | Doxtader<br>Kerns<br>Burns<br>DeMott | PO James Roscher<br>Det. Christopher Ambrose<br>PO Thomas Crean<br>PO David Cicatiello |
|-------|------|------|
| 11/15 | Hill<br>Prokop<br>Kinane | Kenneth Singleton<br>PO Matthew Loftus |
| 11/16 | Charney<br>Agnase<br>Gunn<br>Ivors | Cpt. John Scolaro |

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - :
MICHAEL SCHILLER, et al.,            :    04 Civ. 7922 (RJS) (JCF)
                                     :         *LEAD CASE*
              Plaintiffs,            :
                                     :    DOCKET IN ALL RELATED CASES
        - against -                  :
                                     :
THE CITY OF NEW YORK, et al.,        :
                                     :
              Defendants.            :
- - - - - - - - - - - - - - - - - - :
HACER DINLER, et al.,                :    04 Civ. 7921 (RJS) (JCF)
                                     :
              Plaintiffs,            :
                                     :         O R D E R
        - against -                  :
                                     :
THE CITY OF NEW YORK, et al.,        :
                                     :
                                     :
              Defendants.            :
- - - - - - - - - - - - - - - - - - :
```

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:
> DATE FILED: 10/26/07

In view of the outstanding discovery issues in many of the cases consolidated for discovery, the deadlines currently established by each case management order for submission of dispositive motions are suspended pending further order of the Court.

SO ORDERED.

*James C. Francis IV*

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          October 26, 2007

# EXHIBIT J

JUL 1 · 2005

**MOORE & GOODMAN, LLP**
ATTORNEYS AT LAW
740 BROADWAY AT ASTOR PLACE
NEW YORK, N.Y. 10003-9518

TELEPHONE (212) 353-9587
FACSIMILE (212) 674-4614

**MEMO ENDORSED**

JONATHAN C. MOORE*
WILLIAM H. GOODMAN**

DAVID MILTON

*ALSO ADMITTED IN CALIFORNIA AND ILLINOIS
**ALSO ADMITTED IN MICHIGAN

JANICE M. BADALUTZ
PARALEGAL/INVESTIGATOR

OF COUNSEL
MICHAEL HADDAD
JULIA SHERWIN

July 5, 2005

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/2/05

**VIA FAX: 212-805-7968**
The Honorable Kenneth M. Karas
United States District Court
500 Pearl Street
New York, NY 10007

Re:   MacNamara et al. V. City of New York, et al., 04 CV 9216 (KMK)

Your Honor,

Our law office has unexpectedly lost our lease and as a consequence, we are requesting a three-month delay in the previously negotiated and ordered Case Management Order (CMO) in the above-captioned case. I have contacted counsel for the defendants and we have agreed upon the following modifications in the CMO and are jointly requesting that the Court enter an Order, in accordance therewith.

We have agreed that, with the Court's permission, all dates set forth in the CMO (beginning with Paragraph 8) shall be postponed three months, with the following conditions and exceptions:

1.   Plaintiffs' responses to the City's interrogatories and document requests, served on May 20, 2005, along with all executed releases, shall be served upon the City on a rolling basis, but no later that July 18, 2005;

2.   The depositions of the named plaintiffs, noticed by the defendants on June 15, 2005 are adjourned until the pertinent records are produced and the parties set mutually convenient dates for the depositions, with the understanding that the last of these depositions shall be completed before plaintiffs serve their motion for class certification;

3.   All of the provisions of the current CMO remain in place except those deadlines

07/11/2005 17 52 FAX  212 674 4614          RABINOWITZ BOUDIN                      ☑ 003/003

MOORE & GOODMAN, LLP                    **MEMO ENDORSED**

affected by this agreement and Order;

4.   Plaintiffs shall file their Amended Complaint by July 15, 2005, and defendants'
response shall be due by August 22, 2005;

5.   In the event that any witnesses whom the plaintiffs' seek to depose in this case,
aside from arresting officers, are first noticed in another RNC case, plaintiffs will
participate in that deposition rather than depose the witness separately.

The parties have also agreed that two of the plaintiffs, Julia Cohen and Chris Kornicke,
will be dismissed without prejudice, as they have obtained new counsel. We will prepare a
stipulation and Order. We thank the Court for its patience and cooperation.

Sincerely,

William Goodman
Moore & Goodman, LLP

cc:   James Mirro
Fax: 212-788-9776

With the exceptions noted in this letter, and for
the reasons stated therein, the dates set forth in
the Case Management Order (Doc # 21) below paragraph
4 are postponed for _two months_.

2

SO ORDERED

KENNETH M. KARAS U.S.D.J.

7/11/05

# EXHIBIT K

USDC
DOC
ELEC              LY FILED
DOC #
DATE FILED    5/5/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

KAITLYN TIKKUN, et al.,

                              Plaintiff,

           -versus-

THE CITY OF NEW YORK, et al.

                              Defendants.

------------------------------------------------------------------- x

**CASE MANAGEMENT ORDER**

05 CV 9901 (KMK)(JCF)

        Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court hereby

enters its Case Management Order governing the foregoing case. This case arises from the arrest

and detention of plaintiff by the New York City Police Department around the time of the

Republican National Convention in New York City in late August and early September 2004

("RNC Cases"). It involves numerous Defendants including the City of New York, its Mayor

and Commissioner of Police.

        In this case, the parties expect that issue will be joined shortly and that all of the

material allegations of the complaint will be denied. Defendants have stipulated to the following

terms at this time to permit Plaintiffs in these actions the opportunity to participate in the

consolidated discovery currently underway in the related RNC Cases. In the interests of the

convenience and economy of the parties, and the efficient management and oversight of the

Court's docket, the Court hereby enters this order, the provisions of which are designed to be

compatible with those in the RNC Case of *Macnamara, et al. v. The City of New York, et al.*, No.

*04-CV-9216 (KMK) (JCF)* and others.

        In addition to this order, the parties are bound by (and the Court is entering in this

case separately) Discovery Order #1 (which provides for the consolidated depositions of certain

defense witnesses) and Protective Order #1 (which provides for the confidential treatment of certain discovery materials).

The Court is advised that the parties do not consent to trial of this case by magistrate judge. The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. All motions and applications shall be governed by the Court's Individual Practices, including pre-motion conference requirements. This order may be modified only by agreement of the parties, subject to the Court's approval, or upon a showing of good cause.

| DATE DUE | PLEADINGS & DISCOVERY |
|---|---|
|  | The parties have agreed to dispense with initial disclosures and have commenced discovery. |
| 5/1/06 | Plaintiffs shall have served any amended complaint adding claims or joining parties. No further amendment to the complaint shall be permitted without leave of court. |
| 5/31/06 | The parties currently expect that the consolidated depositions of defense witnesses, as contemplated by Discovery Order #1, shall proceed at least through this date. |
| 8/1/06 ~~11/1/06~~ | All written discovery, including document requests and interrogatories, shall have been served, except as provided below. |
| 11/1/06 ~~2/1/07~~ | All depositions of fact witnesses shall have been noticed. With respect to both fact and expert witnesses, unless the noticing party assents, depositions of particular witnesses are not to be held until the party producing the witness has responded to any outstanding interrogatories and requests for documents pertaining to that witness. Once a party has completed the deposition of a witness, that party shall not later seek to re-depose that witness absent good cause. |
| 2/1/07 | All fact discovery shall have been completed. |
| 3/1/07 | Plaintiffs shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |

**4**
~~7~~/1/07                      Depositions of plaintiffs' trial experts shall be completed.

**5**
~~7~~/1/07                      Defendants shall identify their expert witnesses for trial and provide the
                                disclosures contemplated by the federal rules.

**6**
~~8~~/1/07                      Depositions of defendants' trial experts shall be completed.

**7**
~~10~~/1/07                     All contention interrogatories and requests to admit shall be served.

**8**
~~9~~/1/07                      All responses due to contention interrogatories and requests to admit.

**8**
~~9~~/15/07                     All counsel must meet for at least one hour to discuss settlement no later
                                than this date.

                                Counsel for the parties have discussed holding a settlement conference
                                before a Magistrate Judge.  The parties request a settlement conference
                                before a Magistrate Judge.

                                Counsel for the parties have discussed the use of the Court's Mediation
                                Program.  The parties do not request that the case be referred to the
                                Court's Mediation Program.

                                Counsel for the parties have discussed the use of a privately retained
                                mediator.  The parties do not intend to use a privately retained mediator.

### *DISPOSITIVE MOTIONS*

**9**
~~10~~/1/07                     All dispositive motions shall have been served.  Pursuant to the
                                undersigned's Individual Practices, the parties shall request a pre-motion
                                conference in writing at least four weeks prior to this deadline.

10/1/07  ~~1/1/08~~             Oppositions due to all dispositive motions.

11/1/07  ~~2/1/08~~            Replies, if any, due to all dispositive motions.

Within 30 days of the           Should any part of the case remain after the Court's ruling on dispositive
Court's ruling on               motions, a Pre-Trial Conference with the Court shall be held.  Prior to
dispositive motions             that conference, the parties shall consult and submit to the Court a Joint
                                Pretrial Order prepared in accordance with the Undersigned's Individual
                                Practices and Rule 26(a)(3) of the Federal Rules of Civil Procedure.  If
                                this action is to be tried before a jury, proposed voir dire, jury
                                instructions and a verdict form shall be filed with the Joint Pretrial
                                Order.  Counsel are required to meet and confer on the jury instructions
                                and verdict form in an effort to make an agreed upon submission.

The parties have conferred and their present best estimate of the length of trial of an individual plaintiff's case is approximately 3 weeks.

**SO ORDERED**

DATED:     New York, New York
           May 4 , 2006

James C. Francis IV
United States Magistrate Judge

# EXHIBIT L

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____               │
│ DATE FILED:  5/15/06                 │
└─────────────────────────────────────┘
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------- x

BRIAN PORTERA, et al.,

                              Plaintiff,

      -versus-

THE CITY OF NEW YORK, et al.

                             Defendants.

--------------------------------------------------------------- x

MICHAEL REUBEN, et al.,

                              Plaintiff,

      -versus-

THE CITY OF NEW YORK, et al.

                             Defendants.

--------------------------------------------------------------- x

**CONSOLIDATED CASE**
**MANAGEMENT ORDER**

05 CV 9985 (KMK)(JCF)

05 CV 9987 (KMK)(JCF)

*DOCKET IN BOTH CASES*

      Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court hereby enters its Case Management Order governing the foregoing cases. These cases arise from arrests and detentions by the New York City Police Department around the time of the Republican National Convention in New York City in late August and early September 2004 ("RNC Cases"). They involve numerous Defendants including the City of New York, its Mayor and Commissioner of Police.

      In these cases, issue has been joined and all of the material allegations of the complaints have been denied. Defendants have stipulated to the following terms at this time to permit Plaintiffs in these actions the opportunity to participate in the consolidated discovery currently underway in the related RNC Cases. In the interests of the convenience and economy of the parties, and the efficient management and oversight of the Court's docket, the Court hereby enters this order, the provisions of which are designed to be compatible with those in the

RNC Case captioned *Macnamara, et al. v. The City of New York, et al.*, No. 04-CV-9216 (KMK) *(JCF)* and others. In addition to this order, the parties are bound by (and the Court is entering in these cases separately) Discovery Order #1 (which provides for the consolidated depositions of certain defense witnesses) and Protective Order #1 (which provides for the confidential treatment of certain discovery materials).

The Court is advised that the parties do not consent to trial by magistrate judge. The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. All motions and applications shall be governed by the Court's Individual Practices, including pre-motion conference requirements. This order may be modified only by agreement of the parties, subject to the Court's approval, or upon a showing of good cause.

| *DATE DUE* | *PLEADINGS & DISCOVERY* |
|---|---|
| | The parties have agreed to dispense with initial disclosures and have commenced discovery. |
| 5/31/06 | The parties currently expect that the consolidated depositions of defense witnesses, as contemplated by Discovery Order #1, shall proceed at least through this date. |
| 6/1/06 | Plaintiffs shall have served any amended complaint adding claims or joining parties. No further amendment to the complaint shall be permitted without leave of court. |
| 8/1/06 | All written discovery, including document requests and interrogatories, shall have been served, except as provided below. |
| 11/1/06 | All depositions of fact witnesses shall have been noticed. With respect to both fact and expert witnesses, unless the noticing party assents, depositions of particular witnesses are not to be held until the party producing the witness has responded to any outstanding interrogatories and requests for documents pertaining to that witness. Once a party has completed the deposition of a witness, that party shall not later seek to re-depose that witness absent good cause. |

| | |
|---|---|
| 2/1/07 | All fact discovery shall have been completed. |
| 3/1/07 | Plaintiffs shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 4/1/07 | Depositions of plaintiffs' trial experts shall be completed. |
| 5/1/07 | Defendants shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 6/1/07 | Depositions of defendants' trial experts shall be completed. |
| 7/1/07 | All contention interrogatories and requests to admit shall be served. |
| 8/1/07 | All responses due to contention interrogatories and requests to admit. |
| 8/15/07 | All counsel must meet for at least one hour to discuss settlement no later than this date. |
| | Counsel for the parties have discussed holding a settlement conference before a Magistrate Judge. The parties request a settlement conference before a Magistrate Judge. |
| | Counsel for the parties have discussed the use of the Court's Mediation Program. The parties do not request that the case be referred to the Court's Mediation Program. |
| | Counsel for the parties have discussed the use of a privately retained mediator. The parties do not intend to use a privately retained mediator. |

### *DISPOSITIVE MOTIONS*

| | |
|---|---|
| 9/1/07 | All dispositive motions shall have been served. Pursuant to the undersigned's Individual Practices, the parties shall request a pre-motion conference in writing at least four weeks prior to this deadline. |
| 10/1/07 | Oppositions due to all dispositive motions. |
| 11/1/07 | Replies, if any, due to all dispositive motions. |
| Within 30 days of the Court's ruling on dispositive motions | Should any part of the case remain after the Court's ruling on dispositive motions, a Pre-Trial Conference with the Court shall be held. Prior to that conference, the parties shall consult and submit to the Court a Joint Pretrial Order prepared in accordance with the Undersigned's Individual Practices and Rule 26(a)(3) of the Federal Rules of Civil Procedure. If |

3

this action is to be tried before a jury, proposed voir dire, jury
instructions and a verdict form shall be filed with the Joint Pretrial
Order.  Counsel are required to meet and confer on the jury instructions
and verdict form in an effort to make an agreed upon submission.

The parties have conferred and their present best estimate of the length
of trial of an individual plaintiff's case is approximately 2 weeks.

**SO ORDERED**

DATED:        New York, New York
              May 15, 2006

                                        _____
                                        James C. Francis IV
                                        United States Magistrate Judge

4

# EXHIBIT M

```
┌─────────────────────────────────┐
│ USDC SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____          │
│ DATE FILED: 11 9 05             │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

ADAM WROBLEWSKI,

                         Plaintiff,

        -versus-

THE CITY OF NEW YORK, et al.

                      Defendants.

------------------------------------------------------------------- x

JEANETTE LAHN-SHEEN LEE, et al.

                      Plaintiffs,

        -versus-

THE CITY OF NEW YORK, et al.

                      Defendants.

------------------------------------------------------------------- x

JULIA R. COHEN,

                         Plaintiff,

        -versus-

THE CITY OF NEW YORK, et al.

                      Defendants.

------------------------------------------------------------------- x

CHRIS J. KORNICKE,

                         Plaintiff,

        -versus-

THE CITY OF NEW YORK, et al.

                      Defendants.

------------------------------------------------------------------- x

**CONSOLIDATED CASE**
**MANAGEMENT ORDER**

05 CV 5150 (KMK)

05 CV 5528 (KMK)

05 CV 6780 (KMK)

05 CV 7025 (KMK)

        Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court hereby

enters its Case Management Order governing the foregoing cases. These cases arise from arrests

and detentions by the New York City Police Department around the time of the Republican

National Convention in New York City in late August and early September 2004 ("RNC

Cases"). They involve numerous named Plaintiffs and numerous Defendants including the City

of New York, its Mayor and Commissioner of Police.

In these cases, issue has been joined (or will be joined shortly) and all of the material allegations of the complaints have been denied. The following schedule permits Plaintiffs in these actions the opportunity to participate in the consolidated discovery of Defendants scheduled to commence this fall in the related RNC Cases, as contemplated by the Court's Discovery Order #1 (entered on October 3, 2005), followed by a period of discovery of plaintiffs, non-consolidated defense witnesses and any other discovery in these actions.

The Court is advised that the parties do not consent to trial of this case by magistrate judge. The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. All motions and applications shall be governed by the Court's Individual Practices, including pre-motion conference requirements. This order may be modified only by agreement of the parties, subject to the Court's approval, or upon a showing of good cause.

| *DATE DUE* | *PLEADINGS & DISCOVERY* |
|---|---|
|  | The parties have agreed to dispense with initial disclosures and have commenced discovery. |
| 12/1/05 | Plaintiffs shall have served any amended complaint adding claims or joining parties. No further amendment to the complaint shall be permitted without leave of court. |
| 2/1/06 | Depositions of Defendants' "Consolidated Witnesses," as set forth in the Court's Discovery Order #1, shall be completed. |
| 3/1/06 | All written discovery, including document requests and interrogatories, shall have been served, except as provided below. |
| 5/1/06 | All depositions of fact witnesses shall have been noticed. With respect to both fact and expert witnesses, unless the noticing party assents, depositions of particular witnesses are not to be held until the party producing the witness has responded to any outstanding interrogatories and requests for documents pertaining to that witness. Once a party has completed the deposition of a witness, that party shall not later seek to |

re-depose that witness absent good cause.

| | |
|---|---|
| 6/1/06 | All fact discovery shall have been completed. |
| 7/1/06 | Plaintiffs shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 8/1/06 | Depositions of plaintiffs' trial experts shall be completed. |
| 9/1/06 | Defendants shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 10/1/06 | Depositions of defendants' trial experts shall be completed. |
| 11/1/06 | All contention interrogatories and requests to admit shall be served. |
| 12/1/06 | All responses due to contention interrogatories and requests to admit. |
| 12/15/06 | All counsel must meet for at least one hour to discuss settlement no later than this date. |

Counsel for the parties have discussed holding a settlement conference before a Magistrate Judge. The parties request a settlement conference before a Magistrate Judge.

Counsel for the parties have discussed the use of the Court's Mediation Program. The parties do not request that the case be referred to the Court's Mediation Program.

Counsel for the parties have discussed the use of a privately retained mediator. The parties do not intend to use a privately retained mediator.

### *DISPOSITIVE MOTIONS*

| | |
|---|---|
| 1/1/07 | All dispositive motions shall be served. Pursuant to the undersigned's Individual Practices, the parties shall request a pre-motion conference in writing at least four weeks prior to this deadline. |
| 2/1/07 | Oppositions due to all dispositive motions. |
| 3/1/07 | Replies, if any, due to all dispositive motions. |
| Within 30 days of the Court's ruling on dispositive motions | Should any part of the case remain after the Court's ruling on dispositive motions, a Pre-Trial Conference with the Court shall be held. Prior to that conference, the parties shall consult and submit to the Court a Joint Pretrial Order prepared in accordance with the Undersigned's Individual |

Practices and Rule 26(a)(3) of the Federal Rules of Civil Procedure. If this action is to be tried before a jury, proposed voir dire, jury instructions and a verdict form shall be filed with the Joint Pretrial Order. Counsel are required to meet and confer on the jury instructions and verdict form in an effort to make an agreed upon submission.

The parties have conferred and their present best estimate of the length of trial of an individual plaintiff's case is approximately 2 weeks.

**SO ORDERED**

DATED:     New York, New York
           October **9**, 2005
           *Nov.*

                                        James C. Francis
                                        United States Magistrate Judge

4

# EXHIBIT N

Case 1:05-cv-03616-RJS-JCF    Document 12    Filed 11/10/2005    Page 1 of 4

```
┌────────────────────────────────────┐
│ USDC SDNY                          │
│ DOCUMENT                           │
│ ELECTRONICALLY FILED               │
│ DOC #: _____            │
│ DATE FILED: _11_|10|05             │
└────────────────────────────────────┘
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------

JEFFREY BLACK,

       Plaintiff,

   -versus-

THE CITY OF NEW YORK, et al.,

       Defendants.
------------------------------------------------------------- x

CATHIE L. BELL,

       Plaintiff,

   -versus-

THE CITY OF NEW YORK, et al.,

       Defendants.
------------------------------------------------------------- x

ELIZABETH STARIN,

       Plaintiff,

   -versus-

THE CITY OF NEW YORK, et al.,

       Defendants.
------------------------------------------------------------- x

STUART HABER,

       Plaintiff,

   -versus-

THE CITY OF NEW YORK, et al.,

       Defendants.
------------------------------------------------------------- x

**CONSOLIDATED CASE**
**MANAGEMENT ORDER**

05 CV 3616 (KMK)

05 CV 3705 (KMK)

05 CV 5152 (KMK)

05 CV 6193 (KMK)

   Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court hereby

enters its Case Management Order governing the foregoing cases. These cases arise from arrests

and detentions by the New York City Police Department around the time of the Republican

National Convention in New York City in late August and early September 2004 ("RNC

Cases"). They involve numerous named Plaintiffs and numerous Defendants including the City of New York, its Mayor and Commissioner of Police.

In these cases, issue has been joined (or will be joined shortly) and all of the material allegations of the complaints have been denied. The following schedule permits Plaintiffs in these actions the opportunity to participate in the consolidated discovery of Defendants scheduled to commence this fall in the related RNC Cases, as contemplated by the Court's Discovery Order #1 (entered on October 3, 2005), followed by a period of discovery of plaintiffs in these actions.

The Court is advised that the parties do not consent to trial of this case by magistrate judge. The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. All motions and applications shall be governed by the Court's Individual Practices, including pre-motion conference requirements. This order may be modified only by agreement of the parties, subject to the Court's approval, or upon a showing of good cause.

| *DATE DUE* | *PLEADINGS & DISCOVERY* |
|---|---|
| 12/30/05 | Plaintiffs shall have served any amended complaint adding claims or joining parties. No further amendment to the complaint shall be permitted without leave of court. |
| 2/1/06 | Depositions of Defendants' "Consolidated Witnesses," as set forth in the Court's Discovery Order #1, shall be completed. |
| 3/1/06 | All written discovery, including document requests and interrogatories, shall have been served, except as provided below. |
| 5/1/06 | All depositions of fact witnesses shall have been noticed. With respect to both fact and expert witnesses, unless the noticing party assents, depositions of particular witnesses are not to be held until the party producing the witness has responded to any outstanding interrogatories and requests for documents pertaining to that witness. Once a party has |

2

|  | completed the deposition of a witness, that party shall not later seek to re-depose that witness absent good cause. |
|---|---|
| 6/1/06 | All fact discovery shall have been completed. |
| 7/1/06 | Plaintiffs shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 8/1/06 | Depositions of plaintiffs' trial experts shall be completed. |
| 9/1/06 | Defendants shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 10/1/06 | Depositions of defendants' trial experts shall be completed. |
| 11/1/06 | All contention interrogatories and requests to admit shall be served. |
| 12/1/06 | All responses due to contention interrogatories and requests to admit. |
| 12/15/06 | All counsel must meet for at least one hour to discuss settlement no later than this date. |
|  | Counsel for the parties have discussed holding a settlement conference before a Magistrate Judge.  The parties request a settlement conference before a Magistrate Judge. |
|  | Counsel for the parties have discussed the use of the Court's Mediation Program.  The parties do not request that the case be referred to the Court's Mediation Program. |
|  | Counsel for the parties have discussed the use of a privately retained mediator.  The parties do not intend to use a privately retained mediator. |

## *DISPOSITIVE MOTIONS*

| 1/1/07 | All dispositive motions shall be served.  Pursuant to the undersigned's Individual Practices, the parties shall request a pre-motion conference in writing at least four weeks prior to this deadline. |
|---|---|
| 2/1/07 | Oppositions due to all dispositive motions. |
| 3/1/07 | Replies, if any, due to all dispositive motions. |
| Within 30 days of the Court's ruling on dispositive motions | Should any part of the case remain after the Court's ruling on dispositive motions, a Pre-Trial Conference with the Court shall be held.  Prior to that conference, the parties shall consult and submit to the Court a Joint |

Pretrial Order prepared in accordance with the Undersigned's Individual Practices and Rule 26(a)(3) of the Federal Rules of Civil Procedure. If this action is to be tried before a jury, proposed voir dire, jury instructions and a verdict form shall be filed with the Joint Pretrial Order. Counsel are required to meet and confer on the jury instructions and verdict form in an effort to make an agreed upon submission.

The parties have conferred and their present best estimate of the length of trial of an individual plaintiff's case is approximately 2 weeks.

**SO ORDERED**

DATED:     New York, New York
           November 9, 2005

                                        James C. Francis
                                        United States Magistrate Judge

4

# EXHIBIT O

**MEMO ENDORSED**

**Jeffrey A. Rothman**
Attorney at Law
575 Madison Avenue, Suite 1006
New York, NY 10022
Tel.: (212) 348-9833; (212) 937-8450
Cell: (516) 455-6873
Fax: (212) 591-6343
jrothman@alumni.law.upenn.edu

RECEIVED
NOV 17 2006
CHAMB F
UNITED STATES MAGISTRATE JUDGE

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/20/06

November 17, 2006

By Hand
The Honorable James C. Francis IV
United States Magistrate Judge
United States District Court for the Southern District of New York
500 Pearl Street – Room 1960
New York, NY 10007

Re:    *Phillips, et al. v. City of New York, et al.* 05 Civ. 7624 (KMK) (JCF);
       *Coburn, et al. v. City of New York, et al.*, 05 Civ. 7623 (KMK) (JCF);
       *Sloan, et al. v. City of New York, et al.*, 05 Civ. 7668 (KMK) (JCF);
       *Galitzer v. City of New York, et al.*, 05 Civ. 7669 (KMK) (JCF);
       *Bastidas, et al. v. City of New York, et al.*, 05 Civ. 7670 (KMK) (JCF);
       *Carney, et al. v. City of New York, et al.*, 05 Civ. 7672 (KMK) (JCF);
       *Sikelianos v. City of New York, et al.*, 05 Civ. 7673 (KMK) (JCF);
       *Jarick v. City of New York, et al.*, 05 Civ. 7626 (KMK) (JCF);

Please Docket in all cases

Dear Judge Francis:

        **3**, I write to respectfully request, jointly with counsel for defendants, an additional extension of **4** months on all remaining deadlines pursuant to the Case Management Orders in the above-captioned RNC cases. Pursuant to Your Honor's Discovery Order #2 of November 13, 2006, the parties are in the process of setting up dates for the depositions of twenty-seven "Arresting Officers" over the course of the next several months in the above-captioned cases. In addition to these, a significant number of Commanding Officer depositions, and depositions of officials of the Hudson River Park Trust, will need to be scheduled in the above-captioned cases, in conjunction with the resolution of other discovery issues associated therewith.

        This is the parties' third joint request for an extension of the Case Management Orders in the above-captioned cases.

                                        Respectfully submitted,

                                        Jeffrey Rothman

                                        11/17/06

                                        Application granted as modified.
                                        No further extensions.
                                              SO ORDERED.
                                        James C. Francis IV
                                              USMJ

cc:    James Mirro, Esq. (by email)
       Fred Weiler, Esq. (by email)
       Jeffrey Dougherty, Esq. (by email)
       Curt Beck, Esq. (by email)

**MEMO ENDORSED**



THE CITY OF NEW YORK

## LAW DEPARTMENT

100 CHURCH STREET
NEW YORK, NY 10007

**MICHAEL A. CARDOZO**
*Corporation Counsel*

**FRED M. WEILER**
*Special Federal Litigation Division*
*TEL  212-788-1817*
*FAX: 212-788-9776*

March 2, 2007

**VIA FAX 212-805-7930**
Honorable James C. Francis IV
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/5/07

Re:  Drescher v. City of New York et al, 05 CV 7541 (KMK) (JCF)

Dear Judge Francis:

On behalf of plaintiff and defendants, I write to request a modification of the Case Management Order (CMO) in the above-captioned case, which currently provides for a fact-discovery cut-off date of March 1, 2007. Both sides are exchanging written discovery, but need additional time for fact discovery. Accordingly, plaintiff and defendants jointly request that the Court grant an extension to the CMO deadlines such that fact discovery would be completed by July 1, and the remaining CMO deadlines extended by X months. In addition, plaintiff had been *pro se*, but only recently retained an attorney. If this meets with your approval, would you please "so order" it?

Thank you for your time and consideration.

*Application granted as modified.* 3/5/07
*No further extensions.*
*SO ORDERED.*
*James C. Francis IV*
*USMJ*

Respectfully submitted

Fred M. Weiler (FW 5864)

cc:   Jeffrey Rothman, Esq. (via e-mail)

# EXHIBIT P

Page 1

```
 1

 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 3     ---------------------------------------x

 4     MICHAEL SCHILLER, FRANCESCA FIORENTINI,
       ROBERT CURLEY AND NEAL CURLEY,
 5                           Plaintiffs,

 6            -against-

 7     THE CITY OF NEW YORK;
       RAYMOND KELLY, Commissioner
 8     of the New York City Police
       Department; TERENCE MONAHAN,
 9     Assistant Chief of the Bronx
       Bureau of the New York
10     City Police Department, et al.,
                           Defendants.
11     ---------------------------------------x

12                          December 1, 2005
                            10:00 a.m.
13

14

15            Deposition of TERENCE MONAHAN, held

16       at the offices of NEW YORK CIVIL LIBERTIES

17       UNION, 125 Broad Street, New York,

18       New York, before Vicky Galitsis, a Certified

19       Shorthand Reporter and Notary Public of the

20       State of New York.

21

22

23                   GREENHOUSE REPORTING, INC.
24             363 Seventh Avenue - 20th Floor
                 New York, New York  10001
25                     (212) 279-5108
```

Page 2

```
 1
 2   A P P E A R A N C E S :
 3   NEW YORK CIVIL LIBERTIES UNION
          Attorneys for the Plaintiffs
 4       125 Broad Street
          New York, New York 10004
 5   BY:  CHRISTOPHER DUNN, ESQ.,
          of Counsel
 6
     LESLIE L. LEWIS, ESQ.
 7       Attorney for the Plaintiff Concepcion
         162 West 21st Street, 2 So
 8       New York, New York 10011
          -and-
 9   KAREN WOHLFORTH, ESQ.
         299 Broadway, Suite 1705
10       New York, New York 10007
11   MICHAEL L. SPIEGEL, ESQ.
          Attorney for the Plaintiffs
12       Abdell, et al
         111 Broadway, Suite 1305
13       New York, New York 10006
14   ALAN LEVINE, ESQ.
          Attorney for the
15       Plaintiffs Abdell, et al
         207 West 106th Street, Suite 11C
16       New York, New York 10025
17   ALAN D. LEVINE, ESQ.
          Attorney for the Plaintiffs
18       Meehan, et al
         80-02 Kew Gardens Road, Suite 1010
19       Kew Gardens, New York 11415
20   JEFFREY A. ROTHMAN, ESQ.
          Attorney for the
21       Plaintiffs Coburn, et al
         575 Madison Avenue, Suite 1006
22       New York, New York 10022
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S :
 3   ALLEGAERT BERGER & VOGEL, LLP
          Attorneys for the
 4       Plaintiff Noel Gross o
         111 Broadway, 18th Floor
 5       New York, New York 10006
     BY:  ROBERT F. FINKELSTEIN, ESQ.,
 6          of Counsel
 7
 8   MOORE & GOODMAN, LLP
          Attorneys for the
 9       Plaintiffs MacNamara, et al
         99 Park Avenue, Suite 1600
10       New York, New York 10016
     BY:  DAVID MILTON, ESQ.
11       WILLIAM GOODMAN, ESQ.
12
13
14   LAW OFFICES OF SUSAN TAYLOR
          Attorneys of the
15       Plaintiffs Abdell, et al
         575 Madison Avenue, 10th Floor
16       New York, New York 10022
     BY:  NORMAN BEST, ESQ.,
17          Of Counsel
18
19   AMERICAN CIVIL LIBERTIES UNION
          Attorneys for the
20       Plaintiffs Abdell, et al
         125 Broad Street, 18th Floor
21       New York, New York 10004-2400
     BY:  RICK BEST, ESQ.,
22          of Counsel
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S :
 3   JAMES J. MEYERSON, ESQ.
          Attorney for the
 4       Plaintiff Carol Dudek and others
         396 Broadway
 5       New York, New York 10013
 6
 7
 8   NEW YORK CITY LAW DEPARTMENT
     OFFICE OF THE CORPORATION COUNSEL
 9       Attorneys for the Defendants
         100 Church Street
10       New York, New York 10007-2601
     BY:  JAY A. KRANIS, ESQ.
11       JEFFREY DOUGHERTY, ESQ.
         FRED M. WEILER, ESQ.
12
13
14   POLICE DEPARTMENT SPECIAL COUNSEL
          Attorneys for the Defendants
15       One Police Plaza, Room 1406A
         New York, New York 10038
16   BY:  RUBY MARIN, ESQ.
         S. ANDREW SCHAEFFER, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                    T. Monahan
 2   T E R E N C E   M O N A H A N ,
 3        having been first duly sworn by a
 4        Notary Public of the State of
 5        New York, was examined and testified
 6        as follows:
 7   EXAMINATION BY MR. DUNN:
 8        Q.    Good morning.
 9        A.    Morning.
10        Q.    Thank you for joining us.  For
11   better or for worse, this is not going to be a
12   short process.  So as Mr. Kranis may have told
13   you, this is going to be more than a one-day
14   event.
15             We are going to go until
16   4 o'clock today, and then we will agree upon a
17   date that's convenient for everyone for the
18   continuation of this deposition.
19             MR. DUNN:  The City is
20   representing Chief Monahan, correct?
21             MR. KRANIS:  Yes.
22        Q.    Chief, have you previously been
23   deposed?
24        A.    In this case?
25        Q.    No, in any case.
```

Page 70

T. Monahan

1
2  of how the police would deal with
3  demonstration activity.
4      A.    Yes.
5      Q.    So what do you recall, if
6  anything, him talking about in terms of the
7  legal aspects of dealing with demonstrations?
8      A.    Specifically I cannot recall
9  exactly what he said.  But I know we did
10  discuss stuff along the lines of blocking
11  streets, blocking buses, stuff along those
12  lines.  Exactly what was discussed, I don't
13  recall.
14      Q.    When you talk about blocking
15  streets, are you talking about people either
16  sitting down or lying in a roadway?
17      A.    No.  Blocking streets, blocking
18  it in any way, manner, shape or form.
19      Q.    In a roadway, is that correct?
20      A.    Street, building line to
21  building.
22      Q.    Building line to building line.
23  So you are including sidewalks within that?
24      A.    Yes.
25      Q.    What do you recall, if anything,

Page 71

T. Monahan

1
2  about Captain Sweet saying on this topic?
3      A.    I don't recall what he said.
4      Q.    Do you have any general
5  recollection about what he said about blocking
6  buses?
7      A.    I don't recall exactly, no.
8      Q.    Did he make a PowerPoint
9  presentation in conjunction with his training?
10      A.    I don't recall.
11      Q.    Were you provided with any
12  written materials with respect to this
13  training session, on any topic?
14      A.    Yes.
15      Q.    What materials were you provided?
16      A.    Legal guidelines.
17      Q.    Is this a publication by the
18  legal bureau about guidelines to be used
19  during the convention?
20      A.    It was a guideline, I believe,
21  just of the overall laws regarding free
22  speech, public assemblage and of such.
23      Q.    How many pages would you estimate
24  that was?
25      A.    It was fairly substantial.

Page 72

T. Monahan

1
2      Q.    I will show that to you later.
3      A.    Okay.
4      Q.    Any other written materials you
5  recall receiving during that training?
6      A.    That's the only one I recall.  I
7  may have received others, but I do recall
8  that.
9      Q.    What do you recall, if anything,
10  about any discussion at that training by Kerry
11  Sweet or anyone else about the need for people
12  who are walking on a sidewalk to get a permit?
13      A.    I don't recall him mentioning
14  that.
15      Q.    You said there were three
16  training sessions that you believe you
17  attended.  The first one was approximately the
18  Spring of 2004.  When was the next one?
19      A.    The next one was early Summer of
20  2004.  Early or later summer, maybe end.
21  Sometime of July, beginning of July.
22      Q.    Where did that training take
23  place?
24      A.    Down at headquarters.
25      Q.    By headquarters, you mean One PP?

Page 73

T. Monahan

1
2      A.    Yes.
3      Q.    Where at One PP did that training
4  take place?
5      A.    The auditorium.
6      Q.    Was it a full group of people at
7  the auditorium?
8      A.    Yes.
9      Q.    Do you have any idea how many
10  that auditorium seats, approximately?
11      A.    No.
12      Q.    Do you have any idea who was in
13  attendance at that training?  Again I don't
14  mean by identity, I mean by category, either
15  by rank or type of responsibility, any way
16  that you can describe them as a group.
17      A.    Superior officers from the rank
18  of captain up.  Who was invited, I'm not sure.
19      Q.    How long did that training last?
20      A.    I believe it was a couple of
21  hours.
22      Q.    What was the substance of that
23  training?
24      A.    It was a briefing by the
25  intelligence bureau.

19 (Pages 70 to 73)

Page 74

T. Monahan

1
2     Q.    Was that provided by Commissioner
3  Cohen?
4     A.    Yes.
5     Q.    Did any aspect of that briefing
6  concern any aspect of the policing of
7  demonstrations?
8     A.    The policing of, no.
9     Q.    Again I want to be clear. Any
10  aspect of interaction between police officers
11  and people involved in protest activity?
12     A.    No.
13     Q.    No discussion about that?
14     A.    No. We had the discussion --
15     Q.    I take it that means there was no
16  discussion about intelligence the police
17  department believed it had received about
18  potential disruptive behavior in conjunction
19  with demonstrations?
20           MR. KRANIS: You can answer yes
21  or no.
22     A.    Yes.
23     Q.    It did include that?
24     A.    Yes.
25     Q.    From my perspective, that would

Page 75

T. Monahan

1
2  include some aspect of the policing of
3  demonstrations. Again I want to try to
4  emphasize to you when I am asking you
5  questions about the policing of demonstrations
6  I mean that in the broadest of terms.
7     A.    Normally I take the concept of
8  policing demonstrations, how we're going to
9  respond to a group.
10     Q.    I am talking about everything
11  from how you plan, to what you know in
12  advance, to how you think about what you are
13  going to do, to what you did, to what you did
14  after you did it.
15     A.    Okay.
16     Q.    What discussion was there at that
17  briefing about the policing of demonstrations,
18  in the broadest sense?
19           MR. KRANIS: To the extent that
20  the question asks for and/or the answer
21  would require direct recitation or
22  advice about what Commissioner Cohen
23  told the assemblage on the basis of
24  intelligence, I will object and
25  instruct the witness not to answer.

Page 76

T. Monahan

1
2           MR. DUNN: To that extent, that's
3  fine.
4     Q.    Why don't you try to do it within
5  those parameters?
6           MR. KRANIS: Don't tell them
7  anything about what Commissioner Cohen
8  told you about the intelligence that he
9  had about any groups or about the RNC
10  in general.
11           MR. DUNN: That's a little too
12  broad. You don't want him to disclose
13  specific information about specific
14  events, that's one thing. But he
15  certainly, I think, can talk about --
16  he can categorize what was discussed.
17           MR. KRANIS: I don't have any
18  problem with that.
19           MR. DUNN: Let's start with that
20  and then we will go and you can tell
21  him when to stop.
22           MR. KRANIS: Okay. Stop.
23     Q.    Setting aside what he may have
24  said about any particular group or about any
25  particular piece of intelligence, what was the

Page 77

T. Monahan

1
2  general substance of the information he
3  conveyed to you during this briefing as it
4  relates to the policing of demonstrations
5  during the convention?
6     A.    Groups that they believe would be
7  attending the demonstration, tactics they had
8  used in the past.
9     Q.    Tactics the groups had used?
10     A.    Yes. A lot of it was on what
11  groups he thought were going to be there and
12  tactics they had used in the past.
13     Q.    Just so I'm clear about this, I
14  take it from what you are saying that
15  Commissioner Cohen is talking about groups
16  other than the organizers of an event who
17  might show up in an event and then might
18  deploy certain tactics that specific group
19  showing up at the event had used at some prior
20  occasion, is that correct?
21           MR. KRANIS: I object to the form
22  of the question. Can you just try to
23  rephrase it?
24     Q.    Did you understand what I was
25  saying?

20 (Pages 74 to 77)

1          T. Monahan
2          (Record read.)
3      A.    I don't know if these were
4  organizers or non-organizers, but these were
5  groups that were showing up.
6      Q.    So your recollection was this
7  might have encompassed not only people showing
8  up at someone else's event, but people who are
9  actually planning the event itself?
10     A.    Yes.
11     Q.    Did the presentation that he made
12 at that time get down to the level of a
13 discussion about particular events?
14     A.    No.  Can I ask counsel?
15         MR. DUNN:  Of course.
16         (Witness and counsel confer.)
17     A.    There was mention about a date,
18 August 31st, that the groups had been planning
19 for a day of civil disobedience and potential
20 violence.
21     Q.    Beyond August 31st, was there
22 discussion about events scheduled for any
23 other date?
24     A.    No.
25     Q.    With respect to August 31st

1          T. Monahan
2  itself, was there discussion about particular
3  groups who might engage in these tactics?
4          MR. KRANIS:  You can answer yes
5  or no.
6          (Record read.)
7      A.    They were of the opinion that all
8  the groups were going to focus on August 31st.
9      Q.    I understand that.  I understand
10 you are talking about August 31st. I am
11 talking with respect to that particular date.
12         Was there, as part of
13 Commissioner Cohen's presentation, a
14 discussion of specific groups who on that date
15 the department expected to engage in unlawful
16 tactics?
17     A.    As I said, they expected all the
18 groups to participate in unlawful tactics on
19 that date.
20     Q.    So are you saying that the
21 expectation was that everyone engaged in a
22 demonstration on August 31st was expected to
23 engage in unlawful behavior?
24     A.    No.
25     Q.    That's what I'm trying to focus

1          T. Monahan
2  on.  How much of a focus was on specific
3  groups that might participate in unlawful
4  behavior?
5      A.    There was no focus on what groups
6  were going to do unlawful activity on that
7  date.
8      Q.    Would it be fair to say, as you
9  recall it, the presentation there was to the
10 effect that the department expected on
11 August 31st that there would be a number of
12 groups who might be engaged in unlawful
13 activity?
14     A.    Yes.
15         THE WITNESS:  Can we take a break
16 shortly?
17         MR. DUNN:  We can take a break
18 right now if you like.
19         (Recess:  11:28 to 11:39 a.m.)
20 BY MR. DUNN:
21     Q.    Chief Monahan, was there any
22 discussion, at this training session that
23 we've been discussing, about specific events
24 at which these tactics might be used?
25     A.    No.

1          T. Monahan
2      Q.    What written materials, if any,
3  were given out at this event?
4      A.    None that I recall.
5      Q.    Was there a PowerPoint
6  presentation that was made?
7      A.    Yes.
8      Q.    Was that a PowerPoint
9  presentation that was made in conjunction with
10 Commissioner Cohen's presentation?
11     A.    Yes.
12     Q.    Other than the presentation that
13 was made about intelligence, was there any
14 other topic discussed at this briefing?
15     A.    No.
16     Q.    The prior briefing you mentioned
17 Chief McManus had given a presentation about,
18 I think you said, an overview of the RNC.
19         By that were you referring to an
20 overview of the policing of the convention, or
21 are you talking about something broader?
22     A.    Something broader; the various
23 portions of the convention, inner perimeter,
24 outer perimeter, transit, hotels,
25 transportation, mobile field forces, the

Page 242

1    T. Monahan
2    on it.
3        MR. DUNN:  This copy I have does
4    not have the Bates number on it, but I
5    will make sure the record includes a
6    statement about the Bates number that's
7    on it.
8        MR. KRANIS:  Okay.
9        MR. DUNN:  Okay.  Off the record.
10    (Discussion off the record.)
11        MR. DUNN:  I just want to note
12    for the record that we're going to
13    adjourn the deposition now with the
14    consent of everyone, and we will
15    continue it at a mutually convenient
16    date that we will have to designate.
17        MR. SPIEGEL:  If I may say on the
18    record, throughout both this deposition
19    and at times during Inspector Galati's
20    deposition, instructions not to answer
21    questions were issued by Mr. Kranis.
22        And while neither I nor any of
23    the other plaintiffs' counsel in the
24    room spoke up, we will have objected
25    collectively to those instructions and

Page 243

1    T. Monahan
2    we will take them up at later time.
3        MR. KRANIS:  I understood that
4    you did not agree with me.
5        (Time noted:  1:35 p.m.)

Page 244

1    T. Monahan
2        I, the witness herein, having
3    read the foregoing testimony do hereby
4    certify it to be a true and correct
5    transcript, subject to the corrections,
6    if any, shown on the attached page.


7
8
9    _____
10    TERENCE MONAHAN
11
12
13    Subscribed and sworn to
14    before me this_____day
15    of_____, 2005.
16
17
18    _____
19
20
21
22
23
24
25

Page 245

1            INDEX
2    WITNESS        EXAMINATION BY        PAGE
3    T. Monahan    Mr. Dunn            5
4
5
6
7            EXHIBITS
8    MONAHAN                    PAGE LINE
9    1    Violation, Bates stamped
        SCH 15                231  3
10
11    2    Violation                232  3
12
13    3    Document Bates stamped
        Schiller 21 and 22        232  22
14
15    4    Document Bates stamped
        SCH 1 and 2            233  20
16
17
18
19
20
21
22
23
24
25

62 (Pages 242 to 245)

# EXHIBIT Q

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------x

4    MICHAEL SCHILLER, et al.,
                         Plaintiffs,
5          -against-

6    THE CITY OF NEW YORK, et al.,
                         Defendants.
7    ------------------------------------x

8    HACER DINLER, et al.,
                         Plaintiffs,
9          -against-

10   THE CITY OF NEW YORK, et al.,
                         Defendants.
11   ------------------------------------x

12                       July 7, 2006
                         10:00 a.m.
13

14

15        Deposition of JOSEPH ESPOSITO, held at

16   the offices of NEW YORK CIVIL LIBERTIES

17   UNION, 125 Broad Street, New York, New York,

18   before Vicky Galitsis, a Certified Shorthand

19   Reporter and Notary Public of the State of

20   New York.

21

22

23
                GREENHOUSE REPORTING, INC.
24           363 Seventh Avenue - 20th Floor
             New York, New York  10001
25                  (212) 279-5108

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4   NEW YORK CIVIL LIBERTIES UNION
         Attorneys for the Plaintiffs
 5       Michael Schiller, et al and
         Hacer Dinler, et al.
 6       125 Broad Street
         New York, New York 10004
 7   BY:  CHRISTOPHER DUNN, ESQ.,
         -and
 8       PALYN HUNG, ESQ
             of Counsel
 9
10   LAW OFFICES OF SUSAN TAYLOR
         Attorneys for the Plaintiffs
11       Abdell, et al.
         575 Madison Avenue, 10th Floor
12       New York, New York 10022
     BY:  NORMAN BEST, ESQ.,
13             of Counsel
14
15   ALLEGAERT BERGER & VOGEL, LLP
         Attorneys for the Plaintiff
16       Noel Gross
         111 Broadway, 18th Floor
17       New York, New York 10006
     BY:  ROBERT F. FINKELSTEIN, ESQ.,
18             of Counsel
19
20   OLIVER & OLIVER, ESQS.
         Attorneys for the Plaintiff
21       Dennis Kyne
         c/o 200 East 10th Street, #917
22       New York, New York 12202
     BY:  ERIC ADLER, ESQ.,
23             of Counsel
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S: (Continued.)
 3   ALAN D. LEVINE, ESQ.
         Attorney for the Plaintiff
 4       Greta Smith, et al
         80-02 Kew Gardens Road, Suite 1010
 5       Kew Gardens, New York 11415
 6
 7   ZELDA STEWARD, ESQ.
         Attorney for the Plaintiff
 8       Jody Concepcion
         299 Broadway, 17th Floor
 9       New York, New York 10007
10
11   NEW YORK CITY LAW DEPARTMENT
     OFFICE OF THE CORPORATION COUNSEL
12       Attorneys for the Defendants
         100 Church Street
13       New York, New York 10007-2601
     BY:  PETER FARRELL, ESQ.
14             -and-
         MARK ZUCKERMAN, ESQ.,
15             of Counsel
16
17   ANDREW SCHAFFER, ESQ.
         Deputy Commissioner Legal Matters
18       One Police Plaza, Room 140A
         New York, New York 10038
19       (present a.m. session)
20
21   RUBY MARIN, ESQ.
         Special Counsel to Deputy
22       Commissioner Legal Matters
         One Police Plaza, Room 140A
23       New York, New York 10038
         (present p.m. session)
24
     ALSO PRESENT:
25       Brian Derr, NYC Law Department Intern
```

Page 4

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED,
 3   by and between the attorneys for the
 4   respective parties hereto, that all
 5   objections, except as to form, shall be
 6   reserved to the time of trial.
 7        IT IS FURTHER STIPULATED AND AGREED
 8   that the sealing and filing of the within
 9   deposition are hereby waived.
10        IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be
12   subscribed and sworn to by the witness
13   being examined before a Notary Public
14   other than the Notary Public before whom
15   this deposition was begun.
16
17
18             -o0o-
19
20
21
22
23
24
25
```

Page 5

```
 1             E. Esposito
 2   J O S E P H   E S P O S I T O,
 3        having been first duly sworn by a
 4        Notary Public of the State of
 5        New York, was examined and testified
 6        as follows:
 7   EXAMINATION BY MR. DUNN:
 8        Q.    Good morning, Chief Esposito.
 9        A.    Good morning.
10        Q.    A couple of preliminaries.
11   First, as I assume you understand, you're not
12   a defendant in this case.  There is no
13   allegation of wrongdoing on your part.
14             When did you learn you would be
15   deposed in this matter?
16        A.    I don't remember.
17        Q.    Approximately how long ago would
18   you say?
19        A.    A couple of months.
20        Q.    Since learning you would be
21   deposed, have you had conversations with
22   anyone from inside the police department about
23   this deposition?
24        A.    Yes.
25        Q.    With whom have you had those
```

2 (Pages 2 to 5)

Page 182

E. Esposito

1  specifically. That's my point.
2  
3  Q.    I understand. Let's be clear
4  about that. I understand you may not remember
5  the particulars as to the when or the where,
6  or even the who was there.
7  But is it correct that as you sit
8  here today, you do recall participating in a
9  meeting where at least Commissioner Kelly was
10  present where this particular decision was
11  made?
12  A.    Correct.
13  Q.    What was the reason for the
14  department deciding to have a no summons
15  policy during the convention?
16  MR. FARRELL: Objection. He went
17  through all these factors in this
18  morning's testimony.
19  MR. DUNN: He identified a bunch
20  of factors that might be circumstances
21  under which such a decision might be
22  made for a particular event. It wasn't
23  particular to the convention.
24  MR. FARRELL: He spent a
25  considerable amount of time testifying

Page 183

E. Esposito

1  
2  about those factors. You can ask him
3  if any of those factors weren't
4  applicable.
5  You asked him quite a lengthy
6  series of questions about the reasons
7  why a no summons policy was utilized.
8  MR. DUNN: No, it was not a
9  question about the convention. It was
10  a question about the general policy.
11  Q.    Chief Esposito, why was a no
12  summons policy adopted for the convention?
13  MR. FARRELL: I'm going to object
14  and I'm going to put a note on the
15  record that he's previously testified
16  about the reasons why.
17  A.    Okay. There is a number of
18  reasons why. Information about -- from
19  intelligence, open sources that people were
20  going to come to the City during the RNC for
21  the purpose of shutting down the City,
22  shutting down the RNC, committing criminal
23  acts. They were going to come with false IDs,
24  with no IDs. A lot of people from out of
25  state would come in.

Page 184

E. Esposito

1  
2  We knew from intelligence sources
3  that a lot of people with past criminal
4  history would come in and attempt violent
5  acts. There was a threat of terrorism, that
6  intel was telling us this would be a good
7  venue for a terrorist attack.
8  We want to stop the criminal
9  activity from continuing. A C summons is not
10  the best way to do that many times. I think
11  that's all. I may have missed one or two.
12  Q.    Okay. Were these considerations
13  that were discussed at this meeting where the
14  decision was made?
15  A.    Yes. The best possible
16  prosecution was taken into consideration. You
17  need a proper identification to go forward
18  with a prosecution. Especially if a lot of
19  these people were coming in from out of the
20  City.
21  Q.    I take it that the issue of
22  giving summonses to people who were from out
23  of the City or out of state is an issue that
24  the police department deals with every day?
25  A.    That's correct.

Page 185

E. Esposito

1  
2  Q.    Is it fair to say that the
3  department's standard summons policies and
4  procedures specifically take into account
5  considerations about people being from out of
6  the City or out of the state?
7  MR. FARRELL: Objection.
8  A.    I'm sorry?
9  (Question read.)
10  A.    Yes.
11  Q.    Did you and Commissioner Kelly
12  and perhaps First Deputy Commissioner Grosso
13  give any consideration to applying this policy
14  to particular events, as opposed to the entire
15  RNC?
16  MR. FARRELL: Objection.
17  A.    Every incident is separate from
18  the other. An incident commander could have
19  made any recommendation he or she wanted. An
20  incident commander on the scene of an incident
21  could have made a recommendation. But we have
22  to rely on our incident commanders for the
23  best course of action.
24  Q.    I understand that. But this is a
25  decision that was not made by an incident

Page 186

E. Esposito

1    commander, this was a decision that was made
2    by you and Commissioner Kelly.
3        A.    Right.
4        Q.    What I'm asking you is, when the
5    two of you made this decision, what
6    consideration, if any, did you give to having
7    this policy apply to particular events where
8    there were particular concerns as opposed to
9    having it apply throughout the convention to
10   all events?
11       A.    That's always an option.
12       MR. FARRELL:  Objection.
13       Q.    Is that an option that you
14   considered?
15       MR. FARRELL:  Objection.  If you
16   are asking him about his discussions
17   with Commissioner Kelly as a
18   deliberative process as to why this was
19   adopted, you can ask him what the
20   policy was and why they adopted it.
21   He's given you both.
22       I think you're trying to get at
23   the conversations leading up to the
24   adoption of the policy.  And I'm going

Page 187

E. Esposito

1    to assert the deliberative process on
2    behalf of the City.
3        It's clearly stated what the
4    policy was, and he articulated twice
5    now, once this morning and once this
6    afternoon, the reasons why the policy
7    was adopted.
8        Q.    Chief Esposito, do you recall if
9    at the time this decision was made that you
10   believed that the concerns that you mentioned
11   were concerns that would apply to every single
12   planned RNC event?
13       A.    Generally speaking, this would be
14   the policy.  But incident commanders, anybody
15   on the scene could bring it to our attention
16   that they wanted to not put somebody into the
17   system and give a DAT.
18       We give our commanders a lot of
19   leeway to make the decisions based on the
20   facts at that particular incident.  We're not
21   at every incident, we have to rely on our
22   incident commanders.
23       Q.    Is it your testimony that when
24   the operations people were instructed that

Page 188

E. Esposito

1    there would be a no summons policy during the
2    convention, that they were also informed or
3    otherwise would have known that they
4    nonetheless would have had the discretion to
5    issue summonses to people?
6        MR. FARRELL:  Objection.
7        A.    It's always an option.  They can
8    always bring that to our attention.  Was it
9    articulated?  It doesn't have to be
10   articulated.
11       Q.    What does that mean?  For
12   instance, let's just take an example.  We had
13   a client whose case we settled, so it's not a
14   case anymore.  A single person who got
15   arrested standing on the sidewalk, they went
16   to Pier 57.
17       If the captain who had ordered
18   that arrest had been inclined to give this
19   woman a summons who was charged with blocking
20   the sidewalk or standing on it, what would he
21   have to have done to get permission to make an
22   exception to the no summons policy?
23       MR. FARRELL:  Objection.
24       A.    Bring it to a supervisor's

Page 189

E. Esposito

1    attention.
2        Q.    What supervisor did you
3    understand had the authority to make the
4    exception to the no summons policy you and
5    Commissioner Kelly made?
6        A.    Every situation is different.
7        Q.    I understand every situation is
8    different.  I'm trying to understand who would
9    have had the authority to say --
10       A.    Depending on the situation, it
11   could have been that captain or it could have
12   been me.  It depends on the circumstances that
13   are developing as that situation is unfolding.
14       Q.    So I want to understand what the
15   circumstances would have been at the
16   convention, in which a captain could have
17   decided to make an exception to the no summons
18   policy that you and Commissioner Kelly made.
19       A.    We're talking hypothetical.
20       MR. FARRELL:  Objection.
21       A.    What I'm telling you is that a
22   captain could articulate to me a circumstance
23   where he gave or she gave a summons.
24       Chief, I gave this summons

Greenhouse Reporting, Inc.

(212)279-5108

E. Esposito
1
2  because A, B, C, and D.
3        Okay.  Or I'd say, I don't like
4  it, don't do it again.
5        So every situation is different.
6  And if articulated it can be approved or not
7  approved.
8        Q.    Do you know of a single instance
9  in which a summons was given to anyone
10 arrested in conjunction with the convention?
11       MR. FARRELL:  Objection.
12       A.    I don't recall any.  There may
13 have been, I don't recall.
14       Q.    I want to go back to the decision
15 that you and Commissioner Kelly made.  The
16 question I started with was at the time you
17 made that decision, did you have reason to
18 believe that the factors that you identified
19 as the basis for the policy applied to, in
20 some form, every single event that was
21 scheduled to take place during the convention?
22       MR. FARRELL:  Objection.
23       A.    Again every event is individual.
24 As I've said, we leave it to the incident
25 commander.

E. Esposito
1
2        Q.    But in this incident you didn't
3  leave it to the incident commanders, you
4  established a policy for the entire
5  convention?
6        A.    General policy, that's correct.
7        Q.    General policy.  So it was a
8  general policy that apparently was adhered to
9  with respect to all 1800 and some odd arrests
10 that took place during the convention?
11       A.    I don't know.  There may have
12 been summonses.
13       Q.    There may have been, not that any
14 of us knows of.
15       MR. FARRELL:  Objection.
16       A.    I don't know, I haven't checked.
17       Q.    The question I'm asking you is
18 when you made the decision to have a general
19 policy, did you have reason to believe at that
20 time that the concerns that you articulated as
21 justifying the policy, were concerns that were
22 applicable to all of the events that were
23 scheduled to take place during the convention?
24       MR. FARRELL:  Objection.
25       A.    Every incident is an individual

E. Esposito
1
2  incident that can be judged a number of
3  different ways.  It was a general policy that
4  no C summonses would be issued.  That's how we
5  go into it.
6        There are exceptions to the
7  policy.  And we leave that to the incident
8  commander at whatever venue he or she is at to
9  say the general rule is no C summonses, we're
10 going to DATs.  Or if they want to articulate
11 an exception, they can.
12       And I don't doubt that they did.
13 I just don't have it here.  You're saying they
14 didn't.  I don't know.  Maybe they did.
15       Q.    Let's start with the UFPJ event
16 that was the big march on Sunday.
17       A.    Sunday the 29th?
18       Q.    The 29th.  That's exactly the
19 date.
20       Which of the concerns which you
21 articulated as being the basis of the policy
22 were concerns that you had with respect to
23 that particular event?
24       MR. FARRELL:  Objection.  He's
25 identified these reasons as the basis

E. Esposito
1
2  for adopting the policy.  He said that
3  they applied it to the entire RNC
4  period.  He hasn't specified it by
5  event.
6        MR. DUNN:  Well, now I'm asking
7  him to.
8        MR. FARRELL:  If you understand
9  the question -- again, I don't
10 understand the question.  Objection.
11       A.    Are you saying which of my
12 reasons that helped my decision to make no
13 C summonses came into play during this event,
14 is that what you're saying?
15       Q.    That's not quite what I'm saying.
16 Let's start with that.  We can start with that
17 one.
18       A.    Okay.
19       MR. FARRELL:  Objection.
20       A.    Give me the question again,
21 please.  I'm sorry.
22       Q.    Which, if any, of the concerns
23 that you identified as being justifications
24 for the no C summonses policy during the
25 convention were concerns that you specifically

Page 194

E. Esposito

1
2  had with respect to the United for Peace and
3  Justice event scheduled for August 29th?
4      A.    They all had potential.
5      Q.    They all had potential for what?
6      A.    To be part of that event.  All
7  the concerns that I talked about had potential
8  to be involved with that event.
9      Q.    So for instance, you started off
10  by saying if you had intelligence or
11  information, the people were coming for the
12  purpose of shutting down the RNC?
13      A.    Correct.
14      Q.    What was it about this event that
15  led you to believe that participants in this
16  event were there to shut down the RNC, which
17  was not scheduled to start until the next day?
18      A.    The intelligence that we got,
19  that that is what a large part of the
20  demonstrators coming to New York City were
21  going to try and do.
22          Was it beyond the realm of
23  responsibility that they would crash through
24  the front of the Garden, that we let them
25  march, take it over?

Page 195

E. Esposito

1
2      Q.    As soon as they did that, they
3  would it not be eligible for a summons?
4      A.    That's correct.
5      Q.    We have to remember we're
6  focusing on people that were getting charged
7  with things like disorderly conduct and
8  parading without a permit.
9      A.    I'm looking at the whole event,
10  I'm looking at the potential with those things
11  that I articulated.  That's how I police it,
12  by looking at the whole event taking those
13  things into consideration.
14      Q.    When a decision was made about
15  adopting a no summons policy, were there any
16  documents that were prepared that spelled out
17  the justifications for that policy?
18      A.    I don't think so.  Not that I
19  recall.
20      Q.    Were there any documents that you
21  recall discussing any aspect of the decision
22  to adopt a no summons policy?
23      A.    Not that I recall.
24      Q.    When the decision was made to
25  have a no summons policy, was there a

Page 196

E. Esposito

1
2  discussion about the impact that would have on
3  the length of time people would be kept in
4  police custody?
5      A.    Yes.
6      Q.    Was it recognized then that the
7  people would be in police custody much longer
8  than if the policy were not in place?
9          MR. FARRELL:  Objection.
10      A.    They would be in the system
11  longer, they would be in our custody longer.
12  Yeah, that was recognized.
13      Q.    Was that recognized by
14  Commissioner Kelly?
15      A.    Yes.
16      Q.    At the time that the decision was
17  made about there being a no summons policy for
18  the convention, was there a discussion about
19  the impact it would have on the resources
20  needed to process arrestees?
21      A.    Yes.
22      Q.    Was it recognized that greater
23  resources would be needed, since everyone
24  would be going at least through a DAT step?
25      A.    Yes.

Page 197

E. Esposito

1
2      Q.    What, if any, decisions were made
3  to address the need for additional arrest
4  processing resources, given the no summonses
5  policy?
6      A.    What steps were taken?
7          (Question read.)
8      A.    We developed the system that was
9  put in place to process the arrests.
10      Q.    I take it by that you mean that
11  the arrest processing plan that was put
12  together by the department was specifically
13  done in recognition of the fact that the no
14  summonses policy would require additional
15  arrest processing resources?
16      A.    No.  That was one of the aspects.
17      Q.    I don't mean that was the sole
18  consideration.
19      A.    That's what you said.
20      Q.    If I did, I didn't mean to say
21  that.
22      A.    Okay.
23      Q.    That was one of the
24  considerations in the design of the arrest
25  possess for the convention?

Page 354

J. Esposito

1
2     A.   I am sorry?
3     Q.   In the normal circumstance outside
4  of a mass-arrest situation, outside of a
5  demonstration-related situation, when somebody
6  is arrested for a violation for a
7  quality-of-life crime, they are issued a
8  summons, they are not issued a Desk Appearance
9  Ticket or put through the system if they are
10 summons-eligible, correct?
11          MR. FARRELL:  Objection.
12     A.   If they are eligible, correct.
13     Q.   And they spend maybe a hour in
14 custody based upon that, correct?
15          MR. FARRELL:  Objection.
16     A.   For a C summons?
17     Q.   Yes.  For the processing didn't you
18 say that usually took around a hour?
19     A.   It depends.  You know, we do warrant
20 checks now.  So it could be 10 minutes.  It
21 could be up to a hour.  I think that is the
22 longest.
23     Q.   But that is the time area we are
24 talking about, 10 minutes, an hour, somewhere in
25 that area?

Page 355

J. Esposito

1
2     A.   I think an hour is somewhat in the
3  longest.
4     Q.   Certainly not 24 hours?
5     A.   Correct.
6     Q.   And certainly not 48 hours?
7     A.   Correct.
8     Q.   During the Republican National
9  Convention people were spending 24 hours in jail
10 or 48 hours in jail arrested for offenses that
11 normally they would receive a C summons for and
12 be out in the area of about 10 minutes to an
13 hour, no?
14          MR. FARRELL:  Objection.
15     A.   No.
16     Q.   Explain the distinction.  Is that
17 because -- explain why not, sir?
18     A.   Because you are equating an
19 individual with a quality-of-life offense on the
20 street to a what you call a mass-arrest
21 situation.  Mass-arrest situation prior to the
22 RNC the vast majority were no-C-summons strategy
23 enforcement.
24     Q.   Let me stop you there.
25          Is not the comparison I was making

Page 356

J. Esposito

1
2  in a normal situation, a non-mass situation, if
3  somebody is arrested for Parading Without a
4  Permit or Disorderly Conduct Subsection 5 or
5  Disorderly Conduct Subsection 6 and they were
6  summons-eligible, no problems with their
7  identification or anything like that, they would
8  normally receive their summonses in somewhere in
9  the area of 10 minutes to an hour, correct?
10          MR. FARRELL:  Objection.
11     A.   For Disorderly Conduct, yes.  I'm
12 not sure for Parading Without a Permit.
13     Q.   Let's just take Disorderly Conduct
14 since you are sure about that.  During the
15 Republican National Convention, somebody
16 arrested for Disorderly Conduct Subsection 5 or
17 6 could have spend 24 hours, 36 hours, 48 hours
18 in custody before being released for that same
19 offense, correct?
20     A.   Correct.
21          MR. FARRELL:  Objection.
22     A.   Correct.
23     Q.   Is it ever appropriate to arrest
24 somebody if they hadn't committed a crime?
25     A.   No.

Page 357

J. Esposito

1
2     Q.   What intelligence did you have that
3  suggested that people were coming to engage in
4  continuous unlawful conduct?
5     A.   Briefings from my Intelligence
6  Division, briefing and information from my
7  Intelligence --
8     Q.   Given directly to you?
9     A.   Yes.
10     Q.   And given to your subcommittee?
11     A.   At times.
12     Q.   What intelligence information was
13 given to you specifically about people
14 continuing to engage in continuous unlawful
15 acts?
16     A.   Just that.
17     Q.   Well, what acts and what people and
18 where?
19     A.   I don't recall right now.
20     Q.   You don't have any details at all in
21 your memory about any of the intelligence
22 specifics that underlaid the intelligence
23 conclusion that people were coming to engage in
24 continuous unlawful activity?
25          MR. FARRELL:  Objection.

Greenhouse Reporting, Inc.

Page 358

J. Esposito

1              J. Esposito
2    A.   What you are saying was articulated
3  to me, that groups were going to come into the
4  City and engage in lawful activity, a variety of
5  unlawful activity. Everything from possible
6  bombing to assaults to civil disobedience.
7    Q.   Who was in charge of gathering this
8  information and briefing you from the
9  Intelligence Division?
10    A.   Well, the Commissioner of
11  Intelligence, David Cohen, is the number one
12  person, but at other times members of his staff
13  would brief me.
14    Q.   Can you remember the names of any of
15  his staff members who briefed you in
16  intelligence issues in anticipation of the
17  Republican National Convention?
18    A.   Kevin Perham, P-E-R-H-A-M. I forget
19  the others.
20    Q.   How many times were you briefed
21  independently in a one-on-one conversation by
22  either Mr. Cohen or his subordinates within the
23  Intelligence Division about intelligence matters
24  regarding the Republican National Convention?
25    A.   I don't recall now.

Page 359

1              J. Esposito
2    Q.   Would you estimate it at more than
3  five, less than five?
4    A.   More than five.
5    Q.   More than ten?
6    A.   It's tough to guess.
7    Q.   Well, about 50 times or somewhere in
8  the area of five to a dozen, some estimate of
9  the amount of time?
10       MR. FARRELL: Objection. If you
11  know.
12    A.   More than five. That is for sure.
13    Q.   These are one-on-one conversations,
14  correct?
15    A.   Yes.
16    Q.   How many times did the Intelligence
17  Division, Mr. Cohen or one of his subordinates
18  brief the Executive Committee about intelligence
19  that has been garnered with regard to the
20  Republican National Convention and what was
21  expected to be coming during --
22    A.   More than five.
23    Q.   The same, if you give me an upper
24  amount?
25    A.   No, I couldn't.

Page 360

1              J. Esposito
2    Q.   When you say intelligence, does that
3  include information garnered from open sources,
4  do you make a distinction between open sources
5  of information and intelligence that is
6  gathered?
7    A.   I am talking about both.
8    Q.   So within that category, just so we
9  are on the same page in terms of terminology, is
10  it fair to say non-open source intelligence and
11  intelligence based upon open source?
12    A.   Yes.
13    Q.   Do you have any specific
14  recollection of any of the specific individuals
15  who were expected to the come to New York City
16  during the Republican National Convention and
17  engage in continuous unlawful activity?
18       MR. FARRELL: Objection.
19    A.   At the time --
20       MR. FARRELL: I want to consult with
21  my client and see if that calls for any
22  law enforcement privilege.
23      (Recess taken.)
24      THE WITNESS: I am sorry. Will you
25  repeat it.

Page 361

1              J. Esposito
2       MR. ROTHMAN: Could you read it
3  back.
4      (Record read.)
5    A.   I don't recall the specific names.
6  Names were given to me. I don't recall them
7  now.
8    Q.   How many times were you briefed
9  personally by Mr. Cohen on this subject?
10       MR. FARRELL: Objection.
11    A.   I don't recall.
12    Q.   Less than five?
13       MR. FARRELL: Objection.
14    A.   I would say more than five, but
15  other than that I really couldn't give an
16  educated guess.
17    Q.   How many times did Mr. Cohen brief
18  the Executive Committee on this subject of
19  intelligence related to the Republican National
20  Convention?
21       MR. FARRELL: Objection.
22    A.   I don't recall.
23    Q.   Again more than five, you would
24  estimate?
25    A.   Yes.

27 (Pages 358 to 361)

Page 362

J. Esposito

1
2       Q.    In terms of number of weeks or
3   months before the Convention, when did these
4   intelligence briefings begin, either personally
5   to you or to the Executive Committee?
6       A.    I don't recall.
7       Q.    Can you say that they began in 2004
8   or earlier than that?
9           MR. FARRELL:  Objection.
10      A.    They began almost immediately after
11  it was determined that we were getting the
12  Convention.
13      Q.    How frequently did they occur?
14      A.    I don't recall.
15      Q.    Did they increase in frequency as
16  the Convention approached?
17      A.    Yes.
18      Q.    What intelligence that you received
19  suggested that people were coming to shut down
20  venues relating to the Republican National
21  Convention?
22      A.    Just that, Intelligence Division
23  would brief us as they were getting
24  information.
25      Q.    Again, do you remember any specifics

Page 363

J. Esposito

1
2   at all with regard to what venues people were
3   going to be trying to shut down, which people
4   were going to shut them down, when they were
5   going to try to shut them down and in what
6   manner they were going to try to shut them
7   down?
8       A.    Blocking streets, blocking
9   entrances, events that the delegates were going
10  to go to, chaining themselves, sitting down.
11      Q.    At what venues?
12      A.    Just about every venue that the
13  information was.  They would go to the venues
14  that the delegates were going to be at.  It was
15  more or less generic.
16      Q.    Do you remember any specific
17  intelligence about people going to shut down
18  delegate-related venues on August 29th in the
19  Times Square area?
20      A.    What day of the week was that?
21      Q.    It was a Sunday, the day of the
22  large demonstration by United for Peace and
23  Justice?
24      A.    I am not sure.
25      Q.    Do you remember any specific

Page 364

J. Esposito

1
2   intelligence about people wanting to shut down
3   or prevent or obstruct the ingress or egress of
4   delegates into Broadway theaters?
5       A.    Yes.
6       Q.    Who gave you that information?
7       A.    Someone from the Intelligence
8   Division.
9       Q.    Do you remember who?
10      A.    No.
11      Q.    Do you remember where?
12      A.    No.
13      Q.    Do you remember any specifics about
14  what theaters or what was expected with regard
15  to that?
16      A.    Just the theaters that the delegates
17  were to go to.  I don't remember specifically
18  which ones.
19      Q.    What were the main hotels where the
20  delegates were staying at?
21      A.    I don't remember.
22      Q.    Did you have any personal
23  interaction with any of the delegates during the
24  Republican National Convention?
25      A.    Not that I recall.

Page 365

J. Esposito

1
2       Q.    What intelligence suggested that
3   violent criminals were coming New York to engage
4   in violent activity or to engage in civil
5   disobedience?
6       A.    Information that was given to me
7   from the Intelligence Division.
8       Q.    Again, do you remember any specifics
9   at all about which violent criminals, about what
10  violent acts were expected where and when they
11  were expected to occur?
12      A.    I can't recall the names.
13      Q.    About how many individuals were
14  individuals of concern in the run-up to the
15  Republican National Convention?
16      A.    I don't remember.
17      Q.    There were some people who were
18  designated as individuals of concern, correct?
19          MR. FARRELL:  Objection.
20      A.    Yes.
21      Q.    About how many were designated as
22  individuals of concern?
23      A.    I don't recall at all.
24      Q.    Were any lists or photo displays
25  made depicting these individuals of concern?

28 (Pages 362 to 365)

J. Esposito

1
2 Chief Colegan, would work alongside by him and
3 be brought up to speed?
4    MR. FARRELL: Objection.
5    A.   No. What I'm saying, you wouldn't
6 relieve Devlin and bring Colegan in. If you are
7 going to bring Colegan in, let him work with
8 Devlin until Devlin leaves. I don't think we
9 would have relieved Devlin if he was still
10 working.
11    Q.   Why would you have wanted Colegan to
12 work with Devlin?
13    MR. FARRELL: Objection.
14    A.   To get up to speed.
15    Q.   Did you, at any time, have any
16 conversations with Inspector Morris about RNC
17 arrest planning prior to the RNC?
18    A.   I forget when he came on board for
19 the RNC.
20    Q.   Do you remember why Morris in
21 particular was chosen to work on this project?
22    A.   Very well thought of. I believe he
23 is an attorney. I just think we saw things in
24 his background that we liked.
25    Q.   Do you know if he ever worked with

J. Esposito

1
2 the Legal Bureau?
3    A.   I don't know.
4    Q.   You said that RNC arrests would be
5 reported to the Command Center. What Command
6 Center were you referring to, sir?
7    A.   Emergency Operations Center, the
8 EOC, police headquarters. We have a big
9 conference room. All of the agencies that were
10 working with the RNC were represented there, and
11 there is a sort of a central depository for all
12 activity.
13    Q.   Did you spend a fair amount of time
14 within that Emergency Operations Center during
15 the Republican National Convention?
16    A.   No.
17    Q.   Where did you spend the bulk of your
18 time during the RNC period? Was it out on the
19 street? Was it at a command office? What were
20 you actually doing most of the time? How did
21 you organize your days?
22    A.   We get briefed in the morning on
23 what happened the day before. We get daily
24 briefings.
25    Q.   By whom?

J. Esposito

1
2    A.   Intel would do a lot of it.
3 Operations would do a lot of it. We would just
4 get briefed on what happened day before.
5    Q.   Who from intel would give those
6 briefings?
7    A.   Usually Cohen. We would have
8 somebody there with him giving us the details of
9 what happened the day before. McManus, Chief
10 McManus who is the RNC coordinator, would be
11 there naturally.
12    Q.   And the Operations Division, are
13 they within the Patrol Services Division?
14    A.   They answer to the Chief of the
15 Department.
16    Q.   Are they Patrol Services?
17    A.   No, Chief of the Department's
18 office.
19    Q.   What is their general duties?
20    A.   They coordinate all of the citywide
21 plans, activities details. They are the central
22 depository for what is going on around the City.
23    Q.   Sort of an overview of all of the
24 different police operations?
25    A.   Yes, sir.

J. Esposito

1
2    Q.   The coordination between the --
3    A.   Bureaus, other City agencies,
4 outside City agencies. Anything going on in the
5 City would go through them.
6    Q.   They would give you daily briefings
7 as well as to what occurred on the prior day?
8    A.   They would be part of a briefing
9 process, yes.
10    Q.   Would these briefings be given at
11 the same time or --
12    A.   Generally we try to get them down
13 early in the morning, 8, 9 o'clock I believe
14 they were.
15    Q.   Was that in the Commissioner's
16 conference room?
17    A.   Most of the time they were in the
18 Commissioner's conference room.
19    Q.   How long would they take?
20    A.   It varied.
21    Q.   Were there any written documents
22 that were generated as a result of that?
23    A.   At times there may -- intel would
24 have some documents at times. A lot of times it
25 would be Operations. Operations may generate a

Page 711

1              J. Esposito
2          MR. FARRELL: Objection.
3      Q.    What about the fact that you were
4  arresting people involved in demonstrations made
5  you adopt a no summons rule for people who
6  presumably were arrested in non-demonstration
7  related events at the same time elsewhere in the
8  city were eligible for summons?
9          MR. FARRELL: Objection. Can you
10         read that question back, please.
11         (The record was read.)
12     Q.    What is it about the fact that
13  somebody's being arrested at a demonstration led
14  you to conclude that a no summons policy should
15  be issued for an RNC related arrest when at the
16  same time throughout the city people arrested for
17  a non-RNC related event would be issued a summons
18  if eligible?
19         MR. FARRELL: Objection.
20     A.    If I heard it right, we gave out
21  C-Summonses in other parts of the city for
22  non-RNC related --
23     Q.    Presumably, yes.
24     A.    -- while at the same time at the RNC
25  related event we had a no C-Summons policy?

Page 712

1              J. Esposito
2      Q.    Right.
3      A.    Just for all the reasons I
4  articulated, all the information we were getting
5  about the RNC.
6      Q.    That information being what?
7      A.    What I just said about the RNC --
8          MR. FARRELL: Objection. Asked and
9          answered.
10     A.    -- being -- well, it's a national
11  security incident, a special security event, and
12  that raised up our level of concern. The
13  information we got about people coming into the
14  city for the purpose of shutting the city down,
15  for the purpose of shutting the RNC down, for the
16  purpose of destroying property, attacking
17  businesses, the possibility of a terrorist
18  attack, the possibility of false identification,
19  the probability of false identification.
20     Q.    Now, all these factors that you
21  mentioned, were they contained in some kind of
22  intelligence briefing that you received?
23     A.    Yes.
24     Q.    Was this in written form or was it
25  orally?

Page 713

1              J. Esposito
2          MR. FARRELL: Objection.
3      A.    Both, I believe.
4      Q.    From whom did you receive that --
5  you don't have to tell me specifically what it
6  was -- but from whom did you receive that
7  intelligence briefing?
8      A.    The intelligence division.
9      Q.    And that would be at the time and
10  maybe still is, headed by Commissioner Cohen?
11     A.    That's correct.
12     Q.    And all those factors that you
13  mentioned were factors that were identified in
14  this briefing which you relied upon and adopted a
15  no summons rule?
16         MR. FARRELL: Objection.
17     A.    Yes.
18     Q.    What changes in policing --
19  withdrawn. Did the fact that this event, the
20  RNC, was designated a national special security
21  event -- and you know what that is, right?
22     A.    Yes.
23     Q.    Did that fact mandate that you
24  change your policing procedures in any way?
25         MR. FARRELL: Objection.

Page 714

1              J. Esposito
2      A.    No.
3      Q.    With the intelligence you had with
4  respect to the intention of people to shut down
5  the city and shut down the RNC -- I believe those
6  were your words -- were there any specific
7  credible allegations of that or was that just a
8  general concern expressed by the intelligence
9  division? I'm not asking what the specific
10  concerns were, I'm just asking whether it was
11  specific or whether it was just a general concern
12  that that might happen?
13         MR. FARRELL: Objection.
14     A.    I believe it was a concern based on
15  intelligence they had gathered.
16     Q.    Specific intelligence?
17         MR. FARRELL: Objection.
18     A.    I believe so.
19     Q.    Did you review that intelligence or
20  was that a recommendation that was given to you,
21  this is like George Bush, were there weapons of
22  mass destruction -- no, that's off the record --
23     A.    That was a potential.
24     Q.    Was that information, did you review
25  the specific intelligence of -- that indicated

10 (Pages 711 to 714)

Page 775

```
1              J. Esposito
2    be they be eligible for a summons?
3          MR. FARRELL: Can you read that back
4    for me.
5          (The record was read.)
6      Q.    Are you aware of any such policy in
7    the police department prior to the RNC?
8          MR. FARRELL: Objection. If you
9    understand it.
10     A.    Online and a C-Summons only if the
11   incident commander okayed it?
12     Q.    Right.
13     A.    Online referring to what?
14     Q.    You tell me.
15         MR. FARRELL: Objection.
16     A.    Well, what's your understanding of
17   online?
18     Q.    Well, let me ask you what your
19   understanding of online is?
20     A.    Online to me is usually above DAT,
21   when you're being processed for a complaint
22   before a judge.
23     Q.    Are you aware of any such policy,
24   given that definition of online, were you aware
25   of such policy prior to the RNC?
```

Page 776

```
1              J. Esposito
2          MR. FARRELL: Objection.
3      A.    I didn't think so.
4      Q.    Assuming online includes both
5    arraignment before a judge and the issuance of a
6    DAT, are you aware of any policy that says for
7    anybody arrested at a demonstration for a
8    violation at a demonstration that they would be
9    processed online unless an incident commander
10   concluded that they should get a summons?
11         MR. FARRELL: Objection.
12     A.    As I testified earlier, the incident
13   commander has the discretion to give a C-Summons.
14     Q.    So is it my understanding then that
15   prior to the RNC that for people arrested at
16   demonstrations that the presumption would be that
17   they would be processed online, which could
18   include being given a DAT or going before a judge
19   for arraignment, and that the presumption would
20   be that that's how they would be processed, and
21   that only if the incident commander decided they
22   should get a summons that they would be eligible
23   for a consideration for a summons?
24         MR. FARRELL: Objection.
25     A.    I'm not sure.
```

Page 777

```
1              J. Esposito
2          MR. MOORE: I have nothing further.
3    Thank you, Chief Esposito.
4          MR. FARRELL: All right, it's 12:29.
5    Do you need a break?
6          (A recess was taken.)
7    EXAMINATION BY
8    MS. WOHLFORTH:
9      Q.    Good afternoon. My name is Karen
10   Wohlforth. I represent Jody Concepcion, a
11   plaintiff in this action. I just have a few
12   questions for you today, and you'll excuse me if
13   I may repeat certain information because I wasn't
14   able to be at certain of your other depositions,
15   but it will be short.
16         I understand that you testified that
17   you met with Mr. Cohen, David Cohen, on a regular
18   basis?
19     A.    Yes.
20     Q.    When did those meetings start prior
21   to the convention?
22     A.    Just about immediately when we were
23   awarded the convention.
24     Q.    And did those meetings step up in
25   frequency as you came closer to the convention?
```

Page 778

```
1              J. Esposito
2      A.    Yes.
3      Q.    How often did you meet with him in
4    the months prior to the convention?
5      A.    I couldn't say.
6      Q.    Once a week?
7      A.    Yes, at least.
8      Q.    And who else attended those
9    meetings?
10     A.    At times the commissioner would be
11   there, at times it would just be me and Cohen.
12     Q.    How was John McManus involved?
13         MR. FARRELL: Objection.
14     A.    Jack was the coordinator for the
15   RNC, he was the point person for the RNC.
16     Q.    Can you tell me what his duties
17   involved as the point person for the RNC?
18         MR. FARRELL: Objection.
19     A.    Really organizing the whole event.
20     Q.    Coordinating with this Committee on
21   Arrangements?
22     A.    Coordinating with other city
23   agencies, federal agencies and the RNC people,
24   City Hall.
25     Q.    Did he attend any of the Intel
```

Page 791

J. Esposito

1     explosive device that was retrieved by anyone in
2     the NYPD as a result of the convention?
3         MR. FARRELL: Objection.
4         A.    I would have been aware. Would I
5     remember every incident, no. When they arrested
6     the fellows or the people responsible for setting
7     something on fire on 34th Street, I'm not sure if
8     there was any explosive or accelerant retrieved.
9     Are you aware when they set the display on fire?
10    I'm not sure, they may have recovered some
11    flammable substance, I'm not sure though.
12        Q.    But other than that particular
13    incident that involved a fire, do you have any
14    recollection of any explosive devices that were
15    actually vouchered as a result of any arrests?
16        A.    I don't recall any.
17        Q.    Do you have any recollection of any
18    guns or firearms of any sort that were actually
19    vouchered as a result of any arrest?
20        MR. FARRELL: Objection.
21        A.    Not that I recall.
22        Q.    Nonetheless, as a result of your
23    meetings with Intel, the information that you
24    received led you to expect that you would find --

Page 792

J. Esposito

1     that you might find firearms or explosive devices
2     during the course of this convention; is that not
3     true?
4         MR. FARRELL: Objection.
5         A.    We felt the potential was there.
6         Q.    Was that potential as a result of
7     any specific Intel that was given to you by the
8     intelligence unit?
9         MR. FARRELL: Objection.
10        A.    Yes.
11        Q.    Was that intelligence that you
12    received with respect to any particular location?
13        MR. FARRELL: Objection.
14        A.    I don't recall location being
15    mentioned.
16        Q.    It was a general threat with respect
17    to any area in the city or was there any
18    specificity as to the information that you
19    received from Intel?
20        MR. FARRELL: Objection.
21        A.    As far as the location?
22        Q.    As far as any location, I don't need
23    to know the location, as far as any location or
24    any specific detail regarding what was going to

Page 793

J. Esposito

1     be done that might have involved -- that was
2     intended to involve guns or explosive devices?
3         MR. FARRELL: Objection.
4         A.    Yes, we had information. Did I have
5     information about specific --
6         Q.    Specific information?
7         MR. FARRELL: Objection.
8         A.    Definition of specific -- certain
9     people, named people, that were coming here who
10    had a history of that type of behavior using
11    explosives, yes, we had specific information.
12        Q.    But nothing was found?
13        MR. FARRELL: Objection.
14        A.    No, not to my recollection. You
15    asked me if there was specific information about
16    people, places or things who would be involved
17    with explosives or firearms?
18        Q.    Correct.
19        A.    Information we received from Intel
20    were about individuals who had an arrest history
21    of that type of behavior that were coming here
22    during the RNC, yes.
23        Q.    Did you have any information that
24    any of those specific individuals were expected

Page 794

J. Esposito

1     to turn up on East 16th Street on August 31st?
2         A.    We knew they were coming for the
3     Republican National Convention. We didn't know
4     exactly what location they were going to go to.
5         Q.    Now, with respect to the issue of
6     the warnings, were your command people provided
7     with bullhorns for warnings?
8         A.    I believe so.
9         Q.    Were there specific instructions
10    that each commander had to receive a certain
11    number of bullhorns for any particular location
12    that they were dispatched to?
13        A.    No.
14        Q.    Was there any assurance that there
15    were bullhorns available for each commander for
16    each location that they were dispatched to?
17        MR. FARRELL: Objection.
18        A.    There should have been.
19        Q.    Do you know whether they were?
20        MR. FARRELL: Objection.
21        A.    I'm not sure if every particular
22    commander had a bullhorn but one, I believe, was
23    available.
24        Q.    Where would it have been available?

Greenhouse Reporting, Inc.

(212)279-5108

Page 795

J. Esposito

1
2    A.   That varies.  It should be in
3    someone's vehicle, it could have been at the
4    command post.
5        Q.   Did you give any specific
6    instructions with respect to any proposed
7    demonstrations that were taking place at Union
8    Square?
9            MR. FARRELL:  Objection.
10       A.   I don't think so.
11       Q.   Are you aware of any specific
12   instructions that were given to any of the
13   commanders who were dispatched to Union Square on
14   August 31st?
15           MR. FARRELL:  Objection.
16       A.   Specific instructions?
17       Q.   Yes.
18       A.   No.
19       Q.   Did you have any meetings with
20   Michael Tiffany at Intel?
21       A.   I believe Mike was still in the
22   position of commanding officer of Intel at the
23   time.  He left our agency at one point, I believe
24   it was after the RNC.  So, yes, I would have had
25   meetings with him.

Page 796

J. Esposito

1
2        Q.   He went to Washington, didn't he?
3        A.   Yes.
4        Q.   Did Michael Tiffany participate in
5    most of these meetings with Commissioner Cohen
6    that you had?
7            MR. FARRELL:  Objection.
8        A.   Some.
9        Q.   Did you ever prepare any assessment
10   as to the discrepancy between the intelligence
11   that you received and what you actually found
12   during the course of these arrests during the
13   RNC?
14           MR. FARRELL:  Objection.
15       A.   I don't know what you're referring
16   to.
17       Q.   Did you ever prepare any written
18   reports or critical assessments, did you ever
19   evaluate why the intelligence that you received
20   didn't pan out in terms of the arrests that
21   actually took place during that convention?
22           MR. FARRELL:  Objection.  He never
23       said that.
24       A.   What do you mean by pan out?
25       Q.   You received intelligence regarding

Page 797

J. Esposito

1
2    expected violence or explosive devices and things
3    of that nature.  Those explosive devices were not
4    retrieved as a result of these arrests during
5    this convention; is that correct?
6            MR. FARRELL:  Objection.
7        A.   Correct.
8        Q.   Did you ever do any evaluation or
9    assessment as to the reliability of the
10   intelligence that you received?
11       A.   The intelligence was fine.
12       Q.   Well, it proved not to be correct;
13   isn't that true?
14           MR. FARRELL:  Objection.
15       A.   Not at all.
16       Q.   You didn't find any explosive
17   devices; is that correct?
18           MR. FARRELL:  Objection.
19       A.   We didn't say explosive devices were
20   coming.  There was potential for it.  The
21   individuals who had a history of using explosive
22   devices were said to be coming to New York during
23   the RNC.  I believe good policing prevented the
24   violence from reaching that level.
25       Q.   Were any of these individuals that

Page 798

J. Esposito

1
2    you were warned about, to your knowledge, on East
3    16th Street or Union Square on August 31st
4    specifically?
5        A.   I don't know.
6        Q.   Is there anyone who would have
7    knowledge of that?
8        A.   The intelligence division might have
9    knowledge of that.
10       Q.   But anyone in your policing force --
11           MR. FARRELL:  Objection.
12       Q.   -- who would actually be on the
13   ground at the site?
14       A.   Intel is on the ground.
15       Q.   Are you aware of any reports from
16   Intel on the ground, back to central command,
17   that any of these individuals that you were
18   looking for were actually at East 16th Street?
19           MR. FARRELL:  Objection.
20       A.   Some of the individuals of concern
21   were on the streets during the RNC.  I believe
22   one was seen in the area of Union Square Park.  I
23   guess that's close proximity to 16th Street,
24   would you consider that?
25       Q.   On August 31st?

31 (Pages 795 to 798)

J. Esposito

1
2       A.   I don't know what date.  It may have
3   been the 31st -- no, I'm sorry, I don't know, I'm
4   not sure.
5       Q.   Do you know if any of your
6   undercovers were part of the sweep on East 16th
7   Street?
8           MR. FARRELL:  Objection.
9       Q.   On August 31st?
10          MR. FARRELL:  Objection.  I assert
11  the law enforcement privilege to any
12  questions about the existence or
13  nonexistence of undercover police officers,
14  as I've done for the entire questioning of
15  witnesses.
16          MS. WOHLFORTH:  I have no further
17  questions.
18          (A luncheon recess was taken, 1:15
19  P.M. - 2:55 P.M.)
20
21  A F T E R N O O N   S E S S I O N
22
23  EXAMINATION BY
24  MS. RITCHIE:
25      Q.   Good afternoon.  My name is Andrea

J. Esposito

1
2   Ritchie, I'm counsel for Plaintiff Caitlin Tikkun
3   in Civil Action 059901.  I have some questions
4   for you primarily about NYPD policy and practice.
5       A.   Okay.
6       Q.   It's my understanding that you
7   testified earlier in this deposition that sexual
8   harassment by members of the New York City Police
9   Department would not be tolerated; is that
10  correct?
11      A.   Correct.
12      Q.   As chief of department, are you
13  aware of any specific NYPD policy concerning
14  sexual harassment?
15          MR. FARRELL:  Objection to the
16  extent it's been asked and answered
17  previously.
18      A.   We have a policy, and basically it's
19  not going to be tolerated and we will investigate
20  any allegations and take appropriate disciplinary
21  action if necessary.
22      Q.   Are you talking about sexual
23  harassment between NYPD employees or does this
24  policy cover interactions between NYPD officers
25  and members of the public?

J. Esposito

1
2       A.   Well, it really is the same policy
3   for both, we are not going to allow it.  Now, an
4   investigation may be done by an outside agency,
5   not us, depending on who the complaint is made
6   to.  Civilian Complaint Review Board may do it,
7   the DA's office may do it, it depends on the
8   allegation and how it's taken and the severity of
9   it.
10      Q.   So you're saying that if the
11  complaint is made to the Civilian Complaint
12  Review Board, they would conduct the
13  investigation?
14      A.   They get sent to that area.  They
15  refer it back to us because it's criminal, they
16  may refer it to the DA's office.
17      Q.   Might it also be investigated by the
18  Internal Affairs Bureau?
19      A.   Sure.
20      Q.   Can you tell me where that policy is
21  found, is it written down somewhere?
22      A.   Regarding prisoners or within
23  the agency?
24      Q.   Well, let's start with within the
25  agency?

J. Esposito

1
2       A.   Within the agency, the statements by
3   the Office of Equal Employment, they're the ones
4   who oversee this policy.  And as far as with
5   regards to prisoners, it would be in the patrol
6   guide how to treat prisoners.
7       Q.   Can you give me a precise reference
8   to a section of the patrol guide?
9       A.   No, I don't have it.
10      Q.   Do you know if there is a section
11  that deals specifically with sexual harassment?
12          MR. FARRELL:  Objection.
13      A.   I'm not sure if it mentions that per
14  se.
15      Q.   So what section are you thinking of?
16      A.   With regards to how to treat
17  prisoners.
18      Q.   It's your understanding of the
19  section that deals with how to treat prisoners
20  specifically refers to sexual harassment?
21          MR. FARRELL:  Objection.
22      A.   I don't know if it does.
23      Q.   What about members of the public who
24  are not prisoners?
25          MR. FARRELL:  Objection.

Page 823

J. Esposito

1
2     A.    No.
3     Q.    Do you recall the issue coming up in
4  connection with the 6th Precinct?
5          MR. FARRELL:  Objection.
6     A.    Not specifically, no, I don't.
7     Q.    You referred earlier today on having
8  received specific information from Intel
9  concerning issues relating to identification
10  documents?
11     A.    Yes.
12     Q.    And the concern was that people be
13  carrying false identification documents; is that
14  correct?
15     A.    Yes.
16     Q.    Did any of that information suggest
17  that people would be carrying identification
18  documents that reflected a gender that was
19  different than -- that was of a different gender
20  than you would expect?
21          MR. FARRELL:  Objection.
22     A.    I don't recall that being talked
23  about.
24          MS. RITCHIE:  I have nothing
25  further.  Thank you.

Page 824

J. Esposito

1
2          MR. FARRELL:  For the record, just
3  as I have with the prior days' testimony
4  and the continuing deposition of Chief
5  Esposito, we would request to review and
6  sign pursuant to Rule 30.
7          There are no other counsel here who
8  are seeking to question Chief Esposito, so
9  the deposition of Chief Esposito is closed.
10          (Time noted:  3:30 P.M.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 825

J. Esposito

1
2
3     I, the witness herein, having read the foregoing
4  testimony, do hereby certify it to be a true and
5  correct transcript, subject to the corrections,
6  if any, shown on the attached page.
7
8
9
10  _____
       JOSEPH ESPOSITO
11
12
13
14
15  Subscribed and sworn to
16  before me this _____ day
17  of _____ 2006.
18
19
20  _____
21     NOTARY PUBLIC
22
23
24
25

Page 826

1
2          CERTIFICATE
3  STATE OF NEW YORK  )
                      :ss
4  COUNTY OF NEW YORK )
5
6          I, MARION FROLA, a Court Reporter
7  and Notary Public in and for the State of New
8  York, do hereby certify:
9          THAT the witness whose testimony is
10  hereinbefore set forth, was duly sworn before the
11  commencement of testimony; and
12          THAT the within transcript is a true
13  record of the testimony given by said witness, to
14  the best of my ability.
15          I further certify that I am not
16  related, either by blood or marriage, to any of
17  the parties to this action; and
18          THAT I am in no way interested in
19  the outcome of this matter.
20          IN WITNESS WHEREOF, I have hereunto
21  set my hand this 31st day of July 2006.
22
23
24  _____
       MARION FROLA
25

38 (Pages 823 to 826)

# EXHIBIT R



THE CITY OF NEW YORK
## LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

MICHAEL A. CARDOZO
*Corporation Counsel*

JAMES MIRRO
*Special Assistant Corporation Counsel*
*phone (212) 788-8026    fax (212) 788-9776*

February 1, 2008

***BY FAX***

The Honorable Richard J. Sullivan
United States District Judge
Daniel Patrick Moynihan
   United States Courthouse
500 Pearl Street
New York, New York 10007-1312

     *Re:*   ***Consolidated RNC Cases***

Dear Judge Sullivan:

     On January 23, 2008, Magistrate Judge Francis issued an opinion and order granting in part and denying in part the motions of plaintiffs in approximately 37 RNC actions to amend their complaints to add various claims and defendants (the "Order"). As Your Honor may recall, plaintiffs' motions to amend were filed nearly three years after the incidents giving rise to these claims, on the eve of expiry of the federal statute of limitations and after nearly three years of consolidated discovery in the RNC cases.

     In the Order, the Magistrate Judge has permitted plaintiffs to add as a defendant Deputy Commissioner of Intelligence David Cohen although we believe that plaintiffs have not properly pled any cause of action against him. Due to the importance of this issue, and other potential grounds for appeal that we are reviewing, defendants will appeal the Order for Your Honor's review.

     In light of the burdens under which defendants are laboring in these numerous actions, which includes ongoing party and nonparty discovery as well as heavy briefing schedules before both Your Honor and Magistrate Francis on various issues, the parties have conferred on a briefing schedule. Plaintiffs' counsel, Jeffrey Rothman, has consented to the schedule proposed below; in several conversations, the Beldock firm, through Ms. Norins, has expressed no objection but has not yet provided a final answer; Ms. Weber consents on the

condition that she be permitted an extra week to submit her opposition to the appeal; other plaintiffs' counsel who have moved to amend have not responded to our email inquiries.

Based on these discussions, the parties propose the following schedule: defendants appeal shall be due on February 25, 2008; plaintiffs' opposition shall be due on March 17, 2008; and defendants' reply shall be due on March 31, 2008. The parties respectfully request that the Court "so order" it.

Respectfully submitted,

James Mirro

cc: RNC Distribution List (by email)

2

# EXHIBIT S

## Clare Norins

**From:** Clare Norins
**Sent:** Sunday, February 03, 2008 3:42 PM
**To:** Sundaran, Raju; 'Mirro, James'; 'Farrell, Peter'
**Cc:** Jonathan C. Moore; Rachel Kleinman
**Subject:** Briefing on Rule 72 re Amending Complaints

Hi Jim & Raju:

Counsel in MacNamara consents to the proposed briefing schedule with the understanding that defendants will not be appealing the addition of the as-applied constitutional challenges to the Parading Without a Permit and Disorderly Conduct statutes.

Thanks,
Clare

Clare Rivka Norins, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0400 (phone)     (212) 277-5882 (direct)
(212) 557-0565 (fax)

**CONFIDENTIALITY NOTICE:** The information in this e-mail is attorney privileged and contains confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message and its accompanying documents is strictly prohibited. Please delete the message and notify the sender of the receipt of the message by reply. Thank you.

**Circular 230 Disclosure:** To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.